# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| SARAH J. HUNTER and DAVID N. YOUTZ, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>               v.<br><br>BOOZ ALLEN HAMILTON, INC., MISSION ESSENTIAL PERSONNEL, LLC, CACI INTERNATIONAL, INC., CACI TECHNOLOGIES LLC, and CACI TECHNOLOGIES INC.,<br><br>       Defendants. | CASE NO. 2:19-cv-00411<br><br><br>Judge George C. Smith<br><br>Magistrate Judge Chelsey M. Vascura<br><br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## FIRST AMENDED ANTITRUST CLASS ACTION COMPLAINT

TABLE OF CONTENTS

**Page(s)**

I.     SUMMARY OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE .............................................................. 2

III.   THE PARTIES.......................................................................................... 2

IV.   FACTUAL ALLEGATIONS .................................................................. 3

    A.   Trade and Commerce ...................................................................... 3

    B.   The Market for Defense Intelligence Work at JAC Molesworth................................. 5

        i.   The United States Conducts Intelligence Analysis at JAC Molesworth................ 5

        ii.  Defendants Are Leading Military Intelligence Contractors.................... 5

        iii. Defendants Conduct Intelligence Work for The Department of Defense at JAC Molesworth. ....................................................................... 6

        iv. Defendants control a dominant share of the market for the services of skilled labor at JAC Molesworth. ................................................ 8

    C.   Defendants Engaged in Unlawful Agreements Not to Hire One Another's Workers. . 9

        i.   Defendants' Unlawful Agreement Gave Them Near-Total Control over Their Employees' Lives............................................................... 11

    D.   The Purpose and Effect of The No-Poach Agreements Was to Restrain Competition and Suppress Compensation for Defendants' Skilled Employees. .......................... 13

V.     CLASS ACTION ALLEGATIONS ........................................................ 13

VI.   ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION ...................................................................................... 15

VII.  EQUITABLE TOLLING AND STATUTE OF LIMITATIONS ................................... 17

VIII. CLAIM FOR RELIEF ........................................................................... 18

IX.   DEMAND FOR JURY TRIAL ............................................................... 19

X.    PRAYER FOR RELIEF ........................................................................ 19

Pursuant to Rule 23 of the Federal Rules of Civil Procedure and S.D. Ohio Civ. R. 23, Plaintiffs Sarah J. Hunter and David N. Youtz ("Plaintiffs") file their First Amended Complaint in this antitrust class action, on behalf of themselves and all others similarly situated, against Defendants Booz Allen Hamilton, Inc., Mission Essential Personnel, LLC, CACI International, Inc., CACI Technologies LLC, and CACI Technologies Inc. (collectively "Defendants"). Plaintiffs seek treble damages and injunctive relief for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## I.  SUMMARY OF THE ACTION

1.      This civil antitrust class action seeks damages and injunctive relief for Defendants' unlawful restraint of competition in the market for the services of skilled professionals working at the Joint Intelligence Operations Center Europe ("JIOCEUR") Analytic Center ("JAC"), located at a former Royal Air Force base in Molesworth, England ("JAC Molesworth"). Defendants perform intelligence work at JAC Molesworth, each under its own separate contract with the federal government. After initially competing with one another for skilled labor, Defendants agreed not to hire one another's employees. This was an abrupt change from Defendants' prior practice, when they freely pursued skilled workers employed by the other Defendants.

2.      Prior to Defendants' unlawful agreement not to hire each other's employees, Defendants would compete to attract qualified workers at intelligence facilities such as JAC Molesworth, which requires workers to have top-secret security clearances. To have the required security clearances, employees at JAC Molesworth and other intelligence facilities must be United States citizens. It is expensive and time-consuming to bring skilled workers over from the United States. To avoid this expense, Defendants competed with one another to attract skilled and qualified employees with offers of higher pay or better benefits.

3.      Competition for skilled and qualified employees led to increased payroll costs, but Defendants' revenues remained fixed. Defendants had entered into long-term contracts under which the United States government specified the number of employees that each Defendant was

required to employ and set fixed amounts the government would pay Defendants to cover the cost of employing each worker. With labor costs rising and revenues remaining fixed, Defendants entered into illegal agreements not to hire one another's employees, which are often called "no-poach agreements." Such agreements violate the antitrust laws and suppress the compensation for skilled workers at JAC Molesworth.

4.      Defendants entered into agreements to eliminate competition among them for skilled labor. The purpose and effect of these agreements was to fix and suppress employee compensation, and to impose unlawful restrictions on employee mobility. Defendants' conspiracy and agreements restrained trade and are *per se* unlawful under federal and Ohio law. Plaintiffs therefore seek injunctive relief and damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.      JURISDICTION AND VENUE

5.      Plaintiffs bring this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.       The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331 and 1337.

7.      Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), 28 U.S.C. § 1391(b), (c), and (d), and S.D. Ohio Civ. R. 82.1 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the defendants reside in this district.

8.      Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of Ohio.

## III.      THE PARTIES

9.      Plaintiff Sarah Hunter was employed by Mission Essential from approximately April 24, 2015, to September 24, 2018. Ms. Hunter was injured in her business or property by

reason of the violations alleged herein. At all times relevant to this litigation, Ms. Hunter was and is a citizen and resident of the United States.

10.     Plaintiff David N. Youtz was employed by Mission Essential from approximately May 24, 2017, to September 24, 2018. Mr. Youtz was injured in his business or property by reason of the violations alleged herein. At all times relevant to this litigation, Mr. Youtz was and is a citizen and resident of the United States.

11.     Defendant Booz Allen Hamilton, Inc. ("Booz Allen"), is a Delaware corporation with its principal place of business at 8283 Greensboro Drive, McLean, Virginia, 22102. Booz Allen is a wholly-owned subsidiary of Booz Allen Hamilton Holding Corporation.

12.     Defendant Mission Essential Personnel, LLC ("Mission Essential") is an Ohio limited liability corporation with its principal place of business at 6525 West Campus Oval, Suite 101, New Albany, Ohio 43054, and offices at 13880 Dulles Corner Lane, Suite 400, Herndon, Virginia 20171.

13.     Defendant CACI International Inc. is a Delaware corporation with its principal place of business at 1100 North Glebe Road, Arlington, Virginia, 22201.

14.     Defendant CACI Technologies LLC is a Virginia limited liability company with its principal place of business at 1100 North Glebe Road, Arlington, Virginia, 22201. CACI Technologies LLC is a wholly-owned subsidiary of CACI International Inc.

15.     Defendant CACI Technologies Inc. is a Virginia corporation with its principal place of business at 1100 North Glebe Road, Arlington, Virginia, 22201. CACI Technologies Inc. is a wholly-owned subsidiary of CACI International Inc. (CACI Technologies Inc., CACI International Inc. and CACI Technologies LLC, collectively, "CACI.")

## IV.     FACTUAL ALLEGATIONS

### A.     Trade and Commerce

16.     Defendants conduct intelligence work at JAC Molesworth funded by the Defense Intelligence Agency ("DIA"), a branch of the United States Department of Defense ("DoD"), and provide military intelligence to the DoD. The work is carried out pursuant to contracts executed in

the United States between the federal government and Defendants, all of which are United States corporations. Defendants are required by Executive Order 12968 to hire only United States citizens to work under these contracts. The intelligence work is a product the federal government purchases from United States corporations that can only employ United States citizens.

17.     Neither the United Kingdom nor any other foreign nation pays Defendants for military intelligence gathered at JAC Molesworth. No foreign nation or entity has any contractual relationship with Defendants relating to the work performed at JAC Molesworth. No foreign citizens are employed by Defendants to conduct intelligence work at JAC Molesworth. Defendants provide intelligence solely to the United States government. Plaintiffs and the Class members receive compensation solely from United States corporations.

18.     From at least January 1, 2015, to the present (the "Class Period"), Defendants employed Class members from throughout the United States, including from this judicial district. The intelligence work at issue in this litigation is carried out pursuant to contracts between the Virginia Contracting Activity, the contracting arm of the Defense Intelligence Agency ("DIA"), located in Washington, D.C., and Defendants, which are private companies headquartered in Virginia and Ohio and with operations throughout the United States. After Plaintiffs and the Class members signed their employment contracts with Defendants, they, their families, and their possessions were relocated to England, with a significant portion of this work taking place in the channels of interstate commerce and carried out by companies operating throughout the United States.

19.     Although Plaintiffs and the Class members are located in England while working for Defendants, they are not considered residents of England or the United Kingdom under the NATO Status of Forces Agreement ("SOFA"), which covers United States civilians working in support of the United States Military. Under the NATO SOFA, Plaintiffs' and the Class members' compensation is not subject to English taxation. Plaintiffs and the Class members are not treated as residents of or domiciled in the United Kingdom. They are paid in United States Dollars, the lawful currency of the United States, the country in which they reside. Plaintiffs' and class

members' pay is subject to taxation by the Internal Revenue Service under the United States Tax Code, subject to certain exclusions, and Defendants issue Internal Revenue Service Form W-2 to them. Defendants, which are all incorporated under the laws of the United States, direct and transmit compensation to banks and other financial institutions located in the United States, where Plaintiffs and Class members deposit, maintain, and invest their income. Defendants' payments to Plaintiffs and the Class members has a direct, substantial and reasonably foreseeable effect on United States wage earners, and hence on domestic commerce in the United States. This domestic effect has 'given rise to' the Sherman Act claim.

### B.  The Market for Defense Intelligence Work at JAC Molesworth.

#### i.  The United States Conducts Intelligence Analysis at JAC Molesworth.

20.    The British Royal Air Force established an air base at Molesworth, approximately 70 miles north of London, in 1917. The Royal Air Force flew missions out of Molesworth in the First and Second World Wars. In 1942, fighter planes from the United States Army Air Forces (as it was then known) were stationed at Molesworth and flew the first United States bombing sorties over Europe in the Second World War. The United Kingdom and the United States based various operations out of Molesworth from the 1950s through the 1980s, and the facilities briefly housed nuclear-armed cruise missiles in the 1980s. The United States moved a joint intelligence operations center to Molesworth in 1992. Soon thereafter, the collection and analysis of military intelligence would undergo a fundamental change because the United States government increasingly relied on private contractors to conduct military intelligence work. Defendants have conducted intelligence work at JAC Molesworth since at least 2013.

#### ii.  Defendants Are Leading Military Intelligence Contractors.

21.    Defendants are among the top contractors performing military intelligence work for the United States government.

a.    Booz Allen was founded in 1914. The company began performing defense contract work in or around 1940, including advising the Secretary of the Navy in preparation for, and in fighting, World War II. Booz Allen currently employs approximately 24,600 people,

approximately 69% of whom have security clearances. Booz Allen derives 97% of its revenue from contracts with or for the United States government, with 24.2% of its revenues—$1.49 billion—coming specifically from intelligence work.

      b.     CACI was founded in 1962 as California Analysis Center, Inc., which was eventually changed to CACI International, Inc. CACI had revenues of $4.5 billion in fiscal year 2018, with 93.5% attributable to work performed for the United States government, and 66.6% from DoD contracts. CACI employs approximately 18,800 employees.

      c.     Mission Essential was founded in 2004 as a recruiter for linguists, primarily for the Iraq war. The company grew quickly, winning a $703 million contract to provide linguists for Afghanistan in 2007. In 2010, Mission Essential began providing intelligence services to the government. In 2013 (the last year for which statistics are available), Mission Essential enjoyed $565 million in revenue.

22.     As the DIA increasingly turned to private contractors for military intelligence analysis and support in the wake of the terrorist attacks of September 11, 2001, Defendants were brought in to conduct intelligence analysis at JAC Molesworth. Defendants have been performing intelligence analysis at JAC Molesworth since at least in or around 2013, when each of the Defendants was awarded a contract to perform intelligence work at JAC Molesworth.

### iii. Defendants Conduct Intelligence Work for The Department of Defense at JAC Molesworth.

23.     By 2016, the United States' budget for intelligence had grown to $70.7 billion, of which $17.7 billion was for military intelligence. The Military Intelligence Program budget request for fiscal year 2018 was $22.1 billion. By some estimates, as much as 70% of the United States intelligence budget goes to private contractors. The stakes are high for private contractors working for the government. For example, between 2008 and 2018, annual revenues for Booz Allen nearly doubled from $3.63 billion to $6.17 billion. Similarly, annual revenues for CACI also nearly doubled, from $2.42 billion in 2008 to $4.47 billion in 2018.

24.     Defendants (and defense contractors generally) typically sign two types of contracts with the U.S. government. First, they sign an umbrella contract covering a general area of work (*e.g.*, military intelligence analysis), usually for a duration of four to six years. These contracts, known as Indefinite Duration/Indefinite Quantity ("IDIQ") contracts, enable the contractors to bid on individual projects known as "task orders" that fall under the auspices of the umbrella contract. In or around 2012, all three of the Defendants executed IDIQ contracts with the federal government to provide intelligence services and support under the government's Solutions for Intelligence Analysis II ("SIA II") program. SIA II authorized up to $5.6 billion in defense intelligence spending. SIA II was the successor to SIA I, under which IDIQ contracts covering the years 2007-2012 with an initial estimated value of up to $1 billion were awarded. Plaintiffs are informed and believe that beginning as early as 2007 Defendants signed IDIQ contracts for military intelligence work at JAC Molesworth under SIA I as well.

25.     Once a defense contractor has executed an IDIQ contract, it can bid on DIA requests for proposals to provide specific products or services under the IDIQ umbrella contracts, known as "Task Orders." On information and belief, each of the Defendants executed a Task Order for a discrete project at JAC Molesworth. Thus, while they were working more or less side by side, they were not working on the same projects or under the same IDIQ contracts or Task Orders.

26.     For example, on September 24, 2013, Mission Essential executed a task order to "provide intelligence analysis and analytical support services" to the federal government at JAC Molesworth.[1] The period of performance was for one year plus four option years, ending on September 24, 2018. Each of the four option years was exercised by the federal government. The task order included several projects, including providing counter-terrorism analysis, counterintelligence analysis, and general analytic support, as well as several projects related to specific geographic areas or military commands. The Task Order specifies the number of

---

[1] *See* contract no. HHM402-12-D-0015, available for download at http://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Contracts/.

employees and the requisite level of experience and training for each employee. For example, the Task Order specifies that the counterterrorism project would employ 53 "All Source Analysts," including five Junior Level analysts, forty-two Mid-level analysts, and six Senior Level analysts. In total, the Task Order authorizes 119 analysts and managers for Mission Essential's JAC Molesworth work. The Task Order also sets the amount the government will pay Mission Essential to cover compensation costs for employees at each level of experience and training. The Task Order requires Mission Essential to perform to the standards set forth in the contract, but also states, "[t]he Government shall not exercise any supervision or control over the service providers performing the services herein."

27.     Similarly, Booz Allen executed a task order to provide analytical and intelligence support to the United States Africa Command (USAFRICOM) at JAC Molesworth.[2] This Task Order became effective on September 29, 2014, and is scheduled to be completed on September 28, 2019. The Task Order specifies the levels of experience and training required for each position and the amount of compensation the government will pay to Booz Allen for each employee, based on the experience and training levels. The Task Order authorizes Booz Allen to hire eighty-one analysts and managers to work on the USAFRICOM assignment.[3]

### iv.     Defendants Control A Dominant Share of The Market for The Services of Skilled Labor at JAC Molesworth.

28.     Defendants have been the only non-military employers with contracts with the United States government to conduct military intelligence work a JAC Molesworth since at least 2013. Thus, they controlled 100% of the relevant market throughout the Class period. Because there were no other market participants, Defendants' unlawful agreement not to compete with one another eliminated all competition in the market for skilled labor at JAC Molesworth. There were

---

[2] *See* contract no. HHM402-12-D-0008 to 3, available for download at http://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Contracts/.
[3] Although Plaintiffs do not possess a copy of the Task Order authorizing CACI to work at JAC Molesworth, Plaintiffs have personal knowledge that CACI has carried out intelligence work at JAC Molesworth since at least 2015 and that CACI continues to do so.

approximately 300 skilled workers employed by Defendants at JAC Molesworth during the relevant period.

**C. Defendants Engaged in Unlawful Agreements Not to Hire One Another's Workers.**

29.     Competition for qualified workers at JAC Molesworth by Defendants was robust when Defendants began performing intelligence work there. The incentive to hire workers away from competitors at JAC Molesworth was strong: the workers had valuable experience and skill sets relevant to the work, and they were already in England (whereas relocating workers from the United States to England could cost as much as $30,000 each way). For a time, workers moved freely between Defendants.

30.     To increase their profits, Defendants entered into illegal agreements to fix and maintain compensation for skilled labor at JAC Molesworth at artificially low levels. At a time known only to Defendants, but no later than January 1, 2015, Defendants entered into express agreements—collectively between all three, and individually each with each other—not to hire one another's employees working at JAC Molesworth. The agreements are still in force to this day.

31.     The illegal no-poach agreements prevented Plaintiffs and Class members from seeking better-paid employment opportunities with other Defendants at JAC Molesworth.

32.     For example, when Booz Allen invited Mission Essential workers to a job fair at JAC Molesworth on August 14, 2018, Mission Essential supervisor Ryan LaFleur sent a group email to a list of Mission Essential employees stating, "[i]n regards to the BAH Job Fair on the 14th, if you are an MEP employee, DO NOT go. The no poaching agreement is still in place so they are not allowed to talk to you." (Emphasis in original.) The day of the job fair, another Mission Essential supervisor, Daniel Gollan, sent an email purporting to allow Mission Essential workers to attend the job fair, but warning, "[w]hile you are welcome to attend if you so choose, it is important to be aware that Booz Allen will likely direct you back to Mission Essential for any transition related discussions."

33.     Plaintiff Sarah Hunter spoke with a Booz Allen recruiter near the end of August 2018, after it became clear that Mission Essential would be laying workers off when its Task Order expired on September 24, 2018. Though the recruiter showed interest at first, Ms. Hunter was told soon thereafter that she had not been hired.

34.     A few weeks later, on September 7, 2018, Mission Essential's senior recruiting specialist Mark Hellard, whose office is located at Mission Essential's headquarters in New Albany, Ohio, confirmed to Ms. Hunter that Mission Essential had a no-poach agreement with Booz Allen. Ms. Hunter applied for positions with Booz Allen at JAC Molesworth, but she was not offered a position even though she was well-qualified. Defendants confirmed to Ms. Hunter that that the reason she was not hired was because Defendants would not violate the no-poach agreements they had with each other.

35.     Similarly, Plaintiff David Youtz applied for a position at CACI and several positions at Booz Allen in or around September 2018. Mr. Youtz did not receive an offer, despite his experience and positive performance evaluations. Instead, Mr. Youtz received an email from Mike Shilen, a talent acquisition advisor for CACI located in Oklahoma City, that "CACI is unable to bring over personnel that were on the contract with Booz and MEP."

36.     At the same time, Defendants, including Booz Allen, were horizontal competitors actively hiring intelligence workers at JAC Molesworth—just not from Mission Essential or CACI. Defense contractors, including Defendants, frequently hire workers from subcontractors to fill positions they could not otherwise fill. At JAC Molesworth, because their employers were not parties to the no poach agreements, those workers were and are frequently hired by Defendants over workers from their co-conspirators, even when the co-conspirators' workers, like Plaintiffs, are better qualified for the work by virtue of their training, experience, and industry recognition.

37.     Defendants' decisions not to hire workers from their co-conspirators at JAC Molesworth succeeded in suppressing compensation for skilled labor at JAC Molesworth.

38.      Studies have shown that enforcement of non-compete clauses—a practice similar in effect to no-poach agreements[4]—leads to lower initial wages and lower wage growth,[5] and can have the effect of suppressing wages across an entire market, particularly where—as here—the businesses enforcing the non-competes are concentrated within a particular geographic area.[6]

### i.      Defendants' Unlawful Agreement Gave Them Near-Total Control over Their Employees' Lives.

39.      Plaintiffs and all or nearly all Class members were hired while living in the United States. Once a prospective worker signs a contract with Defendants, he or she must prepare to move to England for a period likely to last at least one year. While Defendants are required under the Federal Acquisition Regulation to pay the costs of moving to England, the move is still extremely disruptive. The workers frequently have to sell their houses or break their leases, and they must often sell or make arrangements to store their cars and other large possessions. Many are reservists who give up opportunities for advancement when they leave for England. The workers' spouses must often leave their stateside jobs, and their children must leave their schools, friends, and relatives behind.

40.      Once in England, workers depend on their job status to maintain their work visas, which expire within 30 days if the workers leave their jobs. Defendants are only required to pay relocation expenses back to the United States if the workers have fulfilled certain time requirements, usually two years. So if a worker leaves his or her job, he or she will have to return

---

[4] *See* Alan Kreuger, *The Rigged Labor Market*, Milken Institute Review, April 28, 2017, available for download at http://www.milkenreview.org/articles/the-rigged-labor-market ("New practices have emerged to facilitate employer collusion, such as noncompete clauses and no-raid pacts [*i.e.*, no-poach agreements], but the basic insights are the same: employers often implicitly, and sometimes explicitly, act to prevent the forces of competition from enabling workers to earn what a competitive market would dictate, and from working where they would prefer to work").

[5] *See e.g.*, Natarajan Balasubramanian et al., *Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers*, available at webuser.bus.umich.edu/jagadees/papers/noncompete/Locked%20In_June_fin_ES.pdf, ("stricter CNC [covenants not to compete] enforceability is associated with lower wages, both one year into the job and throughout the employee's tenure"); *id*. at 35 ("outcomes for workers from high CNC enforceability may be similar to those due to labor market collusion under oligopsony").

[6] *See* U.S. Council of Economic Advisers Issue Brief, *Labor Market Monopsony: Trends, Consequences, and Policy Responses*, October 2016, at 4-5 ("Collusion is more likely to occur when . . . a geographic area is dominated by a single industry with a few firms and the workforce has specialized skills that cannot easily be applied in other industries.") (available at https://obamawhitehouse.archives.gov/administration/eop/cea/factsheets-reports).

to the United States within 30 days, and will have to pay the relocation expense. Moreover, some of workers' pay earned overseas is excluded from taxation, provided they reside outside the United States for at least 330 days out of a twelve-month period. If a worker leaves his or her overseas job prematurely, he or she will be obligated to pay taxes on their compensation. Not only is this a substantial *de facto* pay cut, it also requires the worker to pay potentially tens of thousands of dollars the worker may not have in savings.

41.     These factors, combined with Defendants' unlawful agreement not to hire one another's workers, gave Defendants a great deal of leverage over Plaintiffs and Class members. Many employees learned upon arrival at JAC Molesworth that they would not be performing the job they had been hired for and had been reassigned to a different role. But if a worker was unsatisfied with his or her job, compensation, or treatment at the hands of Defendants, there were no options. Even quitting was out of the question because the worker would have to pay relocation expenses, which can cost as much as $30,000, plus any taxes owed on the compensation received, meaning the out-of-pocket expense of quitting can be $40,000 or more. For a typical intelligence worker at JAC Molesworth, this expense was prohibitive. This is especially so when the only other employers offering the kind of employment for which workers are trained have agreed not to hire the workers.

42.     Once in England, Plaintiffs and the Class members were essentially Defendants' captives. Defendants knew this, and Defendants unlawfully exploited their power over workers. This made Defendants' illegal agreements even more profitable. Workers had few options once they signed their agreements with Defendants, absent another employer willing to hire them. When Plaintiffs and the Class members signed their employment contracts, they had no way of knowing that, despite being at-will employees who could be let go at any moment by their employers, they would be unable to seek opportunities on the open market.

###### D. The Purpose and Effect of the No-Poach Agreements Was to Restrain Competition and Suppress Compensation for Defendants' Skilled Employees.

43. After a period during which Defendants had competed with one another for the services of skilled labor at JAC Molesworth that led to rising labor costs for Defendants, and faced with fixed revenues from their government contracts, Defendants entered into no-poach agreements with one another, which eliminated competition for skilled labor at JAC Molesworth. These agreements had the purpose and effect of restraining competition for the services of Plaintiffs and the Class members.

44. The no-poach agreements had demonstrable classwide impact because Plaintiffs and the Class members were paid according to their level of experience. The Task Orders set out the number of employees each contractor was required to hire for each position and each skill level. For example, Mission Essential's 2013 Task Order for JAC Molesworth sets forth the exact number of Junior Level, Mid-level, and Senior Level analysts and managers required for each project on the Task Order. The Task Orders also set forth the amount the government would pay Defendants for employees at each level of experience. These external limits on funds available for compensation, based solely on the level of experience, created strong pressure for Defendants to pay employees with similar experience the same compensation, thus establishing internal pay equity. Defendants were limited as to how much they could profitably pay their skilled workers by the amount of compensation they received from the federal government, meaning that all skilled workers' compensation for each position and level of experience moved in parallel within a very limited range.

## V.     CLASS ACTION ALLEGATIONS

45. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons employed by Defendants at JAC Molesworth during the Class Period from January 1, 2015 through the present (the "Class Period"). Excluded from the Class are: corporate officers, members of the boards of directors, and senior executives of Defendants who entered into the illicit agreements alleged

herein; employees of the United States government employed at JAC Molesworth during the Class Period; and any and all judges and justices, and chambers' staff, assigned to hear or adjudicate any aspect of this litigation.

46.     Plaintiffs do not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendants. Based upon the nature of the trade and commerce involved, Plaintiffs believe that there are approximately 300 members of the Class, and that Class members are geographically dispersed throughout this district, the United States, and England. Joinder of all Class members, therefore, is not practicable.

47.     The questions of law or fact common to the Class include but are not limited to:

a.     whether the conduct of Defendants violated the Sherman Act;

b.     whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act;

c.     whether Defendants fraudulently concealed their conduct;

d.     whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for skilled labor among Defendants;

e.     whether Plaintiffs and the Class suffered antitrust injury or were threatened with injury;

f.     the difference between the total compensation Plaintiffs and the Class received from Defendants, and the total compensation Plaintiffs and the Class would have received from Defendants in the absence of the illegal acts, contracts, combinations, and conspiracy alleged herein; and

g.     the type and measure of damages suffered by Plaintiffs and the Class.

48.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

49.     Plaintiffs' claims are typical of the claims of the Class.

50.     Plaintiffs will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

14

51.     Plaintiffs have retained competent counsel experienced in antitrust litigation and class action litigation to represent them and the Class.

52.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

53.     This class action is superior to the alternatives for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action. By contrast, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendants.

## VI.     ANTICOMPETITIVE EFFECTS AND LACK OF PROCOMPETITIVE JUSTIFICATION

54.     The Conspiracy substantially reduced competition for labor. Defendants and the co-conspirators entered into, implemented and policed these agreements with the knowledge of the overall Conspiracy, and did so with the intent and effect of fixing, restraining and stabilizing the compensation paid to their personnel at artificially low levels.

55.     The harm not only reached individuals who sought to change their employment from one Defendant to another, but also extended to those who had no intention of changing from one Defendant to another, due to, inter alia, the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency.

56.     These anticompetitive effects were not outweighed by any procompetitive benefits. The no-poach agreements did not provide the government with a better product, save the government money, or create efficiencies that improved the functioning of the market.

57.     While the Conspiracy constitutes a *per se* violation of the Sherman Act, Defendants and unnamed co-conspirators also exploited their collective market power in the relevant market, which is the market for skilled labor at JAC Molesworth.

58.     Through their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefits, and other aspects of compensation and eliminate competition.

59.     The Conspiracy and the conduct of Defendants and their agents and coconspirators in furtherance thereof did not have procompetitive effects and were not intended to have procompetitive effects. The Conspiracy and the conduct of Defendants and their agents and coconspirators in furtherance thereof had substantial anticompetitive effects, including, but not limited to, eliminating competition, preventing Plaintiffs and the Class members from obtaining employment and earning compensation in a competitive market, reducing compensation, and preventing or limiting employment opportunities and choice with respect to such opportunities. The anticompetitive effects outweighed any procompetitive benefits of the Conspiracy.

60.     In the alternative, Defendants are liable under a "quick look" analysis where one with even a rudimentary understanding of economics could conclude that the arrangements and agreements alleged would have an anticompetitive effect on class members and markets.

61.     In the alternative, Defendants are liable under a Rule of Reason analysis because their unlawful Conspiracy , among other things, reduced compensation and restrained competition in the market for the services of skilled professionals at JAC Molesworth, and any procompetitive effects that may have resulted from the Conspiracy and/or the conduct of Defendants and their agents and co-conspirators in furtherance thereof were and are outweighed by the anticompetitive harm alleged herein, including, but not limited to, restricting employee mobility and suppressing wages, benefits, and other aspects of compensation.

62.     Defendants' no-poach agreements did not create any efficiencies that allowed them to provide a better product to the government. Indeed, once Defendants' stopped competing with one another for the best intelligence analysts and other skilled labor, the quality of the work likely declined. Nor did the agreements allow Defendants to compete on price better. The amounts Defendants receive to cover compensation costs for intelligence workers are set by the government, and, on information and belief, the no-poach agreements were put into effect after

the contracts had already been signed in 2013. Thus, the only benefit to be derived from suppressing compensation for Plaintiffs and the Class members was increased profits due to lower costs for Defendants. Defendants' ill-gotten gains, achieved through illegal means and at the expense of Plaintiffs and the Class members, are not a benefit the antitrust laws are designed to confer. There are no pro-competitive benefits to be gained through these illegal no-poach agreements.

## VII.    EQUITABLE TOLLING AND STATUTE OF LIMITATIONS

63.    While Plaintiffs had knowledge of aspects of Defendants' and industry recruiting practices, Plaintiffs had neither actual nor constructive knowledge of Defendants' unlawful conspiracy until, at the earliest, August 13, 2018, when Mission Essential supervisor Ryan LaFleur sent employees an email stating, "[t]he no poaching agreement is still in place so they [Booz Allen] are not allowed to talk to you." Nor did Plaintiffs have any reason to suspect that Defendants were illegally acting in concert to suppress wages and the labor market. At no point did Defendants inform Plaintiffs that their compensation was not competitive but was instead suppressed by Defendants' anticompetitive agreements. Plaintiffs therefore did not know of, did not discover, and could not have discovered through reasonable diligence, the existence of the conspiracy outlined in the foregoing allegations.

64.    Conspiracies, by their nature, must be concealed. To keep the conspiracy hidden from those it affected most—their employees and prospective employees—Defendants and their co-conspirators did not publicize their no-poach agreements.

65.    Defendants also concealed the fraud by giving false and pretextual explanations for hiring and compensation decisions, including that the decisions were based on merit, the operation of free and open competition, and other considerations, instead of pursuant to an unlawful agreement.

66.    As a result of Defendants' and their co-conspirators' successful efforts to conceal the fact and scope of the Conspiracy, the running of any applicable statute of limitations has been tolled with respect to Plaintiffs' claims concerning Defendants' conspiracy.

## VIII.   CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act § 1 15 U.S.C. § 1)
### (Alleged against all Defendants)

67.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further allege against Defendants and each of them the allegations below.

68.     Defendants entered into and engaged in unlawful agreements in restraint of the trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Beginning at a time known only to Defendants, but no later than January 1, 2015, and continuing through the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

69.     Defendants' agreements have included concerted action and undertakings among the Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

70.     As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the Class have suffered injury to their property in the United States and have been deprived of the benefits of free and fair competition on the merits.

71.     The unlawful agreements among Defendants have had the following direct, substantial, and reasonably foreseeable effects, among others:

     a.   competition in the United States among Defendants for skilled labor has been suppressed, restrained, and eliminated;

     b.   Plaintiffs and class members have, as a direct and proximate result, received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful agreements, and, as a result, have been

injured in their property and have suffered damages in an amount according to proof at trial.

72.     The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

73.     Defendants' contracts, combinations and/or conspiracies are per se violations of Section 1 of the Sherman Act.

74.     Accordingly, Plaintiffs and members of the Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## IX.     DEMAND FOR JURY TRIAL

Plaintiffs and class members hereby demand a trial by jury on all applicable claims to the maximum number of jurors permitted by law.

## X.     PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class defined herein, by adjudging and decreeing that:

a.     This action may be maintained as a class action, with Plaintiffs serving as the Class Representatives for the Class, and with Plaintiffs' counsel as Class Counsel for the Class;

b.     Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

c.     The alleged combinations and conspiracy are *per se* violations of the Sherman Act;

d.       Defendants are enjoined from attempting to enter into, entering into, maintaining, or enforcing any no-poach agreement, or other illegal anticompetitive agreement or understanding, as alleged herein;

e.       Judgment be entered for Plaintiffs and the Class members, and against Defendants, for three times the amount of damages sustained by Plaintiffs and the Class, as allowed by law;

f.       Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.       Plaintiffs and the Class recover their costs of suit, including attorneys' fees, as provided by law; and

h.       Plaintiffs and the Class are entitled to such other and further relief as is just and proper under the circumstances.

/s/ Shawn K. Judge_____
Shawn K. Judge (0069493), Trial Attorney
sjudge@isaacwiles.com
Mark H. Troutman (0076390)
mtroutman@isaacwiles.com
Gregory M. Travalio (0000855)
gtravalio@isaacwiles.com
ISAAC WILES BURKHOLDER & TEETOR, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 432015
Telephone: (614) 221-2121
Facsimile:  (614) 365-9516


Joseph R. Saveri (admitted *pro hac vice*)
jsaveri@saverilawfirm.com
Steven N. Williams (admitted *pro hac vice*)
swilliams@saverilawfirm.com
Kevin Rayhill (admitted *pro hac vice*)
krayhill@saverilawfirm.com
JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile:  (415) 395-9940



*Attorneys for Plaintiffs Sarah J. Hunter and David N. Youtz*

C:\Users\llabair\Desktop\2019-05-03 DODNP First Amended Complaint FINAL.docx