UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SARAH J. HUNTER** and
**DAVID N. YOUTZ,** on behalf of
themselves and all others similarly
situated

    **Plaintiffs,**

  v.

**BOOZ ALLEN HAMILTON, INC.,**
*et al.*,

    **Defendants.**

Case No. 2:19-cv-411
**JUDGE GEORGE C. SMITH**
**Magistrate Judge Chelsey M. Vascura**

## OPINION & ORDER

Currently pending before the Court is Defendants Booz Allen Hamilton, Inc. ("Booz Allen"), Mission Essential Personnel, LLC ("Mission Essential"), and CACI International, Inc. and CACI Technologies LLC's (separately and as successor to CACI Technologies, Inc.) (collectively, "CACI" and with Booz Allen and Mission Essential, "Defendants") Motion to Dismiss the Amended Complaint (Doc. 30). Plaintiff responded (Doc. 33) and Defendants replied (Doc. 34). Accordingly, this matter is ripe for review. For the reasons stated below, Defendants' Motion to Dismiss the Amended Complaint (Doc. 30) is **DENIED**.

### I.   BACKGROUND

On February 7, 2019, named Plaintiff Sarah J. Hunter ("Hunter") on behalf of herself and a putative class, commenced this action by filing a one-count proposed class action complaint. (*See generally* Doc. 1, Compl.). On May 3, 2019, named Plaintiff David N. Youtz ("Youtz") (with Hunter "Plaintiffs") joined this action, and the Plaintiffs filed a one-count proposed class action

Amended Complaint, alleging Defendants violated the Sherman Act, 15 U.S.C. § 1. (Doc. 28, Am. Compl. ¶¶ 67–74). As this matter is before the Court on Defendants' Motion to Dismiss, the allegations in the Amended Complaint are taken as true and are as follows:

## A. DIA Background

The Defense Intelligence Agency ("DIA"), an agency within the United States Department of Defense ("DOD"), provides military intelligence for the DOD. Much of the DIA's work is performed or completed by contractors. (*See* Doc. 28, Am. Compl. ¶¶ 16, 23). DIA contractors conduct intelligence analysis and provide the DIA with intelligence reports. (*See id.*). And per Executive Order 12968, DIA contractors must hire only United States citizens to perform DIA contracts. (*Id.*).

DIA contracting generally is conducted through indefinite delivery/indefinite quantity contracts ("IDIQs"). (*Id.* ¶ 24). IDIQs are overarching contracts with the DOD that span for long durations and that allow a contractor to bid on specific task orders. (*Id.* ¶¶ 24–25). The task orders include "several projects, including providing counter-terrorism analysis, counterintelligence analysis, and general analytic support, as well as several projects related to specific geographic areas of military commands." (*Id.* ¶ 26). Further, "[t]he Task Order specifies the number of employees and requisite level of experience and training for each employee." (*Id.*).

## B. Factual Allegations

Defendants are DIA contractors that currently operate out of the Joint Intelligence Operations Center, Europe Analytic Center located at a former British Royal Air Force base in Molesworth, England ("JAC Molesworth"). (Doc. 28, Am. Compl. ¶¶ 16–17). Defendants have been DIA contractors since at least 2013 and have been the sole DIA contractors at JAC Molesworth since that same year. (*Id.* ¶ 28). "Booz Allen derives 97% of its revenue from

contracts with or for the United States government[;]" while 93.5% of CACI's revenues are "attributable to work performed for the United States government, and 66.6% from DoD contracts." (*Id.* ¶¶ 21a, 21b). And, in 2013, Mission Essential grossed a revenue of $565 million. (*Id.* ¶ 21c).

Defendants would hire United States citizens to work on specific DIA task orders, as required by Executive Order 12968. (*Id.* ¶¶ 16, 17). Hiring a United States citizen who lived within the United States was costly and would take time as the individual would need to get his or her stateside affairs in order prior to departing to England. Moving to England would cost an individual approximately $30,000. (*See id.* ¶ 29). As such, DIA contractors would regularly seek to hire United States citizens already living in Molesworth, England. (*Id.*). However, despite the fact that Plaintiffs and the putative class members lived in England while they worked for the Defendants, they were not considered residents of the United Kingdom. (*Id.* ¶ 19). Plaintiffs and the putative class members received their paychecks in United States Dollars and were subject to U.S. tax laws, subject to certain exclusions. (*Id.*).

For several years, Defendants would compete against each other to hire employees of each other, thus creating "robust" competition for the skilled workers already at JAC Molesworth. (*Id.*). However, "[a]t a time known only to Defendants, but no later than January 1, 2015, Defendants entered into express agreements—collectively between all three, and individually each with each other—not to hire one another's employees working at JAC Molesworth." (*Id.* ¶ 30). These no-poach agreements "prevented Plaintiffs and Class members from seeking better-paid employment opportunities with other Defendants at JAC Molesworth." (*Id.* ¶ 31). For example, on August 14, 2018, "Mission Essential supervisor Ryan LaFleur sent a group email to" several "Mission Essential employees stating, '[i]n regards to the [Booz Allen] Job Fair on the 14th, if you are a

3

[Mission Essential] employee, DO NOT go. The no poaching agreement is still in place so they are not allowed to talk to you." (*Id.* ¶ 32) (emphasis in original).

In August 2018, Hunter spoke with a recruiter from Booz Allen, when it became evident that Mission Essential was laying off employees. (*Id.* ¶ 33). The recruiter initially appeared interested in Hunter, but, ultimately, Hunter was not hired. (*Id.*). On September 7, 2018, Mark Hellard, Mission Essential's senior recruiting specialist, confirmed that Mission Essential has a no-poach agreement with Booz Allen at JAC Molesworth. (*Id.* ¶ 34). And "Defendants confirmed to Ms. Hunter that that [sic] the reason she was not hired was because Defendants would not violate the no-poach agreements they had with each other." (*Id.*).

In or around September 2018, Youtz applied for a position at CACI and several openings at Booz Allen. (*Id.* ¶ 35). Youtz, however, "did not receive an offer, despite his experience and positive performance evaluations." (*Id.*). Rather, Youtz received an email from a CACI talent acquisition advisor that "CACI is unable to bring over personnel that were on the contract with Booz [Allen] and [Mission Essential]." (*Id.*). Further, these no-poach agreements did not only affect workers who sought to transfer between the Defendants; it "also extended to those who had no intention of changing from one Defendant to another, due to . . . the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency." (*Id.* ¶ 55). Plaintiffs assert these no-poach agreements are still currently in effect. (*Id.* ¶ 30).

C. **Procedural History**

This action was commenced on February 7, 2019, and on May 3, 2019, Plaintiffs filed an Amended Complaint alleging that Defendants violated the Sherman Act. Defendants have jointly filed a Motion to Dismiss the Amended Complaint asserting that Plaintiffs have failed to state a claim upon which relief can be granted. (*See generally* Doc. 30, Mot. to Dismiss). Alternatively,

4

Defendants assert that the Court limit the applicable start time to Plaintiffs' claim to no earlier than July 2017, as Plaintiffs have failed to allege facts of a no-poach agreement prior to such time. (*Id.* at 28–31). Plaintiffs replied that: 1) they have sufficiently alleged a Sherman Act violation claim; and 2) they have adequately alleged a Sherman Act violation dating back to January 2015. (*See generally* Doc. 33, Pl. Opp'n). Defendants replied. (*See generally* Doc. 34, Reply). This matter is ripe for disposition.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12 authorizes dismissal of a suit or claim for "failure to state claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, the complaint must allege sufficient facts to state claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 578 (2009). In considering a Rule 12(b)(6) motion to dismiss, the court construes the compliant in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Nonetheless, a court must read Rule 12(b)(6) in conjunction with Federal Rule of Civil procedure 8(a), requiring a short and plain statement of the claim showing that the plaintiff is entitled to relief. *Ogle v. BAC Home Loans Servicing LP*, 924 F Supp. 2d 902, 907 (S.D. Ohio 2013). Thus, the pleading's factual allegations assumed to be true, must do more than create mere speculation or suspicion of a legally cognizable claim; they must show entitlement to relief. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Further, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 662.

As such, while a plaintiff is not required to set forth detailed factual allegations at the pleading stage, the complaint must contain a basis upon which relief can be granted; a recitation of facts intimating the "mere possibility of misconduct" will not suffice. *See id.* at 679; Fed. R. Civ. P. 8(a).

### III. DISCUSSION

In their Motion to Dismiss, Defendants assert that the Amended Complaint should be dismissed because the Foreign Trade Antitrust Improvements Act ("FTAIA") bars application of the Sherman Act to the case at bar because Plaintiffs complain of an injury that affects solely foreign commerce.[1] (Doc. 30, Mot. to Dismiss at 10–15). Defendants next argue that Plaintiffs have failed to plead either a per se violation of the Sherman Act or an antitrust claim under the rule of reason. (*Id.* at 15–28). Lastly, Defendants argue that if the Court determines that Plaintiffs have sufficiently pleaded a Sherman Act violation then the Court should limit the relevant time period to begin, at the earliest, in July 2017. (*Id.* 28–31). Plaintiffs oppose dismissal and assert: 1) the FTAIA is inapplicable as their claim involves domestic commerce; 2) they have sufficiently asserted a Sherman Act claim against the Defendants; and 3) they have sufficiently alleged a conspiracy dating back to January 2015. (*See generally* Doc. 33, Pl. Opp'n).

**A.  Sherman Act Claim**

The Sherman Act prohibits "every contract, combination in the form of trust or otherwise,

---

[1] The Court notes that some Circuits have addressed the applicability of the FTAIA as a jurisdictional threshold. *See Carrier Corp. v. Outokump Oyj*, 673 F.3d 430, 440 n.4 (6th Cir. 2012) (noting that some courts construe the "extraterritorial limitations as jurisdictional rather than as [an] element[] of a federal antitrust claim." (citations omitted)). The Sixth Circuit, however, has yet to decide whether courts should consider the applicability of the FTAIA as a jurisdictional question or as a substantive one. *See id.* The Court shall treat it as substantive question rather than a jurisdictional one, as Plaintiffs correctly point out, the Sixth Circuit has stated that "Congress must 'clearly' state a provision creates a jurisdictional limitation before we will treat it as one." *Gunter v. Bemis Co.*, 906 F.3d 484, 492 (6th Cir. 2018).

or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. And under the Clayton Act, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . ." 15 U.S.C. § 15. Under the Sherman Act, restraints on trade can either be vertical—those agreements made by entities at different levels of the distribution chain—or horizontal—agreements between entities made on the same level of the distribution chain.

Horizontal restraints are per se illegal and are generally characterized as "naked restraints of trade with no purpose except stifling competition," and "therefore, [are] *per se* violations of the Sherman Act." *Com-Tel, Inc. v. DuKane, Corp.*, 669 F.2d 404, 409 (6th Cir. 1982) (quoting *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir. 1978)). Sixth Circuit precedent, however, makes clear that the per se doctrine "applies 'only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive.'" *Innovation Ventures, LLC v. Custom Nutrition Labs.*, 912 F.3d 316, 340–41 (6th Cir. 2018) (quoting *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014) (quoting *Expert Masonry, Inc. v. Boone Cty., Ky.*, 400 F.3d 336, 343–44 (6th Cir. 2006))). A horizontal restraint, however, is not necessarily a naked restraint of trade and, as such, not necessarily subject to the per se doctrine. *See Innovation Ventures*, 912 F.3d at 341.

"[A]pplying the rule of reason is the default position and can be applied to horizontal restraints as well if they do not fit into existing categories of *per se* violations." *Se. Milk Antitrust Litig.*, 739 F.3d at 273. Courts use the "rule of reason" standard if an agreement's "competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint and the reasons why it was imposed." *Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "Under this rule, the factfinder weighs all of the circumstances of a case in

deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition . . . [a]ppropriate factors to take into account include . . . 'the restraint's history, nature, and effect.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885–86 (2007).

Additionally, there is a third standard, referred to as the "quick look" approach. Under this approach, courts "take a 'quick-look' where the *per se* rule is inapplicable, but the anticompetitive effects of an agreement are so obvious that 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *Blanton v. Domino's Pizza Franchising LLC*, No. 18-13207, 2019 WL 2247731, at *3 (E.D. Mich. May 24, 2019) (quoting *Cali. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999)).

Plaintiffs asserts that Defendants' alleged no-poach agreement is a horizontal restraint on trade subject to application of the per se Sherman Act violation standard. Alternatively, Plaintiffs have pleaded their claim under both the rule of reason and quick look approaches. Defendants disagree and assert that no matter the standard applied, Plaintiffs have failed to sufficiently allege a Sherman Act claim. However, determining which standard is appropriate to apply to the case at bar is not currently a determination the Court needs to make. *See Blanton*, 2019 WL 2247731, at *4 (declining "to announce a rule of analysis" prior to discovery as "[m]ore factual development [was] necessary."). Rather, the Court need only to determine whether Plaintiffs have alleged a *prima facie* Sherman Act claim. *See id.* at *1, *4–*5 (stating that the applicable standard governing a case would be decided "once all facts become known.").

To allege a Sherman Act violation, a plaintiff must assert that: 1) the defendants contracted, combined, or conspired among each other; 2) that combination or conspiracy produced adverse

8

anticompetitive effects within relevant product and geographic markets; 3) the objects of and conduct pursuant to that contract or conspiracy were illegal; and 4) the plaintiff was injured as a proximate result of that conspiracy. *Expert Masonry*, 400 F.3d at 342 (citing *Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)); *see also Am. Pan Co. v. Lockwood Mfg., Inc.*, No. C-3-06-197, 2008 WL 471685, at *8 (S.D. Ohio Feb. 15, 2008). The fourth element requires a plaintiff to plead an "antitrust injury," which is "(1) 'injury of the type the antitrust laws were intended to prevent' and (2) injury 'that flows from that which makes defendants' acts unlawful.'" *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 909 (6th Cir. 2003) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Plaintiffs claim that Defendants entered into no-poach agreements with each other and, thus, agreed to not hire the employees of the other companies. (Doc. 28, Am. Compl. ¶¶ 30, 68). Thus, the first element is satisfied. Plaintiffs have sufficiently pleaded the second element by alleging that the "[c]onspiracy substantially reduced competition for labor[,]" as it had the "effect of fixing, restraining and stabilizing the compensation paid to their personnel at artificially low levels." (*Id.* ¶ 54). Further, Plaintiffs allege: "The harm not only reached individuals who sought to change their employment from one Defendant to another, but" also affected those who did not intend to transfer from Defendant to another as "the companies' efforts to maintain internal equity in their compensation structures, as well as the reduction of transparency." (*Id.* ¶ 55). Plaintiffs also allege that, by conspiring with one another, the "Defendants exercised and maintained" the collective market power in the relevant market, and suppressed "wages, benefits and other aspects of compensation and eliminate[d] competition." (*Id.* ¶ 58). Lastly, Plaintiffs alleged that Defendants controlled "100% of the relevant market" at JAC Molesworth. (*Id.* ¶ 28).

Turning to the third element, Plaintiffs have alleged that the object of Defendant's

9

conspiracy was illegal by asserting: "Defendants . . . entered into, implemented, and policed [the no-poach] agreements with the knowledge of the overall Conspiracy, and *did so with the intent and effect of fixing, restraining and stabilizing the compensation paid to their personnel at artificially low levels*." (*Id.* ¶ 54) (emphasis added).

Plaintiffs have also sufficiently alleged an antitrust injury. Plaintiffs alleged that the no-poach agreements prevented individuals working at one of the Defendants' companies "from seeking better-paid employment opportunities with other Defendants at JAC Molesworth[,]" and that these no-poach agreements "eliminated all competition in the market for skilled labor at JAC Molesworth." (*Id.* ¶¶ 28, 31). And that, through these no-poach agreements, "Defendants . . . exploited their collective market power in the relevant market, which is the market for skilled labor at JAC Molesworth. [And t]hrough their Conspiracy, Defendants exercised and maintained this power, and did in fact suppress wages, benefit, and other aspects of compensation and eliminate competition." (*Id.* ¶¶ 57–58). As such, Plaintiffs have pleaded of an injury of the type the antitrust laws were intended to prevent and that such injury flowed from Defendants' unlawful acts.

Defendants aver that Plaintiffs' Sherman Act claim is barred as the alleged injury affects only foreign commerce and is thus not cognizable under the FTAIA. (*See* Doc. 30, Mot. to Dismiss at 10–15). However, as Plaintiffs' responsive briefing correctly points out, the applicability of the FTAIA exception goes to the substance of the case.[2] (Doc. 33, Pl. Opp'n at 6) (citing *Animal Sci. Prods. V. China Minmentals Corp.*, 654 F.3d 462, 467–68 (3d Cir. 2011) ("the FTAIA constitutes a *substantive merits* limitation rather than a jurisdictional limitation" (emphasis added)); *Lotes Co.*

---

[2] As stated *supra* the Court acknowledges that at least some courts have viewed the FTAIA exception to the Sherman Act as a jurisdictional limitation, this Court however declines to do so.

*v. Hon hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014) ("the requirements of the FTAIA are substantive and nonjurisdictional in nature"); *Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 848 (7th Cir. 2012) ("the FTAIA's criteria relate to the merits of a claim, and not to the subject-matter jurisdiction of the court"); *United States v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) ("the FTAIA is not a subject-matter jurisdiction limitation on the power of the federal courts but a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations")).

As pleaded, Plaintiffs' Sherman Act claim reasonably alleges domestic injury. The following facts support the conclusion that Plaintiffs have sufficiently alleged a domestic injury so to survive a Rule 12 motion: 1) the named Plaintiffs and putative plaintiff class are all citizens of the United States; 2) Defendants are United States business entities; 3) Plaintiffs and the putative class work solely on contracts for the United States DIA; and 4) Plaintiffs and the putative class are paid in the United States currency and are subject to the tax laws of this country. The Court acknowledges that JAC Molesworth is located in England, outside of the territorial limits of the United States, however the facts listed above, when taken as true, reasonably allege a plausible domestic injury and Defendants' Motion to Dismiss the Amended Complaint is **DENIED** and the Court declines to determine the applicable standard at this time.

B.   **Temporal Scope of Plaintiffs' Claim**

Defendants also seek to limit the relevant time period of Plaintiffs' claim. (*See* Doc. 30, Mot. to Dismiss at 28–31). Defendants submit that the Court "should limit the alleged 'conspiracy period' to the latter part of 2018 (consistent with the allegations of no-poach conduct in the [Amended Complaint]) or at most July 2017 (when Booz entered into a teaming agreement with [Mission Essential] to pursue the IPAS program where the non-solicitation allegedly occurred)."

11

(*Id.* at 31). Plaintiffs assert that as "facts regarding the actual start date of the conspiracy are in the exclusive control of Defendants," limiting the scope of discovery to dates no earlier than July 2017 is unwarranted as "Defendants should not be allowed to benefit from their concealment of material information." (Doc. 33, Pl. Opp'n at 36, 37). The Court agrees with Plaintiffs.

In some circumstances, the Sixth Circuit permits plaintiffs to plead "upon information and belief," when "a plaintiff may lack personal knowledge of a fact, but ha[s] 'sufficient data to justify interposing an allegation on the subject' or [must] 'rely on information furnished by others.'" *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447 (6th Cir. 2014) (Charles A. Wright and Arthur R. Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (3d ed. 2012). "Circuits that have done a deep dive on the subject hold that even after *Iqbal* and *Twombly*, plaintiffs may plead facts 'upon information and belief where the facts are peculiarly within the possession and control of the defendant, *see, e.g., Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible,' *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Iqbal*, 129 S. Ct. at 1949)." *Gerling & Assocs., Inc. v. Odulair, LLC*, No. 2:16-cv-1000, 2017 WL 2790669, at *6 (S.D. Ohio June 28, 2017) (Graham, J.).

Here, Plaintiffs allege a situation where Plaintiffs' belief is based on factual information that makes the inference of culpability plausible. Plaintiffs allege that Defendants entered into no-poach agreements with one another and that named Plaintiffs first became aware of these no-poach agreements in the Autumn of 2018. What is not presently clear is precisely *when* Defendants entered into these no-poach agreements as such documents are in the control of Defendants. Further, it is plausible that the agreements were entered into in January 2015 and that negotiations of such agreements took place in 2013.

## IV. CONCLUSION

For the reasons stated herein, Defendants' Motion to Dismiss the Amended Complaint (Doc. 30) is **DENIED**.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　*/s/ George C. Smith*
　　　　　　　　　　　　　　　　　　　　**GEORGE C. SMITH, JUDGE**
　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT COURT**