# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SARAH J. HUNTER and DAVID N. YOUTZ**, on behalf of themselves and all others similarly situated, | : | |
| | : | |
| | : | Case No. 2:19-CV-00411 |
| | : | |
| Plaintiffs, | : | Chief Judge Algenon L. Marbley |
| | : | |
| v. | : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| **BOOZ ALLEN HAMILTON HOLDING CORPORATION, *et al.*,** | : | |
| | : | |
| | : | |
| Defendants. | : | |

---

## MOVING DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFFS' PROPOSED EXPERT WITNESS TED TATOS

---

Moving Defendants Booz Allen Hamilton Inc. and Mission Essential Personnel, LLC hereby move to preclude Plaintiffs from offering any expert opinion or testimony from Ted Tatos on the grounds that the proffered opinions and testimony are unreliable, unhelpful, and fail to meet the threshold requirements for admissibility under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993).

A memorandum in support of this motion is attached.

Respectfully submitted,

/s/ William G. Porter
William G. Porter (0017296), Trial Attorney
Kimberly Weber Herlihy (0068668)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Tel:    (614) 464-6400
Fax:    (614) 464-6350
Email: wgporter@vorys.com
          kwherlihy@vorys.com
          kmmundy@vorys.com


David A. Higbee *(Pro Hac Vice)*
Todd Stenerson *(Pro Hac Vice)*
Adam Schwartz *(Pro Hac Vice)*
Rachel Mossman *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004-2128
Tel:     (202) 508-8000
Fax:     (202) 508-8100
david.higbee@shearman.com
todd.stenerson@shearman.com
adam.schwartz@shearman.com
rachel.mossman@shearman.com

***Attorneys for Defendant***
***Booz Allen Hamilton Inc.***

/s/ Robert F. Ware
Robert F. Ware (0055515), Trial Attorney
*Rob.Ware@ThompsonHine.com*
Mark R. Butscha, Jr. (0088854)
*Mark.Butscha@ThompsonHine.com*
Caitlin R. Thomas (0093857)
*Caitlin.Thomas@ThompsonHine.com*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 566-5500
Fax: (216) 566-5800


Anthony C. White (0062146)
*Anthony.White@ThompsonHine.com*
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio 43215-6101
Telephone: (614) 469-3235
Fax: (614) 469-3361

***Attorneys for Defendant***
***Mission Essential Personnel, LLC***

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SARAH J. HUNTER and DAVID N. YOUTZ**, on behalf of themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | Case No. 2:19-CV-00411 |
| | : | Chief Judge Algenon L. Marbley |
| v. | : : | Magistrate Judge Chelsey M. Vascura |
| **BOOZ ALLEN HAMILTON HOLDING CORPORATION, *et al.*,** | : : : | |
| Defendants. | : : | |

---

## MEMORANDUM IN SUPPORT OF MOVING DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF TED TATOS

---

Moving Defendants Booz Allen Hamilton Inc. ("Booz Allen") and Mission Essential Personnel, LLC ("ME") submit this memorandum in support of their motion to exclude the opinions and testimony of Plaintiffs' proffered expert, Ted Tatos.

## INTRODUCTION

This antitrust case requires an assessment of any economic impact of certain conduct on the employment status and compensation levels of hundreds of employees over several years, but Plaintiffs' proposed expert, Ted Tatos, did not perform any quantitative or statistical analysis. And although this case involves alleged collusive conduct between Defendants that are government contractors in a teaming agreement to provide intelligence services to the U.S. government, Tatos has no background in government contracting or defense intelligence. Instead, Tatos simply claims that the defense experts' opinions regarding the procompetitive benefits associated with

Defendants' alleged collusive conduct are wrong, based on what he characterizes as "causal inference" and "logic."

Tatos is not qualified by knowledge and experience to testify to the "expert" opinions he has offered in this case; he did not utilize any reliable methodology—indeed no rigorous analysis of any kind—to form those opinions, which amount to unsupported conjectures and assertions based on a cursory and flawed understanding of the evidence; and his speculative testimony will not aid the trier of fact.  Thus, his opinions should be excluded.

## RELEVANT FACTUAL BACKGROUND

Booz Allen, ME, and CACI International, Inc. and CACI Technologies, LLC (together, "CACI") (collectively "Defendants") are government contractors that provide intelligence analysis services to the U.S. Department of Defense at JAC Molesworth, United Kingdom.  Defendants started working at Molesworth at different times, all prior to 2017.  Before 2018 they primarily worked under separate government task orders.  In 2017, the U.S. government announced the opportunity to bid on a new task order at Molesworth – IPAS – that would absorb much of the work Defendants were performing under prior task orders.

ME could not bid on the IPAS task order because it was not qualified under the applicable government contract vehicle.  Because of the broad scope of work covered by IPAS, no single Defendant could satisfy all of IPAS's requirements.  Booz Allen therefore entered into teaming agreements with ME in July 2017 and CACI in January 2018 in order to assemble the most qualified team thereby maximizing its likelihood of success in the bid.  In August 2018, Booz Allen was awarded the IPAS task order, and it executed subcontracts with ME and CACI.  Work under IPAS commenced in September 2018.

According to Tatos, Plaintiffs allege that "Defendants agreed not to solicit or hire each other's employees" (the "Challenged Conduct").[1]  While Defendants do not agree with Tatos's characterization of their conduct, it is not necessary for purposes of this motion to take issue with it.  Regardless, any limitations on solicitation from team members contributed to the Defendants' teaming arrangement because employees switching between the team members at Molesworth would have hindered Defendants' ongoing performance of their obligations to the U.S. government and denigrated the strength of the IPAS bid.

## TED TATOS'S OPINIONS AND ANALYSIS

Tatos's proffered opinions and anticipated testimony concern the procompetitive effects associated with the Challenged Conduct that have been identified by Defendants' experts based on their economic analysis and experience with government contracting.  Under the rule-of-reason standard applicable to this antitrust case, if Plaintiffs were able to meet their burden of establishing anticompetitive effects in a properly defined, relevant economic market, Defendants then would "provide evidence to establish that the restraint complained of has procompetitive effects sufficient to justify the injury resulting from the anticompetitive effect of the restraint."  *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 959 (6th Cir. 2004); *see Antitrust Guidelines for Collaboration Among Competitors*, U.S. Dep't of Justice and Federal Trade Comm'n (April 2000), at 5-6 (discussing procompetitive benefits of competitor collaborations).

Defendants are offering the opinions and testimony of two experts:  Dr. Justin McCrary, an expert in antitrust and labor economics; and Professor Christopher Yukins, an expert in

---

[1] Expert Report of Ted Tatos ("Tatos Rpt."), attached hereto as Exhibit 4, at ¶ 1.  Plaintiffs' other expert, Dr. Phillip Johnson, defines "Challenged Conduct" in virtually identical fashion.  Among the many flaws with Dr. Johnson's analysis, as discussed in the *Daubert* motion related to Dr. Johnson and Moving Defendants' motion for summary judgment filed contemporaneously with this Motion, Dr. Johnson's definition of the Challenged Conduct fails because it impermissibly mixes joint (or potentially joint) conduct with unilateral conduct.

government contracting. Dr. McCrary opined, among other things, that the Challenged Conduct was ancillary to Defendants' teaming arrangements and had procompetitive benefits, namely strengthening competition for the IPAS task order and the labor market for workers by mitigating the business risks of teaming.[2] And Professor Yukins opined, among other things, that the Challenged Conduct enhanced competition in the bid for the IPAS task order and helped ensure better performance under IPAS.[3]

Plaintiffs also are offering two experts: Dr. Phillip Johnson and Ted Tatos. But unlike Defendants' experts who have different areas of expertise, Tatos and Dr. Johnson are both offered as experts in market economics. Dr. Johnson, Plaintiffs' principal economic expert, conducted statistical regression analyses and issued written reports in December 2020, May 2021, June 2021, and July 2021, the latter two of which included assessments of procompetitive benefits. Plaintiffs did not disclose Tatos as an additional economic expert until July 2021 when he issued his report purporting to add a second economic perspective on the issue of procompetitive benefits, albeit with no underlying statistical or quantitative analysis.

According to Tatos's report, Plaintiffs engaged him "to perform two tasks: (i) to evaluate the opinions that Defendants' Experts have offered regarding potential procompetitive benefits of the Challenged Conduct in this matter; and (ii) to opine on whether any procompetitive justifications exist for the No-Hire Agreements between firms operating within a teaming arrangement for purposes of fulfilling contracts, particularly those where the federal government is the client."[4] However, at his deposition Tatos acknowledged that he did not evaluate the

---

[2] Expert Report of Justin McCrary, dated June 3, 2021 ("McCrary Merits Rpt."), attached hereto as Exhibit 2; Expert Reply Report of Justin McCrary, dated July 15, 2021 ("McCrary Merits Reply Rpt."), attached hereto as Exhibit 3.

[3] Expert Report of Christopher Yukins, dated June 3, 2021 ("Yukins Merits Rpt."), attached hereto as Exhibit 4.

[4] Tatos Rpt. at ¶ 6.

procompetitive effects of the Challenged Conduct and said his "job was not to examine – to generate an analysis of procompetitive efficiencies," rather, his job was simply "to respond to [Defendants'] experts."[5] But he failed even to do that, admitting that he had not reviewed the most recent report of one of Defendants' experts and only "skimmed through" one of their deposition transcripts.[6] Tatos's approach was to review a limited number of documents and claim Defendants' experts were wrong without utilizing or referencing any methodology, analysis, or authority for his claim.

Relying on nothing more than his own personal assessments and perspective, Tatos offers four opinions in his report:

In Opinion 1, Tatos opines that "Defendants' Experts erroneously attribute purported benefits associated with a teaming arrangement to the No-Hire Agreements" and "[a]ny claimed procompetitive justifications should be associated with the No-Hire Agreements, not the teaming arrangement."[7] Tatos bases this opinion on the faulty premise that procompetitive benefits cannot flow from the Challenged Conduct unless it is "necessary" to the teaming arrangement.[8] But the applicable legal standard does not require a restraint to be "necessary" to the collaboration; it requires only that the Challenged Conduct "contribute to the procompetitive efficiencies" of the teaming arrangement. Tatos not only fails to apply the correct legal standard, but also he cites no economic authority to support this opinion, instead asserting that it is merely "a matter of causal

---

[5] Transcript of Deposition of Ted Tatos ("Tatos Tr."), attached hereto as Exhibit 5, at 225:18-22.

[6] *Id.* at 27:14; 28:4-8.

[7] Tatos Rpt. at ¶ 8.

[8] Tatos Tr. at 153:15-19.

inference."[9]  This opinion is unsupported by any reliable methodology, and Tatos also does not have the knowledge and experience in government contracting to assert such a conclusion.

In Opinion 2, Tatos opines that "Defendants' Experts confuse input and output markets" and that "the Challenged Conduct and any accordant anticompetitive effects or procompetitive justifications apply to the input market for labor, not to any output market for Defendants' services."[10]  Again, Tatos cites no authority for this hair-splitting proposition, aside from his own personal judgment.[11]  This opinion also is unsupported by any reliable methodology and uninformed by any government contracting knowledge or experience.

In Opinion 3, Tatos opines that "no plausible economic theory or analysis" supports Defendants' "conclusion that the Challenged Conduct yielded procompetitive efficiencies that offset its harm to competition" and that "a more plausible economic explanation for the Challenged Conduct is that it reflected the parties' interest in reducing their own costs by imposing a restraint on their labor force at Molesworth."[12]  But Tatos admits that he did not evaluate the procompetitive impact of the Challenged Conduct, *and* he did not analyze whether there were any pecuniary benefits to Defendants associated with the Challenged Conduct.[13]  He instead purports to rely on "economic inference."[14]  As he also admits that he performed no analysis of why Defendants entered into the teaming agreements,[15] this opinion is pure speculation.

---

[9] Tatos Tr. at 157:9-17.

[10] Tatos Rpt. at ¶ 8.

[11] Tatos Tr. at 184:15-18.

[12] Tatos Rpt. at ¶ 8.

[13] Tatos Tr. at 224:18-20; 270:3-4; 272:11-13.

[14] *Id.* at 274:25-275:5.

[15] *Id.* at 270:3-4; 272:11-13.

Finally, in Opinion 4, Tatos opines that "[n]on-solicitation provisions among defense contractors, particularly those engaged in a teaming agreement, are horizontal market allocation agreements that can substantially restrict employee mobility."[16] Tatos has no education, training or other expertise in the area of government contracting, teaming agreements, or defense intelligence services.[17] Moreover, he offered no empirical analysis or reliable methodology to support this opinion about "employee mobility" and ignored critical facts, including that ME was not permitted by the U.S. government to compete for the IPAS task order.

Tatos's opinions should be excluded because they are not reliable, he does not have the knowledge and experience to offer them, and they will confuse, not assist, the trier of fact.

## LEGAL STANDARD

Expert testimony is only admissible if the witness (1) qualifies as an expert, (2) uses a sufficiently reliable methodology, and (3) offers testimony that will assist the trier of fact to understand the evidence or determine a fact in issue. *See* FED. R. EVID. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993). The party offering expert testimony bears the burden of proving by a preponderance of the evidence that the elements of Rule 702 are satisfied. *Daubert*, 509 U.S. at 592 n. 10; *see Pride v. Bic Corp*., 218 F.3d 566, 578 (6th Cir. 2000) (noting that the proponent of the expert evidence bears the burden of showing that the proffered opinions are reliable).

Trial courts are gatekeepers with an obligation to ensure that all expert testimony is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Reliability requires "more than subjective belief or unsupported speculation." *Id.* at 590; *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517,

---

[16] Tatos Rpt. ¶ 8.

[17] Tatos Tr. at 59:13-15; 61:21-62:4; 65:2-5; 69:2-4.

529-530 (6th Cir. 2008) (noting that district court's duty is to determine if the proffered testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation"); *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999) (noting that reliability determination focuses on "the methodology and principles" underlying the proffered testimony). Further, the expert's opinion must be tied sufficiently to the facts in order to aid the fact-finder. *Daubert*, 509 U.S. at 591; FED. R. EVID. 702(a). A court need not "admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." If "there is simply too great an analytical gap between the data and the opinion offered," a court may exclude the proffered evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). That is, an expert's testimony "must be supported by more than qualifications and a subjective opinion that 'it is so.'" *Amato v. Syntex Labs., Inc.*, 917 F.2d 24 (table), No. 89-2348, 1990 U.S. App. LEXIS 19210, at *7 (6th Cir. Oct. 26, 1990); *see Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

## ARGUMENT

### I. TATOS IS NOT QUALIFIED BY SUFFICIENT KNOWLEDGE AND EXPERIENCE TO TESTIFY AS AN EXPERT IN THIS CASE.

A witness cannot testify as an expert unless he is "qualified as an expert by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Furthermore, "[a]n expert witness's proposed testimony must relate directly to the area in which the witness claims expertise." *Antioch Co. Litig. Trust v. Morgan*, No. 3:10-cv-156, 2014 WL 1365949, 2014 U.S. Dist. LEXIS 47740, at *8 (S.D. Ohio Apr. 7, 2014) (citing *Smelser v. Norfolk S. R.R. Co.*, 105 F.3d 299, 305 (6th Cir. 1997)); *see also Naugle v. Allstate Ins. Co.*, No. 99-107, 2001 U.S. Dist. LEXIS 22684, *9 (E.D. Ky. Jul. 16, 2001) (an expert witness must possess "sufficient knowledge, skill, experience, training, or education to qualify as an expert *in the particular field* within which the witness

proposes to testify") (emphasis added). "'An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702.'" *Antioch Co. Litig. Trust*, 2014 U.S. Dist. LEXIS 47740, at \*8 (quoting *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)). More specifically, even a well-credentialed economist with substantial experience in antitrust economics may be unqualified to offer an opinion about competitive effects if he has not utilized that economic expertise and otherwise has no background or experience in the relevant industry where the effects occurred. *See Nilavar v. Mercy Health Sys.-Western Ohio*, No. 3:99-cv-612, 2005 U.S. Dist. LEXIS 60941, at \*36 (S.D. Ohio June 2, 2005).

Based on the standards set forth in *Antioch* and *Nilavar*, Tatos is not qualified to offer the opinions he put forth in his report. Defendants do not dispute that Tatos has experience in economic and statistical analysis; however, he did not utilize that expertise in reaching his opinions. Although Tatos testified that his report is "an economics report," he admittedly performed no economic regression or any other type of quantitative statistical analysis in arriving at his opinions.[18] Rather, he purports to opine on the procompetitive effects and anticompetitive harms of no-poach agreements in government contracting for intelligence services relying solely on his own personal judgment. Much like the excluded expert in *Nilavar* who did not utilize his economic expertise and had no experience with the health management quality issues relevant to that case, Tatos did not perform a statistical analysis and has no expertise in government contracting matters. He admitted that he is not an expert in government contracting and has not performed work regarding bids for intelligence work or relating to the production of intelligence

---

[18] Tatos Tr. at 39:1-5; 40:5; 57:2-7.

services.[19]  He also has no professional experience concerning government contracts performed outside the United States, and he made clear that he was "not testifying on – on the industry."[20] Despite his admission, Tatos purports to opine – in Opinion 4 in particular – about the nature and effect of teaming arrangements among defense contractors.[21]  He lacks any credentials or experience that would qualify him to do so.

Moreover, he has never "been an expert in a no-poach case before," and he has done no research regarding non-solicitation or no-poach agreements beyond his commentary concerning the NCAA's rules against compensation of college athletes.[22]  Tatos's writings about the NCAA's treatment of college athletes is his only experience analyzing procompetitive benefits.[23]  But his work relating to the NCAA does not qualify him to offer his opinions as an expert on procompetitive benefits in this case.  He has never been an expert in any of the NCAA antitrust cases, so he is nothing more than a third-party observer pursuing his own interest in the subject matter.[24]  Moreover, the NCAA's treatment of college athletes involves numerous unique issues that are entirely different than those relating to government contractors providing defense intelligence services in Molesworth, England.[25]

---

[19] Id. at 59:5-22; 64:21-65:4; 68:23-69:4.

[20] Id. at 72:4-13.

[21] Tatos Rpt. at ¶ 8.

[22] Tatos Tr. at 69:24-25; 70:20-24.

[23] Id. at 106:18-23.

[24] Id. at 101:25-102:24.

[25] As Tatos acknowledged during his deposition, there are many differences between the circumstances in the NCAA case and this case.  The NCAA is an association of member universities attended by students, some of whom are athletes.  (Tatos Tr. at 186:8-188:2.)  Unlike the Plaintiffs and putative class members who were (or are) employees of Defendants, college athletes are not employees of the universities or the NCAA.  (Id. at 188:3-24.)  College athletes have four years of eligibility after which they can no longer participate, but the putative class members here "do not have the same restrictions with regard to eligibility."  (Id. at 189:8-11, 20-25; 190:7-9.)  Further, the NCAA involved "a strictly wage-fixing restraint," whereas here "this is not a wage-fixing claim." (Id. at 88:16; 93:14.)  Tatos acknowledged that in the case of the NCAA the wages of participants were fixed, but here the wages paid by Defendants varied among their employees. (Id. at 92:15-18; 94:7-11.)  In addition, Tatos acknowledged that college athletes "can't really substitute away from the NCAA," but employees of Defendants could get jobs outside

Case: 2:19-cv-00411-ALM-CMV Doc #: 226 Filed: 03/14/22 Page: 13 of 23 PAGEID #: 24312
Case: 2:19-cv-00411-ALM-CMV Doc #: 172 *SEALED* Filed: 09/22/21 Page: 13 of 23 PAGEID #: 11223

Tatos's proffered opinions fall outside the area of his expertise (statistical economic analysis), and he has never analyzed procompetitive benefits in any circumstances remotely similar to the present case. Accordingly, he is not qualified to testify as an expert in this case, and his opinions should be excluded.

## II.  TATOS'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE BASED ON UNRELIABLE METHODOLOGY AND SPECULATION.

Expert testimony is inadmissible unless it is based on a reliable methodology and sufficient facts. *Kumho Tire*, 526 U.S. at 152; *Daubert*, 509 U.S. at 589; FED. R. EVID. 702(a). A court must assess whether the expert's reasoning or methodology is valid and determine if that reasoning or methodology can be applied properly to the facts. *Daubert*, 509 U.S. at 591-92. The expert's "testimony must be supported by more than qualifications and a subjective opinion that 'it is so.'" *Amato*, 1990 U.S. App. LEXIS 19210, at *7. "[W]hen a proponent of expert testimony presents 'only the experts' qualifications, their conclusions and their assurances of reliability,' the Committee emphasizes, '[u]nder *Daubert*, that's not enough.'" *Bechak v. ATI Wah Chang*, No. 4:15 CV 1692, 2017 WL 4541611, 2017 U.S. Dist. LEXIS 168343, at *14 (N.D. Ohio Oct. 11, 2017) (*citing* FED. R. EVID. 702, Adv. Cmte. Notes). Accordingly, mere "speculation, conjecture, and possibility" as to what might or might not happen is insufficient to demonstrate reliability. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072 (6th Cir. 1999).

Guided by *Daubert*, courts generally consider several factors to determine reliability: whether the expert's technique has been tested or challenged in some objective sense; whether the technique has been subjected to peer review and publication; the known or potential rate of error of the technique when applied and the existence or maintenance of standards controlling the

---

Molesworth. (*Id.* at 95:17; 98:13-14.) Finally, he admitted that his NCAA work was based upon publicly available sources and he never had access to the actual discovery record from that case. (*Id.* at 102:18-103:4.)

technique; and whether the technique has gained general acceptance. *See Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007) (citing *Daubert*, 509 U.S. at 592-94).

Here, Tatos's opinions are unreliable because they are not based on a valid methodology or sufficient facts. With respect to methodology, he simply claims that his opinions are based on "a general economic principle of causal inference."[26] He did no econometric modeling or quantitative analysis.[27] Instead, he simply reviewed a limited set of documents provided by Plaintiffs' counsel and opined in conclusory fashion that procompetitive benefits could not have flowed from the Challenged Conduct.

Indeed, although Tatos claims that his task was to "evaluate the opinions that Defendants' Experts have offered regarding potential procompetitive benefits of the Challenged Conduct" and to "opine whether any procompetitive justifications exist for No-Hire Agreements between firms operating within a teaming arrangement for purposes of fulfilling contracts,"[28] he admits he never read the most recent report of Dr. McCrary, which set forth and described in detail his opinions about procompetitive benefits.[29] In fact, Tatos admits that he never performed an analysis of the procompetitive benefits associated with the Challenged Conduct:

> Q:     Did you – I mean, you evaluated the procompetitive impact, correct?
>
> A:     No. My job was not to examine – to generate an analysis of procompetitive efficiencies.[30]

He also assumed that the Challenged Conduct had anticompetitive effects, but he did no analysis of any evidence, including actual wages or whether wages rose or fell, to confirm or refute that

---

[26] Tatos Tr. at 161:23.

[27] *Id.* at 37:16-18; 39:3-5; 57:2-7.

[28] Tatos Rpt. at ¶ 6

[29] Tatos Tr. at 28:4-8; McCrary Merits Reply Rpt. at Sec. 3.

[30] Tatos Tr. at 225:20-21.

assumption.[31]  His opinions on the procompetitive justifications and anticompetitive effects of the Challenged Conduct are based on nothing more than his own say-so.

Tatos's lack of methodology, when combined with this lack of expertise in the government contracting industry, undermines all his opinions, in particular Opinion 1 and Opinion 2.  With respect to Opinion 1, Tatos opines that any procompetitive benefits must "be associated with" the Challenged Conduct restraining labor, "not the teaming arrangement."[32]  Similarly, in Opinion 2 he opines that any procompetitive effects "must apply to the input market for labor, not to any output market for Defendants' services."[33]  In other words, he opines that one must "isolate the effects of the challenged conduct in order to properly analyze the situation."[34]  Tatos testified that his opinions were based merely on "[c]ausal inference" and "logic[]."[35]  He could not cite any specific authority, and when asked he said the opinion was supported by "any book that discusses how we establish a causal nexus."[36]  He identified no particular technique, standard, or publication to support his view and even admitted with respect to Opinion 2 "that economists disagree on this issue."[37]  Tatos's opinion is based on little more than his word that it is so.

In addition to being unrelated to any reliable methodology, Tatos's opinions are not based on sufficient facts.  As an initial matter, he was not provided a complete set of deposition testimony and exhibits, and he obtained only a limited set of documents produced in discovery.[38]  What

---

[31] *Id.* at 197-199.

[32] Tatos Rpt. at ¶ 8.

[33] *Id.*

[34] Tatos Tr. at 130:4-8.

[35] *Id.* at 130:22; 157:17; 184:17.

[36] *Id.* at 158:18.

[37] *Id.* at 184:23-185:6.

[38] Tatos Rpt. at Ex. 1.

documents and depositions he did receive were selected by Plaintiffs' counsel.[39]  Even with the minimal number of documents he did receive, Tatos ignores or dismisses unrebutted testimony and other evidence that the Challenged Conduct was intended to, and did, facilitate the success of the teaming agreements.  Both Annette Redman of Booz Allen and Anna Hunt of ME testified about the reasons for the Challenged Conduct, which relate to supporting the IPAS teaming efforts and improving the outcome, not suppressing wages.[40]  Tatos has no explanation for why he did not consider this relevant evidence in forming his opinions.[41]

Tatos badly misconstrues the limited evidence that he did review.  He bases much of his conclusion that the Challenged Conduct did not have procompetitive justifications and/or anticompetitive effects on a specific case of one ME employee who applied to a position at CACI in late 2019.[42]  He claims that this employee "was unhappy in [ME]'s employ," would "benefit[] from better compensation" at CACI, and would leave ME for an outside employer if she did not receive the job at CACI.[43]  Tatos merely pulls these assertions from thin air.  The employee was not deposed in the case, and Tatos admits that he did not review her personnel file or employment records or any documents about her other than a deposition transcript that mentions her name.[44]  He also admits that he does not know whether the employee ever actually left ME's employment as he posited she would.[45]  Indeed, everything that Tatos claims about this employee to show that the Challenged Conduct was anticompetitive is conclusory and speculative.  Tatos even fails to

---

[39] Tatos Tr. at 30:183-1:2.

[40] See, e.g., Transcript of Deposition of Annette Redman at 114:15-115:6, which is attached as Exhibit 6; Transcript of Deposition of Anna Hunt at 91:7-18; 131:17-132:3, which is attached as Exhibit 7.

[41] Tatos Tr. at 135:21-140:5 ("I'm not offering any opinion on the facts.").

[42] Tatos Rpt. at ¶¶ 54-56, 62-65, 74, 83.

[43] Id. at ¶ 62.

[44] Tatos Tr. at 229:9-20.

[45] Id. at 233:10-12.

use her correct name in his report, referring to her repeatedly as ███████████[46] Had he

actually reviewed the evidence, he presumably would have realized that her name is ███████

██████nd all of his assumptions about her were incorrect: she is still a ME employee, she was

not offered better compensation at CACI, and she actually received a compensation increase from

ME after she was not offered the CACI position.[47]

Many of Tatos's other factual assertions are also incorrect. For example, Tatos states that

ME and CACI engaged subcontractors on the IPAS task order.[48] Though relatively minor in

context, this statement is untrue, and a review of the record evidence would have shown as much.

More importantly, Tatos opines that the teaming agreements could have been successful without

the Challenged Conduct *because the Defendants had entered into teaming agreements together*

*without the Challenged Conduct prior to the IPAS task order*.[49] Tatos is again incorrect. Booz

Allen and ME did not enter into teaming agreements with each other at Molesworth until they

worked together on the bid for the IPAS task order, and Tatos even includes a figure in his report

that reflects this pre-IPAS reality.[50] Tatos also incorrectly asserted that ME "always seeks to be

the prime contractor,"[51] an assertion that was offered to support his view that Defendants are

always horizontal competitors. His assertion is plainly incorrect here given that ME was not

qualified to bid as the prime contractor on the IPAS task order and therefore could not compete

---

[46] Tatos Rpt. at ¶¶ 54-56, 62-65, 74, 83.

[47] Tatos Tr. at 230:25-231:6; Pl. Ex. 65 at CACI00028796 (Jan. 2, 2020 email from Greg Andrews of CACI stating ███████ applied for Cyber Threat Analyst position), which is attached as Exhibit 8; CACI00076041 at '042 (Jan. 10, 2020 email from Greg Andrews of CACI stating salary for Cyber Threat Analyst position to which ███ ███████ applied was capped at ████████, which is attached as Exhibit 9; ME00003223 (Personnel Action Form for ███████ dated Jan. 11, 2020, raising her salary from ███████████, which is attached as Exhibit 10.

[48] Tatos Rpt. at ¶ 21.

[49] Tatos Tr. at 140:25-141:15.

[50] Tatos Rpt. at ¶ 77.

[51] Tatos Tr. at 262:25.

for it. Indeed, when confronted with ME's inability to compete for the IPAS bid, Tatos backtracked somewhat and testified that he only meant they were horizontal competitors "generally" because they "compete at the same level."[52] Tatos either misunderstands or did not actually review the facts. Either way, the supposed factual basis for his opinions is unreliable.

The lack of an adequate factual foundation undermines Opinion 3 in particular because that opinion is based on the premise that there is no evidence "to support the conclusion that the Challenged Conduct yielded procompetitive efficiencies."[53] But there is evidence in the record – Tatos simply ignored it. And he ignored it so that he could opine that "a more plausible economic explanation for the Challenged Conduct" is that it would help Defendants reduce costs and increase profits.[54] That opinion is complete conjecture, as Tatos not only admits, as discussed above, that he did not evaluate the procompetitive effects of the Challenged Conduct, but also that he did not analyze whether there were any pecuniary benefits to Defendants associated with the Challenged Conduct or why Defendants entered into the teaming arrangement.[55] He instead purports to rely on "economic inference."[56] Opinion 3 is pure speculation.

In short, Tatos looked at limited evidence in a cursory manner and pronounced his conclusions without any economic analysis. Even under the most generous view of *Daubert*, a report that is based only on the interpretation of documents provided by Plaintiffs' counsel and the expert's own speculation and inferences is clearly not based upon reliable methodology. *See, e.g.,*

---

[52] *Id.* at 264:11-14.

[53] Tatos Rpt. at ¶ 8.

[54] *Id.*

[55] Tatos Tr. at 224:18-20; 270:3-4; 272:11-13. Indeed, the IPAS task order is a cost-plus award fee contract, meaning that Booz Allen's costs are reimbursed by the government. Thus, if Booz Allen increased its salaries at Molesworth, the government would reimburse Booz Allen for that increased cost. Accordingly, Booz Allen had no incentive to suppress salaries at Molesworth because the government would reimburse Booz Allen if salaries increased.

[56] *Id.* at 274:25-275:5.

*Bechak,* 2017 U.S. Dist. LEXIS 168343, at \*17 (finding expert report was the product of unreliable methodology where based "on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity"). Tatos's opinions are unreliable and should be excluded.

## III. TATOS'S OPINIONS WILL NOT HELP THE COURT OR A JURY UNDERSTAND THE EVIDENCE OR FACTS.

Expert testimony is inadmissible unless it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. An expert opinion must do more than simply tell the fact-finder what result to reach. *See McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir. 1988) ("It is not helpful to the jury when expert testimony gives lay testimony interpreting the facts of the case or addressing matters that are equally within the competence of the jurors to understand and decide"). Moreover, "[e]xpert testimony contrary to the applicable legal standard is inadmissible" because it would not assist the jury. *Ohio Pub. Emples. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, 2018 U.S. Dist. LEXIS 137229, at \*38 (N.D. Ohio Aug. 14, 2018); *see In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, 2005 U.S. Dist. LEXIS 46164, at \*40-42 (N.D. Ohio Aug. 8, 2005) (holding that proffered expert opinions were inadmissible because they were "improperly premised" on an incorrect legal standard); *United States ex rel. Fesenmaier v. The Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003, 2021 WL 101193, 2021 U.S. Dist. LEXIS 5684, at \*52 (D. Minn. Jan. 12, 2021) (excluding proffered opinions "as irrelevant and contrary to the applicable legal standard").

Here, Tatos has done little more than look at the evidence provided to him and interpret that evidence in Plaintiffs' favor. He brought none of his expertise to bear. Instead, he reviewed a limited portion of the relevant evidence and offered a conclusory opinion that there are no

procompetitive benefits flowing from the Challenged Conduct. Tatos himself testified that this analysis is merely a matter of "[e]conomic logic."[57] But drawing conclusions by applying basic logic to the factual record is a matter for juries – not experts. Expert analysis based on this approach should be excluded:

> It is extremely problematic that [an expert] blindly relied on information given to him by counsel, and failed to verify the information from reliable, independent sources. It is not the job of an expert to parrot the opinions of counsel, but to bring to the jury more than the lawyers can offer in argument. Experts participate in cases because, ultimately, the trier of fact will be assisted by their opinions, not to act as an alter-ego of the attorney trying the case. Hence, absent independence from the party or its advocates, a testifying expert lacks the credibility necessary to be of assistance to the trier of fact.

*Rivera-Cruz v. Latimer, Biaggi, Rachid & Godreay, LLP*, No. 04-2377 (ADC), 2008 WL 2446331, 2008 U.S. Dist. LEXIS 46562, at *15 (D.P.R. June 16, 2008) (granting motion to exclude expert). Tatos's opinions do not offer any expertise that would assist the fact-finder. At bottom, he is not using his expertise to assist the jury; he is merely telling the jury what to decide, which is impermissible. *See, e.g., Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) (expert testimony telling the jury what result to reach is properly excluded).

In addition to invading the province of the jury, Tatos's opinions will not assist the trier of fact because they are premised on the wrong legal standard. Tatos opines that "if the challenged conduct was not a necessary part of the teaming agreement and the teaming agreement generated procompetitive effects, then those procompetitive effects would have occurred without the challenged conduct."[58] The premise that the Challenged Conduct must be necessary to the teaming arrangements is pervasive throughout Tatos's entire report.[59] But whether the Challenged Conduct

---

[57] Tatos Tr. at 101:10.

[58] Tatos Tr. at 153:15-19.

[59] *See, e.g., id.* at ¶¶ 24, 28-29, 68-70.

was "necessary" to the teaming agreement is irrelevant; the relevant issue is whether there is "a plausible way" that the Challenged Conduct "contribute[d] to the procompetitive efficiencies of the" team. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 728 (6th Cir. 2019). Tatos offers no opinion on that point. Indeed, when asked directly whether the procompetitive benefits of the teaming arrangement were enhanced by the Challenged Conduct, Tatos said he had no "general opinion" and again pointed to "the specific economic principle of causal inference."[60] So even if, as Tatos posits, the Challenged Conduct was not "necessary" to the teaming agreement, that view is of no moment, and the jury would not be assisted by such testimony. Indeed, they would only be confused by Tatos's testimony because it would conflict with their jury instructions that provide the correct standard for evaluating procompetitive benefits in this Circuit. *See In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, at *41-42; *Noskowiak v. Bobst*, No. 04-C-0642, 2005 WL 2146073, 2005 U.S. Dist. LEXIS 19536, at *14-15 (E.D. Wis. Sep. 2, 2005) (excluding expert testimony because referencing a standard that "is legally incorrect . . . would likely mislead or confuse a trier of fact").

Tatos's opinions should be excluded because this Court and the jury can review the evidence, listen to the arguments of counsel, and make their determinations without them.

## **CONCLUSION**

For all the foregoing reasons, Moving Defendants respectfully request that this Court exclude the expert testimony and opinions of Plaintiffs' proffered expert, Ted Tatos, in their entirety.

---

[60] Tatos Tr. at 132:18-25.

Respectfully submitted,

/s/ William G. Porter
William G. Porter (0017296), Trial Attorney
Kimberly Weber Herlihy (0068668)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Tel:    (614) 464-6400
Fax:    (614) 464-6350
Email:  wgporter@vorys.com
        kwherlihy@vorys.com
        kmmundy@vorys.com


David A. Higbee *(Pro Hac Vice)*
Todd M. Stenerson *(Pro Hac Vice)*
Adam Schwartz *(Pro Hac Vice)*
Rachel Mossman *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004-2128
Tel:      (202) 508-8000
Fax:      (202) 508-8100
david.higbee@shearman.com
todd.stenerson@shearman.com
adam.schwartz@shearman.com
rachel.mossman@shearman.com

***Attorneys for Defendant***
***Booz Allen Hamilton Inc.***

/s/ Robert F. Ware
Robert F. Ware (0055515), Trial Attorney
*Rob.Ware@ThompsonHine.com*
Mark R. Butscha, Jr. (0088854)
*Mark.Butscha@ThompsonHine.com*
Caitlin R. Thomas (0093857)
*Caitlin.Thomas@ThompsonHine.com*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Telephone:  (216) 566-5500
Fax:  (216) 566-5800


Anthony C. White (0062146)
*Anthony.White@ThompsonHine.com*
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio  43215-6101
Telephone:  (614) 469-3235
Fax:  (614) 469-3361


***Attorneys for Defendant***
***Mission Essential Personnel, LLC***

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically with the Court this 22nd day of September, 2021.  Service will be made by the Court's electronic notification system, and all parties may access this filing through the Court's system.

/s/ Robert F. Ware
Robert F. Ware (0055515)