## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SARAH J. HUNTER and DAVID N. YOUTZ, on behalf of themselves and all others similarly situated, | : : : : | |
| | : | Case No. 2:19-CV-00411 |
| Plaintiffs, | : : | Chief Judge Algenon L. Marbley |
| v. | : : | Magistrate Judge Chelsey M. Vascura |
| | : | |
| BOOZ ALLEN HAMILTON HOLDING CORPORATION, *et al.*, | : : : | |
| Defendants. | : : | |

---

### MOVING DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. PHILLIP JOHNSON

---

Defendants Booz Allen Hamilton Inc. and Mission Essential Personnel, LLC (together, "Moving Defendants") hereby move to preclude Plaintiffs from offering any expert opinion or testimony from Dr. Phillip Johnson under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  A memorandum in support of this motion is attached.

Respectfully submitted,

| | |
|---|---|
| */s/ William G. Porter* | */s/ Robert F. Ware* |
| William G. Porter (0017296), Trial Attorney | Robert F. Ware (0055515), Trial Attorney |
| Kimberly Weber Herlihy (0068668) | Rob.Ware@ThompsonHine.com |
| Kara M. Mundy (0091146) | Mark R. Butscha, Jr. (0088854) |
| VORYS, SATER, SEYMOUR AND | Mark.Butscha@ThompsonHine.com |
| PEASE LLP | Caitlin R. Thomas (0093857) |
| 52 East Gay Street, P.O. Box 1008 | Caitlin.Thomas@ThompsonHine.com |
| Columbus, Ohio 43216-1008 | THOMPSON HINE LLP |
| Tel: (614) 464-6400 | 3900 Key Center |
| Fax: (614) 464-6350 | 127 Public Square |
| Email: wgporter@vorys.com | Cleveland, Ohio 44114 |
| kwherlihy@vorys.com | Telephone: (216) 566-5500 |
| kmmundy@vorys.com | Fax: (216) 566-5800 |
| | |
| David A. Higbee *(Pro Hac Vice)* | Anthony C. White (0062146) |
| Todd M. Stenerson *(Pro Hac Vice)* | Anthony.White@ThompsonHine.com |
| Adam B. Schwartz *(Pro Hac Vice)* | THOMPSON HINE LLP |
| Rachel E. Mossman *(Pro Hac Vice)* | 41 South High Street, Suite 1700 |
| SHEARMAN & STERLING LLP | Columbus, Ohio 43215-6101 |
| 401 9th Street, NW, Suite 800 | Telephone: (614) 469-3235 |
| Washington, DC 20004-2128 | Fax: (614) 469-3361 |
| Tel: (202) 508-8000 | |
| Fax: (202) 508-8100 | ***Attorneys for Defendant*** |
| Email: david.higbee@shearman.com | ***Mission Essential Personnel, LLC*** |
| todd.stenerson@shearman.com | |
| adam.schwartz@shearman.com | |
| rachel.mossman@shearman.com | |
| | |
| ***Attorneys for Defendant*** | |
| ***Booz Allen Hamilton Inc.*** | |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH J. HUNTER and DAVID N. YOUTZ, on behalf of themselves and all others similarly situated, | : : : : | Case No. 2:19-CV-00411 |
| Plaintiffs, | : : | Chief Judge Algenon L. Marbley |
| v. | : : | Magistrate Judge Chelsey M. Vascura |
| BOOZ ALLEN HAMILTON HOLDING CORPORATION, *et al.*, | : : : | |
| Defendants. | : | |

---

**MEMORANDUM IN SUPPORT OF MOVING DEFENDANTS' MOTION
TO EXCLUDE THE OPINIONS AND TESTIMONY OF DR. PHILLIP JOHNSON**

---

## TABLE OF CONTENTS

**Page**

**INTRODUCTION**......................................................................................................1

**BACKGROUND** ......................................................................................................4

**LEGAL STANDARD** .............................................................................................6

**ARGUMENT**..........................................................................................................7

Dr. Johnson's class certification and merits opinions are not reliable and should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Dr. Johnson has provided four separate expert reports in this matter and has sat for two depositions. In particular, all of Dr. Johnson's opinions should be excluded because he: (1) does not properly define a relevant antitrust market; (2) has not specified a model capable of showing class-wide harm; (3) has not reliably applied his economic analysis to the case; and (4) improperly extrapolates damages across the entire putative class using an inadequate data set.

I.    **DR. JOHNSON IGNORES EVIDENCE IN THE RECORD SHOWING THAT MOLESWORTH UK CANNOT BE A RELEVANT ANTITRUST MARKET** ...................................................................7

      A.    **Dr. Johnson's Economic Analysis Ignores Commercial Realities and Fails to Assess Actual Substitution Patterns**....................................7

Dr. Johnson ignored the undisputed record which shows that intelligence analysts were readily able to find work around the world and that Defendants at Molesworth hired most of their employees from outside of Molesworth. Dr. Johnson failed to analyze these substitution patterns. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 281 (6th Cir. 2014); *Brighton Optical Inc. v. Vision Serv. Plan*, 422 F. Supp. 2d 792, 806 (E.D. Mich. 2006).

      B.    **Dr. Johnson's Purported SSNIP Test is not Based on Reliable Methodology** ...........................................................................11

Dr. Johnson cannot rely on his purported SSNIP test to confirm a relevant market because he failed to use a reliable methodology; he merely pointed to the results of his Undercompensation regression analysis to claim that antitrust impact occurred in his proffered relevant market of intelligence analysts at Molesworth. *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009); *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*., 388 F.3d 955, 961 (6th Cir. 2004).

II.   **DR. JOHNSON'S ANALYSIS SHOULD BE EXCLUDED BECAUSE IT CANNOT RELIABLY MEASURE PLAINTIFFS' ALLEGED HARM**.......12

**A.  Dr. Johnson's Proof of Conduct (the "Undercompensation Model") Only Generates Firm-Wide Average "Undercompensation," and is not a Reliable Measure of Class-Wide Impact or Individual Harm** .......................................................14

Dr. Johnson's Undercompensation model, which only measures the average percentage of undercompensation at each Defendant, cannot show whether there was a salary impact on any individual, and given the small class size, the fact that Dr. Johnson did not seek to confirm his undercompensation conclusion for any single employee, and the fact that Defendants' salary data shows that many employees' compensation increased during the putative class period, the average undercompensation percentage is not helpful in this case.  Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-154, 157 (1999); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010); *Lake Mich. Contractors, Inc. v. Manitowoc Co.*, 225 F. Supp 2d 791, 800-801 (W.D. Mich. 2002).

**B.  Dr. Johnson Does Not—and Cannot—Show Class-Wide Impact based on Notions of Internal Equity or his "Compensation-Sharing" Regression** ...............................................................17

Dr. Johnson's claim that "internal equity" would cause any alleged undercompensation to be spread to the entire putative class is unfounded in the record and misunderstands Defendants' compensation policies, and his regression models purporting to be evidence of internal equity are not capable of showing whether undercompensation would be spread across the putative class. Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-154, 157 (1999); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010)

**C.  The False Positives Generated by Dr. Johnson's Models are Proof that His Overinclusive Averages Mask Unaffected Compensation** .....20

Dr. Johnson's inability to show that any putative class member was undercompensated or that undercompensation would be spread across the putative class is illustrated by the fact that his analysis generates results for two groups of employees who could not have been impacted by the Challenged Conduct. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-38 (2013); *Hicks v. State Farm Fire & Casualty Co.*, 965 F.3d 452, 460 (6th Cir. 2020); *Hall v. Thomas*, 753 F. Supp. 2d 1113 (N.D. Ala. 2010); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 127 (D.D.C. 2017).

**1.  *New Hires Could Not Have Been Harmed by the Challenged Conduct*** ............................................................................21

2. ***Putative Class Members Terminated before the IPAS Task Order Could Not Have Been Harmed by the Challenged Conduct*** .......................................................................................22

III. **DR. JOHNSON'S ANALYSIS MUST BE EXCLUDED BECAUSE IT IS DRIVEN BY AN INVALID BENCHMARK AND DOES NOT PROPERLY MEASURE COMPENSATION** ...................................23

A. **Dr. Johnson's Results are Driven by an Invalid Benchmark** ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.......................................................24

1. ***The*** ▮▮▮▮▮▮▮▮▮▮▮ ***is not an Appropriate Benchmark for Salaries in Molesworth*** .......................................26

Dr. Johnson's regression analysis is unreliable because it is driven by an independent variable that compares salaries in Molesworth to data from a salary survey from the ▮▮▮▮▮▮▮▮▮▮ despite the fact that the salary survey and Defendants' salaries at Molesworth trended in opposite directions during the "clean" period. *Kentucky. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020); *Hyland HomeServices of Am., Inc.*, 2012 WL 12995647, at *12 (W.D. Ky. July 3, 2012); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000); *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *10 (W.D. Tenn. June 30, 2015); *Iams Co. v. Nutro Prods.*, 2004 WL 5496244, at *4-*6 (S.D. Ohio June 30, 2004); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-154, 157 (1999); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).

2. ***Dr. Johnson did not Reliably Apply the*** ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ ...................................................................29

Dr. Johnson mapped Defendants' employees to the ▮▮▮▮▮▮▮▮▮▮ data based on his own speculation and unfounded methodology, and in a manner that is contrary to the facts of the case. *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *10 (W.D. Tenn. June 30, 2015); *Iams Co. v. Nutro Prods.*, 2004 WL 5496244, at *4-*6 (S.D. Ohio June 30, 2004); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-154, 157 (1999); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010).

B. **Dr. Johnson Excludes a Key Component of Total Compensation from His Regression** ................................................30

Dr. Johnson's Undercompensation regression models exclude employees' allowances in calculating total compensation, despite the record showing that recruits, employees, and managers all considered allowances to be a part of compensation, and that Defendants considered allowances when setting salaries. *See Ferguson v. Nat'l Freight, Inc.*, 2016 WL 1192702, at *4 (W.D. Va. Mar. 22, 2016); *Kentucky. v. Marathon Petroleum Co.*, 464 F. Supp. 3d 880, 894 (W.D. Ky.

2020); *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *10 (W.D. Tenn. June 30, 2015); *Iams Co. v. Nutro Prods.*, 2004 WL 5496244, at *4-*6 (S.D. Ohio June 30, 2004).

**IV.    DR. JOHNSON'S OPINIONS SHOULD BE EXCLUDED BECAUSE OF THE UNRELIABLE DATA SETS USED IN HIS UNDERCOMPENSATION AND DAMAGES MODELS...............................33**

Dr. Johnson only calculates undercompensation percentages for each Defendant for the year 2018, but uses these percentages to calculate damages for the years 2019, 2020, and 2021 (through May).  Dr. Johnson's merits Undercompensation model excludes data for new hires, and imputes certain employees' (including Named Plaintiffs') salaries for 2018 using their 2017 salaries.  Additionally, Dr. Johnson assumes that employees who were employed by Defendants at Molesworth in 2019 remained active at Molesworth through May 2021 at the same salary levels for purposes of calculating damages, despite no evidence supporting such conclusions. *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Lake Mich. Contractors v. Monitowoc Co.*, 225 F. Supp. 2d 791, 801 (W.D. Mich. 2002); *In re Aluminum Phosphide Antitrust Litig.*, 93 F. Supp. 1497, 1506-07 (D. Kan. 1995).

**CONCLUSION ........................................................................................................38**

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Aluminum Phosphide Antitrust Litig.*,
   893 F. Supp. 1497 (D. Kan. 1995)................................................................................26, 38

*In re Behr Dayton Thermal Prods.*, *LLC*,
   2015 WL 13651286 (S.D. Ohio Feb. 27, 2015)..........................................................6

*Brighton Optical Inc. v. Vision Serv. Plan*,
   422 F. Supp. 2d 792 (E.D. Mich. 2006).....................................................................8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993).........................................................................................6, 16, 25

*City of Cleveland v. Cleveland Elec. Illuminating Co.*,
   538 F. Supp. 1306 (N.D. Ohio 1980)........................................................................8

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...................................................................................7, 20, 23

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).......................................................................................6

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*,
   213 F.3d 198 (5th Cir. 2000) ..................................................................................26

*Ferguson v. Nat'l Freight, Inc.*,
   2016 WL 1192702 (W.D. Va. Mar. 22, 2016).......................................................31

*FTC. v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008) ..............................................................................11

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)............................................................................................33

*Hall v. Thomas*,
   753 F. Supp. 2d 1113 (N.D. Ala. 2010) ...............................................................21

*Hicks v. State Farm Fire & Casualty Co.*,
   965 F.3d 452 (6th Cir. 2020) ..................................................................................20

*Home Health Specialists, Inc. v. Liberty Health Sys.*,
   1994 WL 463406 (E.D. Pa. Aug. 24, 1994), *aff'd*, 65 F.3d 162 (3d Cir. 1995) ......................8

*Hyland HomeServices of Am., Inc.,* 2012 WL 12995647 (W.D. Ky. July 3, 2012) ....................26

*Iams Co. v. Nutro Prods.*,
   2004 WL 5496244 (S.D. Ohio June 30, 2004) ..........................................................26, 30, 31

*Kentucky. v. Marathon Petrol. Co.*,
   464 F. Supp. 3d 880 (W.D. Ky. 2020) ...........................................................................25, 26

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................6, 12, 26

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
   2008 WL 113987 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009) ....................11

*Lake Mich. Contractors, Inc. v. Monitowoc Co.*,
   225 F. Supp 2d 791 (W.D. Mich. 2002) ........................................................................15, 33

*Newell Rubbermaid, Inc. v. Raymond Corp.*,
   676 F.3d 521 (6th Cir. 2012) .................................................................................33

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   933 F.3d (9th Cir. 2021) *rehearing en Banc granted* 5 F.4th 950 (9th Cir.
   Aug. 3, 2021) ................................................................................................15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ...............................................................................21

*Robocast, Inc. v. Apple Inc.*,
   2014 WL 334183 (D. Del. Jan. 28, 2014) ...................................................................11

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ....................................................................................8

*Tamraz v. Lincoln Elec. Co.*,
   620 F.3d 665 (6th Cir. 2010) ........................................................................ *passim*

*Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*,
   2015 WL 12001264 (W.D. Tenn. June 30, 2015) ....................................................26, 30, 31

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*,
   388 F.3d 955 (6th Cir. 2004) .....................................................................................12

**Rules**

Fed. R. Evid. 702 .......................................................................................... *passim*

Fed. R. Evid. 1006 ...............................................................................................36

**Other Authorities**

ABA ANTITRUST SECTION, AMERICAN BAR ASSOCIATION .......................................................15, 25

Operationalizing the Hypothetical Monopolist Test, DOJ (June 25, 2015)
(https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-
test#N_12_)............................................................................................................................11

## INTRODUCTION

This Court should exclude the class certification and merits opinions of Plaintiffs' expert Dr. Phillip Johnson, pursuant to Federal Rule of Evidence 702 and *Daubert*. Dr. Johnson's opinions are not reliable because he proposes an antitrust market that cannot be squared with the commercial realities of the government contracts industry, creates a regression model that both improperly includes and excludes variables on known, material issues, and uses data for only a limited number of people, during a limited time period, as a basis for speculating and extrapolating harm to all employees for the entire 4-year putative class period.

Dr. Philip Johnson has defined the conduct that Plaintiffs challenge as "Defendants simply agree[ing] not [to] solicit or hire each other's employees"[1] (the "Challenged Conduct"). Plaintiffs allege that employees of Booz Allen Hamilton Inc. ("Booz Allen"), Mission Essential Personnel, LLC ("ME"), and CACI Technologies LLC (separately and as successor to CACI Technologies, Inc.) (collectively, "CACI" and with Booz Allen and ME, "Defendants") were essentially trapped at the Molesworth base and lacked access to other labor markets. Once trapped, the theory goes, Defendants did not have to raise salaries to prevent their employees from going to work for a co-Defendant, and thus, employees' salaries were suppressed. Dr. Johnson asserts that this alleged salary suppression impacted the entire putative class due to Defendants' "internal equity" pay guidelines that suggested, among many relevant factors, that employees should receive similar pay for similar work.

In both attempting to certify a class and prevail on the merits, Plaintiffs rely on four expert reports by Dr. Johnson. In his class certification reports, Dr. Johnson proffers a method that he

---

[1] Expert Report of Phillip Johnson, dated June 3, 2021 ("Johnson Merits Rpt.") ¶ 63, attached hereto as Exhibit 3; *see also id.* at ¶¶ 65-69. Among the many flaws with Dr. Johnson's analysis, as discussed below, Dr. Johnson's definition of the Challenged Conduct fails because it impermissibly mixes joint (or potentially joint) conduct with unilateral conduct.

claims is capable of measuring class-wide impact. In his merits reports, he purports to calculate an aggregated undercompensation measure of damages for the putative class. These class certification and merits opinions should be excluded for four independent reasons:

_First,_ Dr. Johnson does not properly define a relevant antitrust market. Market definition is the foundation upon which any analysis of potential anticompetitive effects is built. Because Dr. Johnson fails to use reliable methods to define a relevant market, all of his other conclusions about potential effects must be excluded, too. Dr. Johnson's market analysis is divorced from commercial realities because he ignores the abundant evidence that employees (including Named Plaintiffs) changed jobs into and out of Molesworth with ease. Dr. Johnson did not use the accepted methodology that Plaintiffs' second expert, Mr. Ted Tatos, testified was necessary to define a relevant market, namely, an analysis of employment substitution patterns of intelligence analysts at Molesworth prior to the Challenged Conduct (_i.e._ where they worked before Molesworth, how long they typically stayed employed at the base, and how frequently they obtained jobs elsewhere). Moreover, his purported SSNIP test, which he touts as "proof" that he has defined the right market, is no such thing and must be excluded.

_Second,_ Dr. Johnson's Undercompensation and Compensation-Sharing models are not capable of showing class-wide harm. Dr. Johnson's regression analysis is not even designed to show that all or virtually all putative class members were harmed. The analysis that he prepared for each Defendant purports to show that: (1) compensation was suppressed _on average_ during the putative class period by a certain percentage; and (2) _on average_, an employee's compensation is positively correlated with their firm's company-wide _average_ compensation. While averages are helpful in some cases, they are misleading here. Despite a relatively small putative class of 378 employees, Dr. Johnson has not shown that _any_ individual employee was undercompensated at all,

2

let alone by the amount indicated in his models. The record evidence shows that many employees received pay raises during the putative class period and that changes in their compensation were not in lock-step with changes in their colleagues' compensation. Dr. Johnson's models also lead him to conclude, contrary to reason, that individual employees who could not have been impacted by the Challenged Conduct were somehow nevertheless harmed.

   *Third,* his analysis has not been reliably applied. Dr. Johnson's undercompensation results are driven by comparing a small slice of putative class salary data with salary data that he selected from the ████████████████ But ███████ salaries are not a valid benchmark for Molesworth salaries because salaries were trending in *opposite* directions in Molesworth and ███ during the period prior to the Challenged Conduct; for one location to be a valid benchmark for another, salaries in both locations should behave in a similar fashion in the period before the Challenged Conduct. He also intentionally excludes living quarters allowances, a major component of the putative class employees' compensation (as much as 25%). When either of these issues is corrected, Dr. Johnson's undercompensation result disappears.

   *Fourth,* his damages calculations are not based on adequate data. Dr. Johnson opines on damages for the entire four-year putative class period, yet he calculates his damages percentage using data from only a single year of the putative class period and excludes one-third of the total number of putative class members. This highly speculative approach makes Dr. Johnson's opinions too unreliable to support a finding of any antitrust impact and damages for all the putative class members during the entire putative class period.

## BACKGROUND

Dr. Johnson has provided four separate expert reports in this matter:

1. December 18, 2020 – Opening Class certification Report ("Johnson Class Cert. Rpt."): Dr. Johnson's opening Class certification report is intended to answer (1) whether there is evidence common to the putative class capable of showing that the non-solicitation agreements suppressed salaries; and (2) whether there is a reliable method for quantifying the amount of suppressed compensation suffered by the putative class.[2] Dr. Johnson answers both in the affirmative, and in support provides two regression models. The first (the "Undercompensation" model) purports to show the firm-wide average undercompensation percentage at each Defendant. The second (the "Compensation-Sharing" model) purports to show separately for each Defendant that a change in compensation of one employee tends to be similar to the average change in compensation for other employees (with similar and different job titles), and that an employee with lower-than-average compensation one year experiences higher percentage increases in compensation the following year.[3] Dr. Johnson concludes that these models, together with Defendants' policies of internal equity provide the necessary foundation for his opinions that there was undercompensation during the putative class period and that the undercompensation was spread across the entire putative class.

2. May 4, 2021 – Reply Class certification Report ("Johnson Class Cert. Reply Rpt."): Dr. Johnson does not present any new or updated models in his May 4, 2021 report. Instead,

---

[2] Johnson Class Cert. Rpt. ¶ 8, attached hereto as Exhibit 1.

[3] Id. ¶¶ 120-21; Expert Report of Justin McCrary, dated March 12, 2021 ("McCrary Class Cert. Rpt.") ¶ 211, attached hereto as Exhibit 2.

he addresses Defendants' Expert's criticism of his opening report and attempts to run statistical sensitivity checks to support his conclusions.[4]

3. June 3, 2021 – Opening Merits Report ("Johnson Merits Rpt."): In this report, Dr. Johnson provides what he describes as additional support for his undercompensation conclusions, an updated Undercompensation regression model, and a model that purports to calculate damages arising from the Challenged Conduct.[5] This updated Undercompensation regression excludes putative class members whom Dr. Johnson includes in his class certification report, and also removes and updates certain variables. It relies only on data from a subset of employees to calculate an average undercompensation percentage for all employees for the year 2018.[6] Dr. Johnson then uses this 2018-only calculation of undercompensation to simply assume the same common impact and level of damages in 2019, 2020, and 2021 (though May).[7] He also presumes that employees active in 2019 remained active,[8] receiving the same salaries through the remainder of the putative class period.[9] To be clear, Dr. Johnson does not rely upon any post-2018 data to calculate undercompensation percentages—for all of his opinions regarding impact and damages in 2019, 2020 and 2021 (through May)—he just assumes that nothing changed. Dr. Johnson

---

[4] *E.g.*, Johnson Class Cert. Reply Rpt. ¶ 136, attached hereto as Exhibit 11.

[5] *E.g.*, Johnson Merits Rpt. ¶ 4.

[6] *Id.* ¶¶ 97-101, at Fig. 2.

[7] *Id.* ¶¶ 108-109, at Fig. 8.

[8] Data for 2019 were used to estimate employee counts and compensation in 2020 and 2021. Employees whose last known status in 2019 was "active" in Molesworth are assumed to have worked in Molesworth through May 31, 2021 unless a termination date was provided. *Id.* at Fig. 8 at n. 3. Booz Allen's 2019 employee and salary data were cut off at June 30, 2019, while ME and CACI provided data for some employees through the end of 2019. *Id.* at n. 1, 2; *see also* Johnson Merits Rpt. ¶ 109 ("To estimate class Size and compensation for July 1, 2019 through May 31, 2021, active employees as of June 30, 2019 are assumed to have worked in Molesworth continuously through May 31, 2021, unless a termination was provided, at the same compensation.").

[9] *Id.*

also puts forth an analysis defining a relevant market as "Intelligence Analysts for U.S. Defense Contracting at Molesworth," which is based on a review of certain documentary evidence and a purported SSNIP test.

4.  July 15, 2021 – Reply Merits Report ("Johnson Merits Reply Rpt."):  Dr. Johnson does not present any new or updated models in this report.  He dedicates most of this report to arguments about the procompetitive benefits of the Challenged Conduct,[10] the geographic impact of the conduct, and his faulty market definition.

## **LEGAL STANDARD**

Federal Rule of Evidence 702 requires expert testimony to be reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  To be admissible, expert testimony must be "based on sufficient facts or data," "the product of reliable principles and methods," and the expert must have "reliably applied the principles and methods to the facts of the case."  *See* Fed. R. Evid. 702(b)-(d); *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) (citing Fed. R. Evid. 702(b), (c)).  An expert opinion cannot support a jury's verdict when it is "not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).  To assist the trier of fact, expert testimony must fit the case in which it is being offered, *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-154, (1999), and cannot be based on "science that is junky," *see id.* at 159.

Exclusion under Fed. R. Evid. 702 may be appropriate both at the merits stage of a case and at class certification.  *In re Behr Dayton Thermal Prods., LLC*, 2015 WL 13651286, at *6

---

[10] Dr. Johnson addressed the claims related to procompetitive benefits raised in the Expert Report of Dr. Justin McCrary, dated June 3, 2021 ("McCrary Merits Rpt.") and the Expert Report of Professor Christopher Yukins dated June 3, 2021.  *See* Johnson Merits Reply Rpt. at II, attached hereto as Exhibit 10.

(S.D. Ohio Feb. 27, 2015) (noting that "the relevant inquiry" at class certification is "'whether an expert's opinion [is] sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance.'" (internal citations omitted) (brackets in original)); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[An expert's model] must measure only those damages attributable to [plaintiffs'] theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire putative class for purposes of Rule 23(b)(3).").

## **ARGUMENT**

I.      **DR. JOHNSON IGNORES EVIDENCE IN THE RECORD SHOWING THAT MOLESWORTH UK CANNOT BE A RELEVANT ANTITRUST MARKET**

The foundation underlying Dr. Johnson's opinions about competitive impact is his assertion that "Intelligence Analysts in Molesworth, England" is a properly defined antitrust market. Because Dr. Johnson's analysis of the antitrust market is unreliable, his attempt to measure the alleged effects in such a market is also unreliable.

    A.      Dr. Johnson's Economic Analysis Ignores Commercial Realities and Fails to Assess Actual Substitution Patterns

Dr. Johnson's proposed market does not reflect the commercial realities because he ignores the overwhelming factual evidence that shows intelligence analysts were readily able to find work around the world and that Defendants at Molesworth hired most of their employees from somewhere else.[11] In ignoring that evidence, he did not analyze substitution patterns as required in defining a market, and his analysis therefore should be excluded.

---

[11] *See* Moving Defendants' Motion for Summary Judgment, filed contemporaneously with this Motion, at Section II.A ("Defs.' Mot. for Summ. J.").

The purpose of defining a relevant market is to provide context for assessing the conduct at issue. A relevant geographic market is "the locale in which consumers of a product or service can turn for alternative sources of supply." *Brighton Optical Inc. v. Vision Serv. Plan*, 422 F. Supp. 2d 792, 806 (E.D. Mich. 2006). The geographic component of a relevant market must comport with the area to which intelligence analysts can turn for jobs. As the Sixth Circuit has made clear, when defining the geographic component of a relevant market, "[c]ommercial realities should be contemplated…" *In re Se. Milk Antitrust Litig*., 739 F.3d 262, 281 (6th Cir. 2014). This includes the "factors bearing upon where customers might realistically look to buy the product," and requires a "fact-intensive" inquiry. *Id.* at 277 (internal quotations omitted); *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1306, 1310 (N.D. Ohio 1980) (describing the "flow of commercial interaction," identification of "consumer behavior patterns," and "actual commercial transactions between buyers and sellers" as central to market definition inquiry); *Home Health Specialists, Inc. v. Liberty Health Sys*., 1994 WL 463406, at *4 (E.D. Pa. Aug. 24, 1994), *aff'd*, 65 F.3d 162 (3d Cir. 1995) (finding insufficient evidence to support Plaintiffs' proposed market of hospital services where plaintiffs presented "no evidence as to where Delaware County residents look to purchase hospital services or home health care services"). Indeed, Plaintiffs' second expert, Mr. Tatos, agrees. He explained that to properly define a market here, an expert should see how employees moved in a market absent the conduct by evaluating the area employees at Molesworth came from and where they went when they left (*i.e.*, their "substation patterns") during the period before the Challenged Conduct. [12]

---

[12] Expert Report of Ted Tatos, dated July 15, 2021 ("Tatos Rpt.") at 81, attached hereto as Exhibit 4; Transcript of Deposition of Ted Tatos, dated Aug. 26, 2021 ("Tatos Tr.") at 76:22-77:14, 79:14-80:6, attached hereto as Exhibit 5. Mr. Tatos and Dr. Johnson are both employed by the economic consulting firm EconOne.

Dr. Johnson admits that he does not use the accepted methodology. He does not analyze employee substitution patterns before the Challenged Conduct.[13] His report does not indicate he analyzed the impact of salary changes on hiring at Molesworth before the Challenged Conduct using any other method, nor does he cite any literature on that subject. He does not analyze how intelligence analysts at Molesworth applied for new jobs, where they came from, how long they stayed there, or where they went afterward.[14] His report is similarly silent on other considerations, like whether employees relocating to other European locations might face the same tax costs he alleges served as a restraint in Molesworth.[15]

Instead, relying on a review of cherry-picked documents, Dr. Johnson claims that there are potential costs to employees in leaving Molesworth and employers hiring from outside of Molesworth.[16] He then concludes that these purported costs limited the ability of all of the intelligence analysts to freely move outside of Molesworth, which permitted Defendants to suppress wages through the Challenged Conduct. But Dr. Johnson's assessment that there are potential costs for intelligence analysts to switch jobs is unsurprising, because "[a]lmost every labor market in the world is characterized by costs of switching between jobs. . ."[17] In his deposition Dr. Johnson conceded that he does not know whether, in the global market for intelligence analysts, a *hiring* firm might cover the costs of an intelligence analyst's relocation— which Defendants in this case did and which rebuts the notion that the cost of moving overseas

---

[13] Transcript of Deposition of Dr. Philip Johnson, dated Aug. 27, 2021 ("Johnson (Aug. 2021) Tr.") at 396:11-397:23, 399:15-400:19, 538:4-16, attached hereto as Exhibit 6.

[14] Exhibit 6, Johnson (Aug. 2021) Tr. at 396:11-397:23, 399:15-400:19, 538:4-16.

[15] Johnson Merits Rpt. ¶ 20 (recognizing the existence of tax benefits, but not analyzing the impact on markets).

[16] *See generally id.* ¶¶ 16-25.

[17] Expert Report of Dr. Justin McCrary, dated July 15, 2021 ("McCrary Merits Reply Rpt.") ¶ 26, attached hereto as Exhibit 7.

limited mobility.[18]  To determine whether switching costs, or any other factors, are in fact sufficient to establish a relevant market, it is necessary to go beyond hypothesis and to analyze the actual experience of employees.

Had he done so, Dr. Johnson would have discovered that the record shows that the purported switching costs for putative class members to leave Molesworth were often paid by someone else (usually, their employer), and in any event, those costs did not stop intelligence analysts from regularly moving in and out of Molesworth.[19]  As discussed in Defendants' motion for summary judgment, intelligence analysts at Molesworth are assigned to perform work on short-term, limited duration government contracts and thus inherently know that they may not stay for long.[20]  The record also is replete with evidence that they were frequently able to obtain positions across the globe, and that the Defendants recruited globally.[21]  These commercial realities eviscerate Dr. Johnson's untested hypothesis that theoretical switching costs trapped Plaintiffs at Molesworth—the evidence shows they did not.  For example, Named Plaintiffs themselves were hired from the United States into Molesworth and easily found employment outside of Molesworth upon termination.[22]

Because Dr. Johnson makes no attempt to grapple with the commercial realities of the industry to determine the degree to which purported switching costs ever impacted the putative class members, his conclusion that Defendants suppressed salaries is based entirely on untested

---

[18] Exhibit 6, Johnson (Aug. 2021) Tr. at 539:15-540:16; BAH0449918 at '922, attached hereto as Exhibit 30 (Booz Allen Global Assignment Agreement with relocation reimbursement provisions).

[19] *See* Defs.' Mot. for Summ. J. at 31-33, 36.

[20] *Id.* at 5-6, 31-33.

[21] *Id*. at 31-33.

[22] *Id*. at 4-6, 14-15, 31-32.

and flawed assumptions regarding the geographic aspect of his purported relevant market. His opinion should be excluded.

B.    Dr. Johnson's Purported SSNIP Test is not Based on Reliable Methodology

Dr. Johnson cannot rely on his purported SSNIP test to confirm his proposed relevant market definition because, there too, he fails to use a reliable methodology.

The purpose of a SSNIP test is to support an opinion about the relevant area of competition in which to assess competitive effects. [23] "*Daubert* requires reliable inputs reliably applied[,]" and a SSNIP test that is not applied reliably should be excluded. *Robocast, Inc. v. Apple Inc*., 2014 WL 334183, at *2 (D. Del. Jan. 28, 2014). In *Ky. Speedway* the Sixth Circuit upheld the lower court's rejection of an expert's litigation-driven SSNIP test where the expert used his "own version" of a SSNIP test "that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support within the scientific community, and was produced solely for purposes of the instant litigation." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009). That is exactly what Dr. Johnson has done here, and this court should exclude it for the same reasons.

Since market definition provides the context for assessing the effect of the conduct at issue, an expert should conduct a SSNIP and *then* assess competitive effects. Dr. Johnson's analysis is exactly backwards. He first created a regression model to measure effects. Then, he used those

---

[23] A SSNIP, which stands for "Small but Significant and Non-transitory Increase in Price" test is commonly used to help define a relevant market. The test measures whether a hypothetical monopolist (or monopsonist) "can raise its prices by a small amount (typically 5% is used) and still make money. That is: if such a price rise were implemented, would the consumers go elsewhere?" *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc*., 2008 WL 113987, at *4 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009). If the SSNIP reveals that a hypothetical monopsonist could not profitably pay prices below the competitive level for work, then it is evidence that the market is broader than alleged. *FTC. v. Whole Foods Mkt., Inc*., 548 F.3d 1028, 1038 (D.C. Cir. 2008). SSNIP tests are generally applied through an analysis of the impact of price changes on consumer demand in an independently controlled setting. *See* Operationalizing the Hypothetical Monopolist Test, DOJ (June 25, 2015) (https://www.justice.gov/atr/operationalizing-hypothetical-monopolist-test#N_12_).

results to claim that he conducted a SSNIP test.[24] In other words, his analysis is totally circular; he uses the conclusion from his Undercompensation regression analysis—that antitrust impact occurred during the putative class period in his proffered relevant market of intelligence analysts at Molesworth—to argue that he performed a SSNIP test to determine that intelligence analysts at Molesworth is a properly defined, relevant market.

Dr. Johnson's Undercompensation model *depends* on establishing a relevant market in the first place, so it cannot logically be used as *proof* that a relevant market exists. *See, e.g., Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 961 (6th Cir. 2004). By drawing support for his market definition through his own analysis of the purported effects of the conduct (which itself is unreliable for the reasons explained in Sections II-IV), Dr. Johnson makes a transparent attempt to side-step the market definition requirement of the rule of reason, and his opinions on a market and the effects therein should be excluded accordingly.

## II. DR. JOHNSON'S ANALYSIS SHOULD BE EXCLUDED BECAUSE IT CANNOT RELIABLY MEASURE PLAINTIFFS' ALLEGED HARM

To be admissible, an expert's method for analyzing data must be capable of "draw[ing] a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire*, 526 U.S. at 154 (emphasis in original); Fed. R. Evid. 702. Dr. Johnson's class certification and merits opinions should be excluded because his models do not reliably measure any alleged putative class-wide harm or individual damages.

Dr. Johnson explained during his most recent deposition that, under his theory of harm, the Challenged Conduct reduced the mobility of the putative class members by eliminating Defendants' perceived fear that their employees would be poached or hired by another firm.[25]

---

[24] Johnson Merits Rpt. ¶ 8; Exhibit 6, Johnson (Aug. 2021) Tr. at 394:10-394:14.

[25] Exhibit 6, Johnson (Aug. 2021) Tr. at 497:23-498:18.

Though he testified that it may be impossible to measure a change in such "mobility,"[26] he nonetheless created a model that purports to measure its effects. Dr. Johnson claims to show putative class-wide undercompensation and calculate aggregated damages by presenting two averages: (1) a single firm-wide average percentage of undercompensation for each Defendant (which he claims is proof of the effects of the Challenged Conduct),[27] and (2) a coefficient that shows, on average, that employees' salaries at a given firm are correlated (which he claims is proof of common impact).[28]

While averages can be helpful in some cases, they also can be misleading if they mask individual characteristics. That is exactly what the record shows in this case, where there is no evidence that any individual putative class member was undercompensated as a result of the Challenged Conduct (let alone by the amount that Dr. Johnson's models generate), or that any average undercompensation would spread broadly to the putative class. In fact, the record shows the exact opposite. Despite the relatively small putative class size, Dr. Johnson did not try to confirm his conclusions by analyzing even one of the 378 putative class members' salaries. The flaws in Dr. Johnson's analysis are further revealed by the fact that he opines on damages for two groups of putative class members who could not possibly have been impacted by the Challenged Conduct, as described below. Accordingly, the method Dr. Johnson concocted to prove Plaintiffs' case is too unreliable to be admitted.

---

[26] *Id.* at 498:21-499:16.

[27] *See* Johnson Class Cert. Rpt. at Figs. 6-8; Johnson Merits Rpt. at Fig. 2.

[28] *See* Johnson Class Cert. Rpt. at Figs. 12-14.

A.     Dr. Johnson's Proof of Conduct (the "Undercompensation Model") Only Generates Firm-Wide Average "Undercompensation," and is not a Reliable Measure of Class-Wide Impact or Individual Harm

Dr. Johnson's first regression, the Undercompensation model,[29] is not capable of showing common class-wide impact or individual harm. It cannot do so because it only provides, for each Defendant, a single average percentage of purported undercompensation for the subset of the putative class whose data is analyzed. It simply cannot and does not measure whether there was a salary impact on all (or most) of the putative class members.

The model is supposed to measure the effect of Defendants' conduct. It purports to do this by controlling for a handful of variables that might impact compensation and then generating a single average undercompensation percentage for each Defendant.[30] Significantly, the model does not, and cannot, actually measure Defendants' conduct—it simply purports to measure a compensation change from before the putative class period to during it. Dr. Johnson then relies upon the average percentage to calculate an aggregated damages amount for the putative class.[31] He uses this model to make a baseless inferential leap of faith, however. Even though his Undercompensation model can only show—at most—an average figure, he nevertheless relies on it to conclude that its results would apply to every member of the putative class.[32]

---

[29] Dr. Johnson's "Undercompensation Model," in the singular in this section, encompasses both the Undercompensation model presented in Dr. Johnson's class certification report (Johnson Class Cert. Rpt. at Figs. 6-8) as well as the model in his merits report (Johnson Merits Rpt. at Fig. 2).

[30] Johnson Class Cert. Rpt. ¶¶ 87-90; Johnson Merits Rpt. ¶ 98.

[31] Johnson Merits Rpt. ¶¶ 108-109, at Fig. 8.

[32] *See* Transcript of Dr. Philip Johnson, dated Feb. 18, 2021 ("Johnson (Feb. 2021) Tr.") at 215:5-6, attached hereto as Exhibit 8 ("The model estimates the undercompensation for the class as a whole . . . ."), 216:14-17 (stating that if "they were part of the class, . . . the model says that defendants' compensation was -- was suppressed by that percentage"). Despite choosing to design his model to use averages, Dr. Johnson admits that not every putative class member would necessarily be undercompensated "precisely the same." *Id.* at 215:8-11. As discussed later, *see infra* Section II.C, Dr. Johnson's lack of deeper analysis actually causes him to use his models to opine on undercompensation for certain putative class members who *could not* have been harmed.

This point is not controverted, and it is not surprising that an average undercompensation percentage *cannot* be proof that any single employee was undercompensated by a specific amount—or by *any* amount.[33] In fact, Dr. Johnson himself admits the risks inherent in relying on an average undercompensation percentage to show the impact of the Challenged Conduct on salaries:[34]

> "Q. If Booz Allen's salaries on average were lower than ME, why would Booz Allen have to raise its salaries to poach ME salaries?
>
> A. This is an average across the firm. There's different titles, different – different number of people had different titles. ***So an average doesn't necessarily inform you about how compensation levels compare.***"
>
> . . .
>
> "Q. So, essentially, an average can mask differences at the individual employee level; is that what you're saying?
>
> A. ***It can.***"

That is not to say that averages are intrinsically bad, and in *some* antitrust cases they might be helpful. But here, the averages are misleading and unreliable. Dr. Johnson opted not to confirm that his single firm-wide average is representative of any individual putative class member (including either Named Plaintiff).[35] Nor did Dr. Johnson identify any documentary evidence that

---

[33] *See, e.g.*, *Lake Mich. Contractors, Inc. v. Monitowoc Co.*, 225 F. Supp 2d 791 at 800-801 (W.D. Mich. 2002) (excluding expert testimony for impermissibly relying on a single impact number of 50% while failing to "account for differences in rain volume and the impact that rain might have had on the types of work to be performed" on any given day); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 933 F.3d at 774, 790 (9th Cir. 2021) *rehearing en Banc granted* 5 F.4th 950 (9th Cir. Aug. 3, 2021) (stating that the "use of averaging assumptions in a regression analysis may be inappropriate" in certain circumstances, and citing *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002); ABA ANTITRUST SECTION, AMERICAN BAR ASSOCIATION, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES, § 13.B.1.c.2 (2d ed. 2014), attached hereto as Exhibit 9 ("When averages are used, there is a risk that the averages may hide substantial differences among customers or products, which may be critical for determining whether there is individual impact.").

[34] *See* Exhibit 8, Johnson (Feb. 2021) Tr. at 139:15-141:2 (emphasis added); *see also* Exhibit 6, Johnson (Aug. 2021) Tr. 505:4-18.

[35] *See* Exhibit 8, Johnson (Feb. 2021) Tr. at 215:2-216:21 ("Q. . . . Does that, for example, mean that Sarah Hunter's salary was 6.2 percent lower than it would have been in the but-for world? A. I didn't analyze Sarah Hunter separately.

Defendants' Challenged Conduct led to undercompensation for every employee.  In fact, when Defendants' expert re-ran the Undercompensation model at the individual—rather than firm-wide—level, Dr. Johnson's model[36] found that "the majority of class Members' salaries were not suppressed and **many class Members actually saw their salaries increase during the class period.**"[37]  The point of this analysis, of course, is to show that Dr. Johnson's models are unreliable and simply cannot be used to meet Plaintiffs' burden that the Challenged Conduct had anywhere near a common impact, let alone a negative impact, on all (or most) of the putative class.

Further, a lack of common impact, or any impact, is consistent with Defendants' salary data in general, which shows that salaries started trending upward at the start of the putative class period (the opposite of what one would expect if the Challenged Conduct led to suppressed salaries).[38]  Dr. Johnson asks the Court to admit his single average undercompensation percentage as proof of the common harm resulting from the Challenged Conduct, despite evidence that directly contradicts it.  Such speculation is improper, *see Tamraz,* 620 F.3d at 670, particularly as it is directly contradicted by Defendants' salary data, *see Brooke Grp. Ltd.*, 509 U.S. at 242 (expert opinion cannot be contradicted by "indisputable record facts [that] contradict or otherwise render the opinion unreasonable"), and the court should exclude his undercompensation opinions.

---

Q. How about for Mr. Youtz? A. Him neither.").  In fact, Named Plaintiffs' actual class-period salary data **are not even included in the Undercompensation regression model during the putative class period.**  *See generally infra* Section IV. Therefore, Dr. Johnson does not even know whether either Named Plaintiff's salary was actually suppressed, let alone the whether the rest of the putative class' salaries were.

[36] Dr. McCrary ran Dr. Johnson's Undercompensation regression by adding "individual fixed effects" to Dr. Johnson's own specification in order to show how the challenged conduct would impact individual employees, rather than the putative class as a whole.  McCrary Class Cert. Rpt.  ¶¶ 146 n. 164, 151-152.  Dr. Johnson applied these same "individual fixed effects" to his Compensation-Sharing regression model.  *See* Johnson Class Cert. Rpt. at Figs. 12-14; Exhibit 8, Johnson (Feb. 2021) Tr. at 250:1-251:17.

[37] McCrary Class Cert. Rpt. ¶¶ 155-157 (emphasis in original).

[38] *Id.* ¶ 148, at Exs. 1, 15.

B.    Dr. Johnson Does Not—and Cannot—Show Class-Wide Impact based on Notions of Internal Equity or his "Compensation-Sharing" Regression

Dr. Johnson attempts to overcome the limitations in his Undercompensation regression by running a second model—the Compensation-Sharing regression, which he claims shows that Defendants suppressed all putative class members' salaries as a result of Defendants' policies of "internal equity."[39]  Dr. Johnson argues that internal equity—the corporate goal of attempting to pay employees similar compensation for performing similar jobs, all else being equal—would cause undercompensation to any employee from the Challenged Conduct to be spread to the whole putative class.[40]  In other words, assuming employees' salaries are interconnected, if one employee is harmed, for example because they did not receive a retention incentive, then all employees would be harmed because their salaries would not need to be adjusted to stay in line with the "undercompensated" employee.[41]    However, the evidentiary record again contradicts Dr. Johnson's assumptions and does not support a reasonable inference that the concept of internal equity plays the outsized role that Dr. Johnson's model requires to support his opinions.  In addition to suffering from the same limitations as the Undercompensation model, including that it relies upon averages that mask important individual differences between employees, the Compensation-Sharing regression does not—and cannot—actually show that any purported individual undercompensation would be spread across the putative class.

First, Dr. Johnson has cited no documentary evidence that supports his point that internal equity would generally cause undercompensation to be spread across the putative class.  On the

---

[39] *See* Johnson Class Cert. Rpt. ¶ 119 ("The model looks for whether there are internal equity forces driving changes in individual employee compensation.").

[40] *See* Exhibit 6, Johnson (Aug. 2021) Tr. at 618:19-620:10; *see also* Johnson Class Cert. Rpt. ¶¶ 93-99, 110-113; Johnson Class Cert. Reply Rpt. ¶ 98.

[41] *See* Johnson Class Cert. Rpt. ¶¶ 93-99; Johnson Class Cert. Reply Rpt. ¶ 98.

other hand, Booz Allen's corporate representative testified that internal equity is just one of many factors that impact compensation, which is driven by individual considerations.[42]  Booz Allen's project manager for IPAS similarly testified that many individual factors, including individual negotiations and contract restraints, impact how a given employee is paid.[43]  As one would expect, a myriad of factors impact individual compensation, and Dr. Johnson has not identified any documentary evidence that the application of internal equity during the putative class period is so dominant that it would mean that a negative impact to one employee's compensation would lead to a similar impact to all other employees' compensation.  He just asks the Court to assume it is the case.

Nor is the Compensation-Sharing regression proof that internal equity plays the driving role that Dr. Johnson ascribes to it.  The model attempts to measure two things: (1) whether, *on average*, the change in compensation of one employee tends to be similar to the *average* change in compensation of other employees with similar and different job titles (a "contemporaneous" sharing effect), and (2) whether, *on average*, an employee with lower-than-average compensation one year experiences higher percentage increases in compensation the following year (a "corrective" sharing effect).[44]  Dr. Johnson thinks that if both of these are true it is sufficient proof for him to opine that any undercompensation would be spread across the entire putative class.[45]

---

[42] *See* Transcript of 30(b)(6) Deposition of Marc Buchsbaum, dated Dec. 7, 2021 at 89:2-90:6, attached hereto as Exhibit 12; *see also* Transcript of 30(b)(6) Deposition of Stephanie Costianes, dated Dec. 9, 2020 at 134:3-23, attached hereto as Exhibit 13 (testifying that "there are a variety of factors that would impact or could potentially impact the salary being above or below [a target salary]."); BAH0153077 at '077, attached hereto as Exhibit 14 (Booz Allen Ancillary Compensation Treatments policy listing internal equity as one of six factors considered in setting salaries); BAH0043365 at '403, attached hereto as Exhibit 15 (Booz Allen IPAS proposal explaining the same).

[43] *See* Transcript of Deposition of Annette Redman dated December 3, 2020 ("Redman Tr.") at 37:14-38:15, attached hereto as Exhibit 20.

[44] Johnson Class Cert. Rpt. ¶¶ 88, 120-21; McCrary Class Cert. Rpt. ¶¶ 206-211; Def. Ex. 90, attached hereto as Exhibit 16.

[45] Johnson Class Cert. Rpt. ¶ 124; McCrary Class Cert. Rpt. ¶ 204.

However, it is not.  Because the model examines only whether, on average, an individual employee's compensation generally rises when class-wide compensation rises,[46] the model is not asking the right question Plaintiffs need to answer—did the alleged undercompensation caused by the Challenged Conduct spread from one employee (or a handful of employees) across the putative class?[47]  Again, Dr. McCrary—who uses Dr. Johnson's own dataset to look at individual employees rather than relying blindly upon averaging—finds that *in reality* (rather than based on a theoretical regression model) "at the same point in time different employees experienced different changes to their compensation: some employees received a raise, some employees' compensation remained unchanged, and some employees' compensation decreased."[48]  Dr. McCrary's findings illustrate the precise risk inherent in Dr. Johnson's reliance on an average when the assumptions underlying that average are not sound.

Moreover, Dr. Johnson's theory of internal equity is not useful in a case like this where—by his own account—Defendants set salaries at a firmwide (*i.e.*, global) level,[49] but the Challenged Conduct allegedly impacted only those few employees at Molesworth.  For anticompetitive impact to spread to the broader putative class through internal equity, it first would have to affect the multitude of salary surveys Defendants separately consider, and thereby influence their separate firmwide salary bands to a degree significant enough to push Molesworth employees out of the

---

[46] *See* McCrary Class Cert. Rpt. ¶ 207.

[47] For example, if annual increases for workers tend to move together from year to year depending on how well the firm is doing (*i.e.*, in good years, average increases are bigger across all types of jobs than in bad years), a positive correlation would be expected under Dr. Johnson's compensation-sharing model.  Such correlation says nothing about what would happen if a single worker (or a small number of workers) received a pay increase due to a competitive threat.

[48] McCrary Class Cert. Rpt. ¶¶ 185-191.

[49] Johnson Class Cert Rpt. ¶¶ 99 ("results from a no-poaching agreement can be expected to impact compensation levels *across the firm*") (emphasis added), 95 ( "outside opportunities put pressure at one point in the wage structure calling for higher wages for a set of employees, firms will tend to reward everyone to some degree to maintain *the overall relative firm wage structure*.") (emphasis added), 102 (noting that Booz Allen benchmarked salaries and applied salary ranges "broadly across the firm").

salary band. Next it would have to travel back to Molesworth via their separate firmwide structures. And finally, someone at each Defendant Molesworth would have to recognize that their employees' salaries are outside the range and adjust them.[50] Dr. Johnson's report offers no indication that he considered how any purported undercompensation might spread to the entire putative class when salary structures are set at a firmwide level, yet the conduct at issue affects only a very small fraction of that firm. He further has no opinions on how long it might take for any such effects to ripple up from Molesworth to Defendants' corporate salary departments and then back again.[51]

Thus, Dr. Johnson's models cannot serve as a reliable method for showing class-wide harm (in relation to class certification) or for calculating damages (as he attempts to do in relation to the merits). They merely provide an average percentage of undercompensation and no information about how many putative class members (if any) are impacted by that average number. Accordingly, Dr. Johnson's opinions should be excluded.

C.    The False Positives Generated by Dr. Johnson's Models are Proof that His Overinclusive Averages Mask Unaffected Compensation

Dr. Johnson's inability to show class-wide harm or reliably measure damages is perhaps most clearly highlighted by the fact that he uses his model to "find" undercompensation for two groups of putative class members who *could not have been harmed* by the Challenged Conduct (*i.e.*, false positives)—"new hires," and putative class members who were terminated before the start of the IPAS task order.[52]

---

[50] *See* Defs.' Opp. to Plfs.' Mot. For Class Cert., ECF No. 112 at PageID 2591-2592.

[51] Exhibit 8, Johnson (Feb. 2021) Tr. at 245:6-24 ("Q. In other words, did – did the entry of the no-poach agreements immediately stop an effect that otherwise would have occurred? A. It may have. You know, I haven't done an analysis.").

[52] A plaintiff's "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Comcast Corp.*, 569 U.S. at 35–38; *see also Hicks v. State Farm Fire & Casualty Co.*, 965 F.3d 452, 460 (6th Cir. 2020) ("[A] court must ensure at the class-certification stage that plaintiffs' formula

1.    *New Hires Could Not Have Been Harmed by the Challenged Conduct*

The evidentiary record shows that after the putative class period began, 104 employees[53] in the putative class were hired by Defendants for their positions at Molesworth from locations outside of the Defendants' workforce at Molesworth (even though Dr. Johnson claims that Molesworth is a standalone antitrust market) ("new hires"). Dr. Johnson opines that these employees, who constitute a significant portion of the overall putative class,[54] were harmed in the same exact way as all other employees. That conclusion defies common sense.

The Challenged Conduct could not have impacted these new hires because they were not subject to any non-solicitation agreements or policies at the time of their initial hire.[55] Each of these new hires, as a rational economic actor, was free to accept a job offer from any Defendant for a position at Molesworth (or not), without restriction.[56] They could evaluate competitive offers from Defendants at Molesworth relative to the broader job market that they had access to at the time of their job search.[57] Accordingly, Dr. Johnson should have found that this set of new-hire employees did not suffer any undercompensation, but he instead opines that they were

---

calculates damages based only on their theory of liability."). Accordingly, for expert testimony to be admissible, the expert must separate out the "multiple factors that might cause 'false positive correlation.'" *Hall v. Thomas*, 753 F. Supp. 2d 1113, 1146 n. 179 (N.D. Ala. 2010); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 127 (D.D.C. 2017) ("The central question before the court therefore is whether plaintiffs have shown ... that [expert's] damages model does not show false positives . . . [P]laintiffs have failed to meet that burden, undermining [expert's] damages model.").

[53] *See* Johnson Class Cert. Rpt. at Fig. 3 (showing 104 employees hired in 2018 and 2019).

[54] *Id.; see also* McCrary Rpt. ¶ 65 ("In particular, in 2018 new hires accounted for 29 percent of BAH employees, 39 percent of CACI employees, and 17 percent of ME employees."), at Ex. 5 (showing new hires per year); McCrary Merits Reply Rpt. at Ex. 2 (showing Molesworth arrivals and departures per year).

[55] Exhibit 6, Johnson (Aug. 2021) Tr. at 416:23-417:14 (testifying that Defendants had the ability to simultaneously pursue a new hire).

[56] McCrary Class Cert. Rpt. ¶¶ 63-65 ("A fundamental precept of economics is that people choose their most preferred option among the choices they confront. Applying this principle, a new hire at Molesworth would have been offered a level of compensation at least as high as that necessary to induce them to accept the job offer at Molesworth.").

[57] *See* McCrary Class Cert. Rpt. ¶¶ 62-63 ("When a worker who does not work at Molesworth receives a job offer from a Defendant at Molesworth, the challenged conduct does not prevent other Defendants or any other employer in the world from recruiting or making a job offer to that worker.").

undercompensated *at the exact same percentage* as the employees he claims were held captive at Molesworth.[58]  This is particularly problematic as data for these employees are not even included in Dr. Johnson's merits Undercompensation regression.[59]

2.   *Putative Class Members Terminated before the IPAS Task Order Could Not Have Been Harmed by the Challenged Conduct*

Similarly, Dr. Johnson concludes that employees who were terminated before the IPAS task order began (by the start of October 2018) were harmed by the challenged conduct, despite the fact that their salaries were set *before* the putative class period, and their salaries simply could not have been suppressed before they were let go.  Ninety-one putative class members, including both Named Plaintiffs and seventy-nine other ME employees,[60] worked at Molesworth in early 2018 and were removed from employment before the beginning of the IPAS task order.[61]  The majority of these employees' salaries were established prior to the start of the putative class period based on task orders that were not re-negotiated during the period in which the Challenged Conduct was allegedly in effect.[62]  These employees' pre-class salaries could not have been impacted, as there was simply no opportunity to change their salaries until the new task order began and new labor rates were negotiated.[63]  And further, Dr. Johnson does not include class-period data for the

---

[58] *See* Johnson Class Cert. Reply Rpt. ¶ 35 (claiming that his undercompensation analysis shows that impact on new hires was similar to that on incumbents); Exhibit 6, Johnson (Aug. 2021) Tr. at 417:4-419:1; *see also* Johnson Class Cert. Rpt. ¶ 125 ("In summary, my review and analysis of the documents referenced above, and Defendants' data indicates that the alleged No-Poach Agreements suppressed compensation across the class"), at Figs. 6-8 (showing aggregated undercompensation results for each Defendant); Johnson Merits Rpt. at Fig. 8 (applying firm-wide undercompensation percentages to all employees at each Defendant).

[59] *See* Johnson Merits Rpt. ¶ 97.i.  Dr. Johnson removes these employees from his undercompensation analysis yet claims that they were injured by the Challenged Conduct.  *See* Johnson Merits Rpt. at Fig. 8 (applying firm-wide undercompensation percentages to all employees at each Defendant).

[60] McCrary Merits Reply Rpt. ¶ 157.

[61] McCrary Class Cert. Rpt. ¶ 68; McCrary Merits Reply Rpt. ¶ 157.

[62] *Id.*

[63] ME's JAC Omnibus task order provided for zero percent escalation, meaning that ME could only adjust labor rates, and in turn salaries, if it requested and received an equitable adjustment form the government client—which required an onerous process that was rarely used.  *See* Exhibit 13, Costianes 30(b)(6) Tr. at 81:11-18, 83:14-22; ME00206991

majority of these employees in either his class certification[64] or merits Undercompensation regression models.[65] These employees, who constitute 24% of the putative class[66] (and 40% of ME's total putative class),[67] are therefore masked by the single undercompensation average that Dr. Johnson calculates for ME.

Nevertheless, Dr. Johnson uses his model's results to opine that both common impact and damages exist as to those sets of employees who were not harmed and certainly could not have been harmed at the same level as other putative class members under any circumstances. Dr. Johnson's finding of numerous "false positives" for these employees constitutes an independent ground for his exclusion, *see Comcast Corp.*, 569 U.S. at 36–38, and it shows the serious unreliability of his methodology.

## III. DR. JOHNSON'S ANALYSIS MUST BE EXCLUDED BECAUSE IT IS DRIVEN BY AN INVALID BENCHMARK AND DOES NOT PROPERLY MEASURE COMPENSATION

In addition to the intrinsic problem with Dr. Johnson's averaging of data, his models also generate undercompensation results by: (1) comparing salary trends in Molesworth to a single,

---

at '991, attached hereto as Exhibit 17; ME00077387 at '413, attached hereto as Exhibit 18. For example, Named Plaintiff Sarah Hunter's compensation had not changed for the last three years she was employed at ME, and only increased the year prior because she received a promotion. *See* Pls.' Am. Supp. Answers to Defs.' Second Set of Interrogs. to Pls., Pls.' Supp. Answer to Interrog. No. 1, attached hereto as Exhibit 19.

[64] Dr. Johnson excluded salary data for ME employees from the year of their termination in his class certification Undercompensation regression. *See* Johnson Class Cert. Rpt. ¶ 137 ("The data lacked records for some employees in their termination year. Title and salary are estimated based on previous year's record for these employees in their year of termination."); *see also* Johnson Merits Rpt. ¶ 97.f ("I now include in the analysis the employee observations that were previously being excluded due to insufficient data produced by ME in their year of termination, using their last known title and compensation."); *infra* Section IV ("Data Included in Undercompensation Analyses" chart showing that data for 67 ME employees was excluded from the class certification Undercompensation regression).

[65] Dr. Johnson imputed 2017 salary data for the year 2018 for 67 ME employees who were terminated in 2018. *See* Johnson Merits Rpt. ¶ 97.f ("I now include in the analysis the employee observations that were previously being excluded due to insufficient data produced by ME in their year of termination, using their last known title and compensation."); *see also infra* Section IV ("Data Included in Undercompensation Analyses" chart showing that compensation data for 67 ME employees was imputed into the analysis as the employees' 2018 compensation data).

[66] *Compare* McCrary Merits Reply Rpt. ¶ 157 (91 putative class members in this category), *with* Johnson Merits Rpt. at Fig. 8 (378 total putative class members).

[67] *See* McCrary Merits Reply Rpt. ¶ 157.

misapplied salary survey from the ███████████████ and (2) ignoring a known, material component of putative class members' compensation. These are yet two other, independent fatal flaws in Dr. Johnson's analysis that warrant the exclusion of his opinions pursuant to Fed. R. Evid. 702.

      A.     Dr. Johnson's Results are Driven by an Invalid Benchmark to ███████ ████ Salaries

Dr. Johnson chose a single salary survey from the ████████████ as a benchmark in his analysis even though it is not a reasonable comparison for compensation at Molesworth. Dr. Johnson's regression analysis is a "before/after" analysis that compares putative class members' compensation during the putative class period to their compensation before the putative class period (by controlling for certain factors that impact compensation) to calculate the undercompensation allegedly caused by the Challenged Conduct.[68] This regression analysis includes an independent variable which is supposed to control for industry-wide market conditions and non-Challenged Conduct reasons for changes in salaries.[69] In particular, Dr. Johnson's model compares salary trends for the few hundred putative class employees of the three Defendants in Molesworth to salary trends from the █████████████████████████████ ██████, which tracks thousands of salaries at ██████████████████████ many of which are not even government contractors.[70] Dr. Johnson uses this variable to suggest that salaries in Molesworth were suppressed when the Molesworth salaries do not increase in an amount commensurate to an increase in the ████████ salaries.[71] To see how trends in

---

[68] Johnson Class Cert. Rpt. ¶¶ 86-88.

[69] *Id.* ¶¶ 89b, 90, 122; Johnson Merits Rpt. ¶ 99.c.

[70] Johnson Class Cert. Rpt. ¶¶ 140-142; Exhibit 8, Johnson (Feb. 2021) Tr. at 197:25-199:6 (confirming 49 participants in ████████ Survey, including AT&T and Johns Hopkins University.).

[71] *See* McCrary Merits Reply Rpt. at App'x C ¶ 10 ("Then, including the manufactured benchmark in his Undercompensation regression allows him to claim evidence of wage suppression at Molesworth because his measure



Molesworth salaries compare to trends in ▮▮▮▮ salaries, Dr. Johnson attempted to manually match (or "map") each Molesworth employee to a corresponding "career level" in the ▮▮▮▮ Survey data.[72]

This variable is essentially a benchmark or "yardstick" analysis,[73] as it provides a comparison to a "clean" market so that Dr. Johnson can supposedly isolate the effects of the Challenged Conduct. *See Kentucky. v. Marathon Petrol. Co.*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020) ("The [yardstick] approach requires the expert to analyze the differences in the price of the product at issue among meaningfully comparable markets, firms, or locations."). By allowing the ▮▮▮▮ comparison to drive his undercompensation,[74] Dr. Johnson essentially specified a yardstick or benchmark analysis within a "before/after" regression.

Courts permit benchmark analyses, and they can be useful when fairly applied. But courts also recognize the risks of permitting benchmarks that are not truly analogous—a benchmark must

---

of total compensation did not increase by an amount commensurate with the artificial increase imposed through his manufactured benchmark."). For example, if ME employees' salaries remained flat, but their comparison ▮▮▮▮ salaries increased during the same period, the variable would generate results suggesting undercompensation.

[72] Johnson Class Cert. Rpt. ¶ 142.

[73] Dr. Johnson claims that his analysis is not a "benchmark" analysis. Johnson Class Cert. Reply Rpt. ¶ 146, n.159. But just because Dr. Johnson says the analysis is not a benchmark does not make that true. In fact, Dr. Johnson's analysis is a textbook benchmark analysis. *See* Exhibit 9, ABA ANTITRUST SECTION at 5.B.1.b (explaining that a benchmark analysis is a "comparison [of a] variable of interest (like the change in price) in the market and the period at issue to a benchmark not affected by the challenged conduct"). Dr. Johnson compares how Molesworth salary trends compare to ▮▮▮▮ *See* Exhibit 8, Johnson (Feb. 2021) Tr. at 214:8-13 (agreeing that "the whole point" of the ▮▮▮▮ Johnson Class Cert. Rpt. ¶¶ 140-42 (explaining his process of mapping Molesworth job titles to ▮▮▮▮ titles); Johnson Merits Rpt. at App'x A (describing the "Mapping of ▮▮▮▮ to Defendant Job Levels."); McCrary Class Cert. Rpt. ¶ 163 (describing Dr. Johnson's mapping process); McCrary Merits Reply Rpt. at App'x C (same). Nevertheless, even if Dr. Johnson's analysis is not a benchmark, it must still be excluded because the divergence in trends between Molesworth and the ▮▮▮▮ and the improper way in which ME employees were mapped to ▮▮▮▮ (as described herein), show that the variable has not been reliably applied to the facts of the case. Fed. R. Evid. 702; *Tamraz*, 620 F.3d at 670; *Brooke Grp.*, 509 U.S. at 242.

[74] *See* McCrary Class Cert. Rpt. at Ex. 21 (showing 2.4% *overcompensation* for ME when ▮▮▮▮ controls are removed from Dr. Johnson's regression); McCrary Merits Reply Rpt. at Ex. 19 (showing *overcompensation* for each Defendant when ▮▮▮▮ controls are removed from Dr. Johnson's regression).

be sufficiently comparable to the market under consideration and the expert must "control for the major differences" among the markets that could impact the comparison. *See Marathon Petrol. Co.*, 464 F. Supp. 3d at 892-94; *Hyland HomeServices of Am., Inc.*, 2012 WL 12995647, at *12 (W.D. Ky. July 3, 2012) (benchmark inadmissible because expert "created a fictional, hypothetical benchmark that reflects his thoughts on how a real estate market should be structured"); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208 (5th Cir. 2000); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1504 n. 18 (D. Kan. 1995) ("Thus, Dr. Hoyt's selection of individual benchmark prices is inconsistent with the way an economist would do it, and his methodology is clearly calculated to exaggerate the amount of damages, without any basis in economic theory or principle."). In other words, for a benchmark to be reliable, it must support an "apples to apples" comparison. And, as with all other analyses, Dr. Johnson's regression analysis must be reliably applied based on the facts of the case and "account for the 'major factors' that might influence the dependent variable." *Universal Coin & Bullion, Ltd. v. Fed. Express Corp.*, 2015 WL 12001264, at *10 (W.D. Tenn. June 30, 2015); *Iams Co. v. Nutro Prods.*, 2004 WL 5496244, at *4-*6 (S.D. Ohio June 30, 2004) (noting that regression analysis "can be seriously misapplied, providing results which are not helpful to the trier of fact."); *see also Tamraz*, 620 F.3d at 670; *Kumho Tire*, 526 U.S. at 159.

Against this framework, Dr. Johnson's ███████ variable is not a reliable benchmark for salaries in Molesworth because he selected an apple and compared it to a kumquat.

1.  *The* ████████████ *is not an Appropriate Benchmark for Salaries in Molesworth*

Dr. Johnson's use of the ███████ variable is unreliable because the data unmistakably shows that the relevant salaries in the ██████ are not similar to salaries in Molesworth. A reliable benchmark should be sufficiently comparable to the market at issue. *Marathon Petrol.*

*Co.*, 464 F. Supp. 3d at 892-894. As a threshold matter, then, one would expect that if the ▮▮▮ ▮▮▮▮ benchmark were reliable in this case, the ▮▮▮ salaries would trend in a similar direction as the Molesworth salaries during the "clean" period (in the absence of the Challenged Conduct).[75] However, the opposite is true:[76]



In other words, during the "clean period," when one would expect to see reliable benchmark salaries trend in similar ways to Molesworth salaries, *the ▮▮▮▮▮ salaries and Molesworth salaries actually move in opposite directions.* This is not surprising and should have given Dr. Johnson pause because employees working on task orders in international locations like Molesworth have materially different components of compensation—such as housing stipends and education allowances—that employees working on task orders in the ▮▮▮▮▮▮▮▮▮▮

---

[75] McCrary Class Cert. Rpt. ¶ 136 ("Because it does not track salaries at Molesworth even during the clean period, the ▮▮▮▮▮▮▮▮ is not a reliable predictor of what the trends in salaries would have been at Molesworth in the absence of the challenged conduct."); McCrary Merits Reply Rpt. ¶¶ 136-138.

[76] McCrary Merits Reply Rpt. at Ex. 20.

may not have.[77] Their compensation, therefore, is intrinsically different from compensation for U.S. employees, and comparing the two as he does makes little sense.

Dr. Johnson's feeble attempts to justify the ███████ variable in light of these concerns fall flat. He provides three primary reasons why the benchmark is appropriate: (1) the ████████ ██████ is the "hub" for intelligence analysts,[78] (2) some of the ████████████ participants service government contracts,[79] and (3) the ████████ is one of the surveys Defendants use in setting their own internal salary levels.[80] His other justification is self-serving: it is appropriate because his Undercompensation model generates undercompensation results when he included the variable. Or, more simply, he uses it because it gives him the result he wants— another truly circular, ends-justify-the-means argument.[81]

---

[77] *See, e.g.*, Exhibit 20, Redman Tr. at 99:3-19 (testifying that Living Quarters allowances are a part of overseas' employees' total compensation); Transcript of 30(b)(6) Deposition of Annette Redman at 43:10-45:9, attached hereto as Exhibit 21 (explaining that dependent education allowances are paid to employees under IPAS); Transcript of Deposition of Anthony Crawford at 63:9-64:5, 88:1-89:9, attached hereto as Exhibit 22 (explaining that "OCONUS" (Outside of Continental U.S.) "uplifts" refer to cost of living and housing allowances); McCrary Merits Reply Rpt. ¶ 135; *see also* Johnson Class Cert. Reply Rpt. ¶ 146 n. 159 (recognizing that "there are substantial cost of living, taxation and other differences" between Molesworth and the ████████ salaries.); Exhibit 6, Johnson (Aug. 2021) Tr. at 612:11-613:3 (admitting that he didn't consider the impact of Molesworth not being subject to U.S. tax on the ████████████████████████████████████████████████████████████████████████████. and Molesworth).

[78] *See* Johnson Class Cert. Reply Rpt. ¶¶ 147, 151. ████████████████████████████████████ ████████████████████████████████████████████████████████ explain why this matters (*e.g.*, does the Pentagon somehow set putative class members' Molesworth salaries?).

[79] *See* Exhibit 6, Johnson (Aug. 2021) Tr. at 592:15-23. However, Dr. Johnson does not explain whether the ████ ████ participants provide services to the same branch of the government as the Defendants do under IPAS (the Defense Intelligence Agency). Confusingly, Dr. Johnson testified that it did not matter for his comparison which companies participated in the ████████████. *See* Exhibit 8, Johnson (Feb. 2021) Tr. at 197:17-19.

[80] *See, e.g.*, Exhibit 6, Johnson (Aug. 2021) Tr. at 608:22-611:19; Johnson Class Cert. Reply Rpt. ¶ 143 ("The ████ ████ data is a reliable data source as reflected by the Defendants own use of it for their internal salary analysis … ."). Dr. Johnson does not explain why the ██████████████████ which is one of 14 surveys that Booz Allen uses to set internal compensation levels, *see* Pl. Ex. 125 at '012-'013, attached hereto as Exhibit 23, is particularly significant for Molesworth salaries, or why none (or a combination) of the other 13 surveys aren't a better benchmark. *See* Exhibit 6, Johnson (Aug. 2021) Tr. at 610:15-613:6 (Dr. Johnson admitting that he did not know how many other salary surveys Defendants used and that he did not run his model with any other survey).

[81] *See* Exhibit 6, Johnson (Aug. 2021) Tr. at 608:22-609:17 (testifying that the ██████████████ is an appropriate comparison, in part, because "The regression confirmed it was informative."); Exhibit 8, Johnson (Feb. 2021) Tr. at 195:2-196:8.

As Dr. Johnson also admitted, he does not know how market demand factors or salaries in the ████████████ compare to those in Molesworth, and he did not even try to run his regression using *any* other benchmark or industry market control.[82]  Dr. Johnson's utter failure to validate his choice, coupled with the fact that the salaries in the ████████████ data move in the opposite direction of Molesworth salaries prior to the Challenged Conduct, render the variable inherently unreliable.  Dr. Johnson should not have used it.

2. *Dr. Johnson did not Reliably Apply the* ████████████

The second reason why the ████████████ variable renders Dr. Johnson's regression inadmissible is that the data has not been reliably applied to the facts of this case.  As explained above, to use the ████████████ data for benchmarking, Dr. Johnson had to map each putative class member to a "career-level" in the ████████████ data, which he claims permitted a reliable comparison of movements in Molesworth salaries to movements in ████████████ salaries.  In his merits report, Dr. Johnson has an odd divergence in his methods for mapping.[83]  He maps all of ME's "mid-level" employees to a career level *before* the putative class period based on the minimum experience typically required of the job they held without any consideration of their actual experience.  Then, *during* the putative class period (in 2018) he inexplicably changes his method and maps those same employees to an ████████████ career level in 2018 based on the employee's actual years of experience.[84]

---

[82] *See* Exhibit 6, Johnson (Aug. 2021) Tr. at 591:25-594:20 (testifying that the salary trends between Molesworth and ███ are "mostly irrelevan[t]."), 612:11-613:6.

[83] Dr. Johnson re-mapped ME's mid-level employees to new career levels in his merits report after Dr. Johnson criticized him for baselessly mapping all ME mid-level employees to one ████████████ career level before the putative class period, and inexplicably to a *higher* career level during the putative class period, in his class certification report. *See* McCrary Class Cert. Rpt. ¶¶ 161-164.  Thus, even with a second bite at the apple Dr. Johnson is unable to reliably map ME employees to ████████████ career levels.

[84] McCrary Merits Reply Rpt. at App'x C ¶¶ 3, 10-13.

Unsurprisingly, since actual experience necessarily exceeds minimum requirements, this application of different methodologies inflates the benchmark salary *during the putative class period* and allows Dr. Johnson to falsely attribute this widened gap between the benchmark and salaries to the purported undercompensation.[85] As Dr. McCrary explains, this "increase in the benchmark . . . is due to a change in Dr. Johnson's methodology, <u>not due to evidence that their job responsibilities changed in a way that would reflect a career level change.</u>"[86] When the ███ ███████████ is removed from the regression altogether, Dr. Johnson's undercompensation results disappear.[87] In other words, using Dr. Johnson's own before-and-after model without his rigged ██████████████ no longer shows that compensation was suppressed at Molesworth for the employees in his model during the putative class period. If anything, it shows that compensation exceeded what Dr. Johnson would have expected absent the Challenged Conduct.[88]

B. Dr. Johnson Excludes a Key Component of Total Compensation from His Regression

Finally, Dr. Johnson's Undercompensation regression analysis is also unreliable because it ignores putative class employees' living and other expense allowances from the measure of total compensation, despite the record establishing that such allowances are a well-known, material

---

[85] *See id.*; *see also* McCrary Class Cert. Rpt. ¶ 163.

[86] *Id.* at App'x C ¶ 10 (emphasis added); *see also id.* at App'x C ¶ 17, at Ex. 28.

[87] *See* McCrary Class Cert. Rpt. at Ex. 21 (showing 2.4% *overcompensation* for ME when ██████ controls are removed from Dr. Johnson's regression); McCrary Merits Reply Rpt. at Ex. 19 (showing *overcompensation* for each Defendant when HR Alliance controls are removed from Dr. Johnson's regression).

[88] Importantly, Dr. Johnson's inclusion of the H.R. Alliance variable shows that he believes that market-level factors are necessary to control for in order to determine the effects of the Challenged Conduct. Because the variable has not been properly specified, Dr. Johnson thus fails to control for a material factor, and his analysis must therefore be excluded. *See, e.g., Universal Coin*, 2015 WL 12001264, at *10; *Iams Co.*, 2004 WL 5496244, at *4-*6.

component of compensation for U.S. government contractors working outside the U.S.[89] The point of Dr. Johnson's Undercompensation model is to show the impact of the Challenged Conduct on putative class members' compensation. Dr. Johnson had previously agreed that allowances—which are benefits including cash allowances and reimbursements paid to government contractors assigned to work overseas for expenses such as housing, education, and cost of living[90]—are a relevant part of putative class members' compensation.[91] Then, when he analyzed Defendants' allowance data, he changed his mind without any legitimate explanation,[92] and the Undercompensation model therefore does not include *any* allowances in its calculation of compensation: instead it is limited to salaries and bonuses.[93] Dr. Johnson's exclusion of allowances is contrary to the facts of the case, which show that candidates for employment, employees, and managers all considered allowances to be an important part of compensation.[94] His willfully incomplete analysis should therefore be excluded. *See Ferguson v. Nat'l Freight, Inc.*, 2016 WL 1192702, at *4 (W.D. Va. Mar. 22, 2016) (expert found unreliable for failing to consider "material factors"); *Universal Coin*, 2015 WL 12001264, at *10-*12; *Iams Co.*, 2004 WL 5496244, at *4-*6.

---

[89] Allowances can be a significant portion of international employees' overall pay—for example, Booz Allen employees received an average of ▮▮▮▮ in allowances per year between 2013 and 2019. McCrary Class Cert. Rpt. ¶ 167; McCrary Merits Reply Rpt. ¶ 127 n. 165.

[90] *See supra* note 77.

[91] *See* Exhibit 8, Johnson (Feb. 2021) Tr. at 149:3-25 (testifying that "living quarters allowances are a part of compensation, so – they're – they're relevant to the analysis").

[92] Johnson Class Cert. Reply Rpt. ¶ 165 ("[I]t does not make sense to count these allowances towards total compensation for my analysis."); Johnson Merits Rpt. ¶ 98 n. 134

[93] Johnson Class Cert. Rpt. ¶ 91 n. 157; Johnson Merits Rpt. ¶ 98 n. 134.

[94] *See infra* notes 97 and 98.

Dr. Johnson tries to justify ignoring the allowances, which may amount to ██████ for employees often paid less than $100,000 in base salary,[95] by arguing that allowances are set and reimbursed by the government under the terms of each contract.[96] That is nonsensical and purposely avoids considering the true total compensation paid to putative class members. Defendants' managers specifically consider the amount of allowances provided by the government under each contract when setting salaries and use them to arrive at overall competitive and attractive compensation packages to recruit and retain employees at Molesworth.[97] The candidates for employment, employees, and managers all consider allowances to be part of their total compensation,[98] but Dr. Johnson completely ignores these significant monetary benefits in an effort to support his opinion that those same employees are undercompensated. Since he excludes as much as ██████ in compensation for each relevant employee, it is not surprising that Dr.

---

[95] *See* McCrary Class Cert. Rpt. ¶ 167; McCrary Merits Reply Rpt. ¶ 127 n. 165.

[96] *See* Johnson Class Cert. Reply Rpt. at V.D; Exhibit 6, Johnson (Aug. 2021) Tr. at 466:15-467:13.

[97] *See, e.g.*, Exhibit 20, Redman Tr. at 94:23-96:18 ("Q. Do you agree with the statement that access to LQA at a reasonable level is a key lever in terms of reducing attrition rates and improving quality and ensuring much faster attraction and retention of talent? Do you agree with that statement? A. I do agree. Q. Can you say why? A. Because that – that housing allowance is more money that goes into the pocket of the individuals that are relocating overseas, be it England, Germany, Belgium, wherever they are being relocated to. It would be something that would be attractive to a candidate."), 99:3-19 (testifying that LQA is a part of total compensation for overseas employees); BAH0352157 (Uplift Strategy for Booz Allen Staff in Europe, April 2018) at '160, attached hereto as Exhibit 24 ("By increasing the LQA % we can balance total compensation and overall profitability."); ME00025297 at '299, attached hereto as Exhibit 25 (email from Anna Hunt regarding recruits: "There is the LQA benefit to help offset on salary for total comp needs.").

[98] *See, e.g.*, Exhibit 24, BAH0352157 at '160; Exhibit 25, ME00025297 at '299; Transcript of Deposition of Nora Thompson at 76:20-77:11, attached hereto as Exhibit 26 (testifying that the overall compensation package at Booz Allen was better than at ME because "Booz Allen offers, you know, full relocation, full repatriation when the contract has ended. We offer tuition assistance. We offer a housing allowance. Those types of benefits."); Exhibit 13, Costianes 30(b)(6) Tr. at 57:20-58:3 ("Q. … Are you familiar with Mission Essential using living quarters allowances to increase the overall compensation to employees? A. It's a – it is additional compensation that they receive under the contract."); Transcript of Deposition of Sarah Hunter at 258:6-258:15, attached hereto as Exhibit 27 (testifying that it was "very significant" that ME did not pay a housing allowance), 260:12-22 (testifying that whether a firm payed an allowance would be a factor she would consider when accepting a job); Transcript of Deposition of David Youtz at 200:13-202:22, attached hereto as Exhibit 28 (testifying that housing and cost of living allowances were a part of his total compensation in his post-ME position and that these allowances increased his total compensation package by $30,000-$40,000).

Johnson concludes undercompensation existed.[99] In fact, when allowances are added to his Undercompensation regression, the model generates *overcompensation* results for ME.[100] Thus, it is unmistakable that allowances are a "material factor," and Dr. Johnson's decision to ignore them when calculating "undercompensation" is yet another reason why his model is unreliable and inadmissible.

## IV. DR. JOHNSON'S OPINIONS SHOULD BE EXCLUDED BECAUSE OF THE UNRELIABLE DATA SETS USED IN HIS UNDERCOMPENSATION AND DAMAGES MODELS

In addition to all of the other flaws in Dr. Johnson's analysis discussed thus far, his opinions should be excluded on the wholly independent ground that his class-wide undercompensation and damages opinions are based only on his own speculation and extrapolation, not on actual facts or data. Under Fed. R. Evid. 702, expert testimony must be based on sufficient facts or data rather than speculation, *see Tamraz*, 620 F.3d at 670. Opinions that are only connected to data by the *ipse dixit* of an expert are not admissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012); *Lake Mich. Contractors*, 225 F. Supp. 2d at 801 (excluding expert's damages calculation that "is really no more than speculation based on assumed conditions.").

In his class certification reports, Dr. Johnson's Undercompensation model *did not include any* class-period salary data for either Named Plaintiff or for a majority of ME employees who were terminated in 2018.[101] In his merits report, Dr. Johnson's Undercompensation model

---

[99] This is especially true for ME employees, who did not receive allowances under the JAC Omnibus task order, but did under the IPAS task order. *See* Exhibit 13, Costianes 30(b)(6) Tr. at 56:16-57:2.

[100] McCrary Class Cert. Rpt. ¶ 168, at Ex. 22.

[101] *See* Johnson Class Cert. Rpt. ¶ 137 ("The data lacked records for some employees in their termination year. Title and salary are estimated based on previous year's record for these employees in their year of termination."); Exhibit 19, Pls.' Am. Supp. Answers to Defs.' Second Set of Interrogs. to Pls., Pls.' Supp. Answer to Interrog. No. 1 (showing that Hunter and Youtz stopped working for ME in 2018).

removed data for all employees who were hired during the putative class Period[102] and *purported to measure undercompensation for only the year 2018*.[103]  For Named Plaintiffs and other ME employees terminated in 2018, Dr. Johnson imputed salaries from 2017 (assuming their 2018 salary would have been the same as their 2017 salary).[104]  The chart below shows how Dr. Johnson changed the data he used between the class certification and merits reports and how little of the total putative class's data he includes in any of his models:

---

[102] *See* Johnson Merits Rpt. ¶ 97.i.  Dr. Johnson removes these employees from his undercompensation analysis yet claims that they were injured by the Challenged Conduct.  *See id.* at Fig. 8 (applying firm-wide undercompensation percentages to all employees at each Defendant).

[103] *See id.* ¶¶ 97.e, 108-109.  Plaintiffs did not have data beyond 2019 due to their own failure to ask for it during discovery.  As memorialized in an order from the Court, Defendants fully complied with their obligations to produce data.  Any additional data Plaintiffs needed should have been sought during discovery, but Plaintiffs failed to make a timely request for it. The evidentiary consequences of that failure now rest with Plaintiffs. Op. and Ord. Den. Pls' Req. to Compel Supp. Doc. Produc. from Defs., ECF No. 109 at PageID 2287, *adopted* ECF No. 149 (June 14, 2021).

[104] *See* Johnson Merits Rpt. ¶ 97.f ("I now include in the analysis the employee observations that were previously being excluded due to insufficient data produced by ME in their year of termination, using their last known title and compensation."); Exhibit 19, Pls.' Am. Supp. Answers to Defs.' Second Set of Interrogs. to Pls., Pls.' Supp. Answer to Interrog. No. 1 (showing that Hunter and Youtz stopped working for ME in 2018).

| Data Included in Dr. Johnson's Undercompensation Analyses[105] | | |
|---|---|---|
| | **Class Cert. Undercompensation Model** | **Merits Undercompensation Model** |
| Years of data used to determine results for the entire 4-year period[106] | 1.5 years (2018 through June 2019) | 1 year (2018) |
| Number of employees' data included to conduct the analysis | 306 Employees.  Employees who worked in Molesworth during the Putative class Period except for ME employees who were terminated in 2018 and missing compensation and title data (67 employees). | 241 Employees.  Employees who worked in Molesworth before and during the putative class period. |
| Number of employees whose data are NOT used to conduct the analysis | 67 Employees.  ME employees who were terminated in 2018 but do not appear in the 2018 compensation data.

13 Employees.  Employees who are missing other data required for Dr. Johnson's regression model. | 125 Employees.  Putative class Members who worked at a Defendant at Molesworth and did not work for that same Defendant prior to 2018.
10 Employees.  Employees who are missing other required data for Dr. Johnson's compensation regression.
5 Employees.  Employees who worked until 2019 but do not have 2018 compensation data.
5 Employees.  Senior executives for one of the Defendants. |
| Types of compensation data used to conduct the analysis | Employees' annualized salary, but not their bonuses or allowances, for the period that the employee was at Molesworth from January 2018 through June 2019.[107] | For ME Employees terminated in 2018: Annualized salary **and** bonuses, but not their allowances, from 2017 (67 employees)

For all other employees: Annualized salary **and** bonuses, but not their allowances, from 2018 (174 employees). |

Dr. Johnson heavily manipulates the composition of the data set, using only a small portion

of the available data: he uses data from a single year to extrapolate for the entire putative class

---

[105] Unless otherwise noted, the data referenced in this chart is from the backup files to Dr. Johnson's December 18, 2021 Class certification Report and June 3, 2021 Merits Report.

[106] Both models incorporate available data prior to the putative class period (before 2018) to calculate the alleged "undercompensation."  *See* Johnson Class Cert. Rpt. ¶ 86 ("I believe that this kind of analysis can be used in this case to calculate undercompensation suffered by the class in a formulaic manner as the Defendants have provided several years of employee data prior to the start of the conduct period in 2018.").

[107] *See* Johnson Class Cert. Rpt. ¶ 89, at Figs. 6-8.

period; uses a subset of the putative class's data to draw conclusions about everyone; excludes bonuses and allowances from the class certification model; and includes bonuses but not allowances in the merits model. Each of these decisions to use only a subset, or to hand-select certain data and discard others, means that he is using partial data to support broad opinions and conclusions.

Dr. Johnson generates undercompensation in each of his models even after changing the data that he used and the variables that he controlled, suggesting that his models are not based on reliable facts and data.[108] The excluded data in both his class certification and merits Undercompensation models show that his analysis amounts to mere guesswork, even for his results in 2018, and therefore it should be excluded.

Dr. Johnson's damages model exacerbates this guesswork by using the already speculative merits undercompensation percentage from 2018 as the sole support for his common impact and damages opinions for the years 2019, 2020, and 2021 (through May), *based on litigation-created employee rosters and salaries*.[109] Dr. Johnson assumes that an employee who was active in 2019 remained employed at the same compensation level continuously through the end of the putative class period and that the putative class is therefore entitled to damages for a person who may not

---

[108] For example, Dr. Johnson removed variables that were meant to control for switches from one Defendant to another and for the number of net new hires across all Defendants from his class certification model. *See* Johnson Merits Rpt. ¶¶ 97.d, 97.g. Dr. Johnson also added a new "Change in Molesworth Workforce" variable to his merits Undercompensation model, which is meant to control for the change in employee count at each Defendant year over year, *see id.* ¶ 97.d, and updated the mapping from his ▉▉▉▉▉▉▉▉▉▉▉ variable in his merits report, *see id.* ¶ 97.c. Dr. Johnson also used both base salary and bonuses in his total compensation calculation in his merits report, but not his class certification report. *Id.* ¶ 97.h; *see also* Fed. R. Evid. 1006 Summary of class compensation and underpayment data from the December 18, 2020 and June 3, 2021 reports of Plaintiffs' Expert Dr. Phillip Johnson, attached hereto as Exhibit 29 (showing wide variations in undercompensation percentages and estimated underpayment between Dr. Johnson's class certification and merits reports. For example, at class certification Dr. Johnson found that CACI's percentage of underpayment was 8.12%, but at merits found it was just 1.82%).

[109] *See* Johnson Merits Rpt. ¶¶ 108-109.

even work at Molesworth anymore.[110]  As an example, his undercompensation calculation for a Booz Allen employee who had a salary of $65,000 in 2018 and who was active on June 30, 2019 at a salary of $70,000 would be as follows:

| Damages Calculation – Hypothetical Booz Allen Employee | | | | |
|---|---|---|---|---|
| | 2018 Salary (Actual) | 2019 Salary (imputed from June 2019) | 2020 Salary (imputed from June 2019) | May 2021 Salary (imputed from June 2019) |
| Booz Allen's 2018 Undercompensation: 8.66% | $65,000 | $70,000 | $70,000 | $70,000 |
| Yearly Damages | $5,629 | $6,062 | $6,062 | $6,062 |

As this chart shows, there are two major flaws in Dr. Johnson's damages calculation which make it entirely speculative and unreliable: (1) Dr. Johnson has no foundation for imputing undercompensation from 2018 to any other year;[111] for example, it is possible that a significant number of putative class members received raises in 2019, 2020, or 2021, causing undercompensation levels for those years to be lower than in 2018,  and (2) Dr. Johnson assumes that an employee who worked for Defendants as of 2019 continued to do so through May 2021.[112] This has the effect of including employees in the putative class for periods during which they may

---

[110] Data for 2019 were used to estimate employee counts and compensation in 2020 and 2021 for purposes of calculating damages.  Employees whose last known status in 2019 was "active" in Molesworth are assumed to have worked in Molesworth through May 31, 2021 unless a termination date was provided.  Johnson Merits Rpt. at Fig. 8 n. 3.  Booz Allen's 2019 employee and salary data were generally cut off at June 30, 2019, while ME and CACI provided data for some employees through the end of 2019.  Johnson Merits Rpt. at Fig. 8 n. 1, 2; *see also* Johnson Merits Rpt. ¶¶ 108-109.

[111] Dr. Johnson conducted a "robustness" check by adding in 2019 salaries to his Undercompensation model, *see* Johnson Merits Rpt. at Figs. 6 and 7.  However, Booz Allen's results were statistically insignificant at the 95% p-level in this check, *see id.* at Fig. 6, and the undercompensation percentage for each Defendant changed, *see id.* at Figs. 6, 7.  Further, although Dr. Johnson added salary data for 2019 to his model, he still excluded salaries for new hires from that year, *see id.*

[112] *See* Johnson Merits Rpt. at Fig. 8 n. 1-3; Johnson Merits Rpt. ¶¶ 108-109.

not have (and in fact, likely did not)[113] actually work for any Defendant at Molesworth. This makes Dr. Johnson's damages estimates utterly unreliable because: (a) he calculated damages for these non-putative class Members, and (b) it is possible that employees who left Molesworth between 2019 and 2021 were replaced by new-hires whose compensation could not have been impacted by the Challenged Conduct.

In sum, Dr. Johnson applies an undercompensation percentage—which he hasn't established is accurate for any single employee—to a putative class of employees that Dr. Johnson himself created. Such an untethered method for opining on antitrust impact and damages is inadmissible. *See Tamraz*, 620 F.3d at 672 ("[The expert's] opinion contains not just one speculation but a string of them: A suggests by analogy the possibility of B, which might also apply to C, which, if we speculate about D, could eventually trigger E, so perhaps that happened here. At some point, the train becomes too long to pull and the couplings too weak to hold the cars together."); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1506 (ruling that an expert cannot "plug evidentiary holes in plaintiffs' case."). The Court should exclude Dr. Johnson's chain of speculation.

## **CONCLUSION**

For the foregoing reasons, the Court should exclude the Class certification and Merits opinions of Plaintiffs' expert Dr. Phillip Johnson.

---

[113] As Dr. McCrary explains, employees that were hired and departed Molesworth between 2013 and 2019 stayed for an average of 1.7 years, and 65% of these employees worked for Defendants for fewer than two years. McCrary Merits Reply Rpt. ¶ 167 n. 203. If that same turnover percentage remained constant over one third of putative class members from June 2019 were no longer employed by Defendants as of May 2021.

Respectfully submitted,

*/s/ William G. Porter*

William G. Porter (0017296), Trial Attorney
Kimberly Weber Herlihy (0068668)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND
PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Tel:    (614) 464-6400
Fax:    (614) 464-6350
Email: wgporter@vorys.com
          kwherlihy@vorys.com
          kmmundy@vorys.com

David A. Higbee *(Pro Hac Vice)*
Todd M. Stenerson *(Pro Hac Vice)*
Adam B. Schwartz *(Pro Hac Vice)*
Rachel E. Mossman *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004-2128
Tel:    (202) 508-8000
Fax:    (202) 508-8100
Email: david.higbee@shearman.com
          todd.stenerson@shearman.com
          adam.schwartz@shearman.com
          rachel.mossman@shearman.com

***Attorneys for Defendant***
***Booz Allen Hamilton Inc.***

*/s/ Robert F. Ware*

Robert F. Ware (0055515), Trial Attorney
Rob.Ware@ThompsonHine.com
Mark R. Butscha, Jr. (0088854)
Mark.Butscha@ThompsonHine.com
Caitlin R. Thomas (0093857)
Caitlin.Thomas@ThompsonHine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 566-5500
Fax: (216) 566-5800

Anthony C. White (0062146)
Anthony.White@ThompsonHine.com
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio 43215-6101
Telephone: (614) 469-3235
Fax: (614) 469-3361

***Attorneys for Defendant***
***Mission Essential Personnel, LLC***

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically with the Court this 22nd of September, 2021.  Service will be made by the Court's electronic notification system, and all parties may access this filing through the Court's system.

*/s/ Kara M. Mundy*