# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SARAH J. HUNTER and DAVID N. YOUTZ, on behalf of themselves and all others similarly situated, | : : : : | Case No. 2:19-CV-00411 |
| Plaintiffs, | : : | Chief Judge Algenon L. Marbley |
| v. | : : | Magistrate Judge Chelsey M. Vascura |
| BOOZ ALLEN HAMILTON HOLDING CORPORATION, *et al.*, | : : : | **ORAL ARGUMENT REQUESTED** |
| Defendants. | : | |

---

## MOVING DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants Booz Allen Hamilton Inc. ("Booz Allen") and Mission Essential Personnel, LLC ("ME," and together with Booz Allen, "Moving Defendants") hereby reply to the opposition to Moving Defendants' Motion for Summary Judgment (ECF No. 175) filed by Plaintiffs Sarah J. Hunter and David N. Youtz (together, "Plaintiffs" or "Named Plaintiffs") (ECF No. 203).

Respectfully submitted,

*/s/ William G. Porter*
William G. Porter (0017296), Trial Attorney
Kimberly Weber Herlihy (0068668)
Kara M. Mundy (0091146)
VORYS, SATER, SEYMOUR AND
PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Tel:    (614) 464-6400
Fax:    (614) 464-6350
Email: wgporter@vorys.com
         kwherlihy@vorys.com
         kmmundy@vorys.com


David A. Higbee *(Pro Hac Vice)*
Todd M. Stenerson *(Pro Hac Vice)*
Adam B. Schwartz *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
401 9th Street, NW, Suite 800
Washington, DC 20004-2128
Tel:    (202) 508-8000
Fax:    (202) 508-8100
Email: david.higbee@shearman.com
         todd.stenerson@shearman.com
         adam.schwartz@shearman.com


Rachel E. Mossman *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
2828 North Harwood Street, 18th Floor
Dallas, TX 75201
Tel:    (214) 271-5777
Email: rachel.mossman@shearman.com

***Attorneys for Defendant***
***Booz Allen Hamilton Inc.***

*/s/ Robert F. Ware*
Robert F. Ware (0055515), Trial Attorney
Rob.Ware@ThompsonHine.com
Mark R. Butscha, Jr. (0088854)
Mark.Butscha@ThompsonHine.com
Caitlin R. Thomas (0093857)
Caitlin.Thomas@ThompsonHine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 566-5500
Fax: (216) 566-5800


Anthony C. White (0062146)
Anthony.White@ThompsonHine.com
THOMPSON HINE LLP
41 South High Street, Suite 1700
Columbus, Ohio 43215-6101
Telephone: (614) 469-3235
Fax: (614) 469-3361

***Attorneys for Defendant***
***Mission Essential Personnel, LLC***

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................v

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................1

I.      THE FTAIA BARS PLAINTIFFS' CLAIMS. ................................................................1

Moving Defendants are entitled to Summary Judgment under the FTAIA because the Challenged Conduct occurred entirely overseas and had no substantial effect on domestic commerce. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004); *CSR Ltd. v. CIGNA Corp.*, 405 F. Supp. 2d 526, 546 (D.N.J. 2005); *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F. Supp. 2d 1101 (N.D. Cal. 2007). Plaintiffs cannot evade the FTAIA on the basis of the citizenship of the parties or the use of U.S. dollars. *See In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Corp.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006); *Liamuiga Tours, Div. of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd.*, 617 F. Supp. 920, 924 (E.D.N.Y. 1985); *McLafferty v. Deutsche Lufthansa A.G.*, 2009 WL 3365881, at *4-5 (E.D. Pa. 2009).

II.     THE RULE OF REASON, NOT THE *PER SE* STANDARD, SHOULD APPLY BASED ON THE UNDISPUTED FACTS. ....................................................................5

Determining which standard of review should apply is a question of law for the Court to decide. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014)

A.     The Undisputed Record Shows that the Challenged Conduct is Ancillary to a Legitimate Collaboration and the Rule of Reason Therefore Applies....................6

It is beyond any reasonable dispute that the Challenged Conduct was implemented as part of and to support the IPAS teaming arrangement, and the rule of reason is, accordingly, the applicable standard.

B.     Plaintiffs Confuse the Standard. ........................................................................10

1.     The *Per Se* Standard Applies in Very Specific and Limited Circumstances. ...........................................................................10

Plaintiffs cannot establish that the Challenged Conduct falls within the narrow category of activity so obviously anticompetitive that it should be subject to *per se* treatment. Courts and federal agencies are in accord that, while the *per se* standard may apply to "naked" non-solicitation agreements, the rule of reason applies to non-solicitation agreements that are ancillary to legitimate collaborations. *Leegin Creative Leather Prod., Inc. v. PSKS,*

*Inc.*, 551 U.S. 877, 877-78 (2007); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 271-73 (6th Cir. 2014).

2.     Plaintiffs Misstate the Standard for Ancillary Restraints. ..........................13

The relevant standard for ancillary restraints is whether the Challenged Conduct is reasonably related to the joint venture. *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 726 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 380, 205 L. Ed. 2d 219 (2019). Defendants need not have formed a formal corporate "joint venture" for the ancillary restraints doctrine to apply. *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994); *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231, 1253–54 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986). Defendants also need not prove that the Challenged Conduct was "necessary" or that the Challenged Conduct has procompetitive benefits for it to be ancillary.

3.     The Quick Look Standard Does Not Apply.................................................19

The quick look standard is inappropriate because this is not a clear case with an obvious anticompetitive effect on customers and markets. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 387 (8th Cir. 2007); *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955, 960 (6th Cir. 2004); *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1311 (10th Cir. 2017); *Cal. Dental Ass'n*, 526 U.S. at 781; *1-800 Contacts, Inc. v. FTC*, 1 F. 4th 102, 116-17 (2d Cir. 2021).

III.    WITHOUT A PROPERLY DEFINED, RELEVANT ANTITRUST MARKET, DEFENDANTS DID NOT HAVE THE REQUISITE MARKET POWER TO SUPPRESS COMPENSATION. ........................................................................................21

A.     Plaintiffs Ignore Undisputed Facts that Establish that Plaintiffs Do Not Properly Define the Product or Geographic Components of Their Proposed Relevant Market.......................................................................................................21

Plaintiffs fail to address that intelligence analysts are not interchangeable and, thus, the "product" component of the alleged market is improper. *Nat'l Hockey League Players Ass'n, v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 471 (6th Cir. 2005). Plaintiffs also ignore the overwhelming evidence that the geographic scope of the relevant market should be broader than Molesworth as Plaintiffs and putative class members had global job opportunities. Plaintiffs' discussion of switching costs fails to assess if such costs were incurred or actually had an impact on class members' decisions.

B.     Plaintiffs Cannot Show that Defendants Had Market Power Through "Direct" or "Indirect" Proof. ...............................................................................................25

Plaintiffs fail to show direct proof of market power as the undisputed data is clear that employees' compensation went up, not down after the Challenged Conduct began. *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). Plaintiffs also fail to provide indirect proof as Plaintiffs do not offer evidence of Defendants' market power in a properly defined market for intelligence workers.

IV.    MOVING DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
       UNDER THE RULE OF REASON BECAUSE PLAINTIFFS FAILED TO SHOW
       COMPETITIVE HARM. .................................................................................................28

       A.    Plaintiffs Do Not Dispute Moving Defendants' Evidence that Hunter and
             Youtz Did Not Suffer Any Antitrust Injury. ..........................................................28

Plaintiffs fail to present sufficient evidence that the Named Plaintiffs suffered an antitrust injury from the Challenged Conduct—not being considered for IPAS is not an antitrust injury. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990).

       B.    Plaintiffs' Only Evidence of Harm to Competition is Dr. Johnson's Flawed
             Analysis. ...............................................................................................................31

Plaintiffs only evidence for harm to competition is Dr. Johnson's regression analysis, but this analysis is flawed and does not provide sufficient evidence to create a triable issue as to harm to competition.

       C.    Plaintiffs' Economic Theories Do Not Align with the Record. .............................32

Plaintiffs' theoretical arguments about economic theory are at odds with the undisputed record in this case. Plaintiffs base their application of the theory on an improperly defined market. The record further does not support a conclusion that the Challenged Conduct led to any material change in actual hiring decisions or that Defendants intended to foreclose competition. Rather, the record shows that the Challenged Conduct was intended to promote efficient staffing under the IPAS teaming arrangement.

V.     PLAINTIFFS FAIL TO ESTABLISH A TRIABLE ISSUE AS TO DAMAGES. ..........37

Plaintiffs have no factual basis to support damages. Dr. Johnson's speculative calculations are based on several faulty assumptions—relying on data from one highly disruptive, unique year for only a fraction of the putative class with unsubstantiated assumptions that employees continued working from 2019 through 2021 without an increase in salary. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946).

VI.    PLAINTIFFS' ADMISSIBILITY OBJECTIONS ARE PREMATURE AND LACK
       SUFFICIENT SPECIFICITY TO REQUIRE A RESPONSE. ..........................................38

Plaintiffs fail to articulate why the information in the over 97 documents that they object to would not be admissible at trial or to which portions of each exhibit their objections

apply.  *Myers v. Am. Educ. Servs*., 2021 WL 859538, at *3 (S.D. Ohio Mar. 8, 2021).  It would be unduly burdensome and premature for Defendants to go point-by-point on each piece of evidence at this point.  Plaintiffs further fail to identify any evidence that, if excluded, would create a disputed, material issue of fact.

CONCLUSION.................................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021) .......................................... 19, 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 28

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d. Cir. 2011) ........................ 3

*In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................ 12

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) .......................................... 28

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181 (S.D. Cal. May 20, 2020) .......................................... 12

*Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003) ............ 25

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251 (1946) .......................................... 36, 37

*In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP (S.D. Ala. Apr. 5, 2018) .......................................... 5

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017) ......... 19

*Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999) .................................................. 18, 19, 20

*Cal. Pharmacists Assoc. v. Maxwell-Jolly*, 2010 WL 11523634 (C.D. Cal. July 6, 2010) ........... 11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380 (8th Cir. 2007) ........................... 19

*CSR Ltd. v. CIGNA Corp.*, 405 F.Supp.2d 526 (D.N.J. 2005) .......................................... 2

*In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113 (S.D.N.Y. Feb. 8, 2012) .......................................... 17

*Deslandes v. McDonald's USA, LLC*, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ................... 12

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ................................. 2, 3

*ForeWord Mag., Inc. v. OverDrive, Inc.*, 2011 WL 5169384 (W.D. Mich. Oct. 31, 2011) ......... 38

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521 (6th Cir. 2001) .......................................... 27

*Helmerich & Payne Int'l Drilling Co. v. Schlumberger Tech. Corp.*, 2017 WL 6597512 (N.D. Ok. Dec. 26, 2017) ................................................................................12

*In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ........................12

*In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Corp.*, 452 F. Supp. 2d 555 (D. Del. 2006) ......................................................................................3

*Kelsey K. v. NFL Enters. LLC*, 2017 WL 3115169 (N.D. Cal. July 21, 2017), aff'd, 757 F. App'x 524 (9th Cir. 2018) .............................................................12

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CIV.A.05-138(WOB), 2008 WL 113987 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009) ...........................................................................24

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)......................................10

*Liamuiga Tours, Div. of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd.*, 617 F. Supp. 920 (E.D.N.Y. 1985) ......................................................4

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .....................18

*McLafferty v. Deutsche Lufthansa A.G.*, 2009 WL 3365881 (E.D. Pa. Oct. 16, 2009)..................4

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 380, 205 L. Ed. 2d 219 (2019) ........................................13, 16, 17, 18

*Med. Ctr. Elizabeth Place, LLC v. Premier Health Partners*, 2017 WL 3433131 (S.D. Ohio Aug. 9, 2017) ..................................................................16

*Myers v. Am. Educ. Servs.*, 2021 WL 859538 (S.D. Ohio Mar. 8, 2021)....................................38

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986)..................................................15

*Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021)...............................................16

*Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712 (6th Cir. 2003).......................................................................9, 17

*Nat'l Hockey League Players Ass'n, v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005)......................................................................21

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ..............................................................17, 25

*In re Outpatient Medical Center Employee Antitrust Litigation*, No. 1:21-cv-00305 (N.D. Ill. Dec. 9, 2021) ......................................................................11

*In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, 2019 WL 5386484 (W.D. Ky. Oct. 21, 2019) .................................................................................................................11

*Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185 (7th Cir. 1985) .............................13, 16

*In re Pre-filled Propane Tank Antitrust Litig.*, 2021 WL 5632089 (W.D. Mo. Nov. 9, 2021) .........................................................................................................................29, 31, 37

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) .............................25

*Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc.*, 540 F.2d 824 (5th Cir. 1976) ...............................12

*Radovich v. Nat'l Football League*, 352 U.S. 445 (1957) ..............................................................12

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999) ............................................22

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) .................11

*In Re Ry Indus. Emp. No-Poach Antitrust Litig.*, No. 2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019) ..................................................................................................................................11

*SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958 (10th Cir. 1994) ............................................13, 15

*In re Se. Milk Antitrust Litig.*, 739 F.3d 262 (6th Cir. 2014) .....................................................5, 10

*In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011) ...................................25, 27

*Seaman v. Duke University*, No. 1:15-cv-00462 (M.D.N.C. Mar. 7, 2019), ECF No. 325 ...........10

*Stigar v. Dough*, Inc., No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 8, 2019).........................11, 19

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F.Supp.2d 1101 (N.D. Cal. 2007) ..........................................................................................................................................4

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ......................................................................25

*Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ................................................................29

*United States v. eBay*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013) ....................................................12

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n.*, 388 F.3d 955 (6th Cir. 2004)...........................................................................................................19, 20

## Statutes & Rules

15 U.S.C § 6a ...................................................................................................................................2

26 U.S.C. § 911(d) (2018) ...............................................................................................................3

Fed. R. Civ. P. 56 ............................................................................................38

Fed. R. Civ. P. 56(e)(1) ...................................................................................38

Fed. R. Evid. 201(b) .......................................................................................11

**Other Authorities**

American Bar Ass'n, Antitrust Law Developments, ch. 4 (8th ed. 2016) ...........................14

Cong. Rsch. Serv., LSB10591, Agency Use of Guidance Documents (2021),
    https://crsreports.congress.gov/product/pdf/LSB/LSB10591 ...................................11

Dep't of Just. & Fed. Trade Comm'n, Antitrust Guidelines for Human Resource
    Professionals 3 (Oct. 2016), https://www.justice.gov/atr/file/903511/download; ...............10

Fed. Trade Comm'n & U.S. Dep't of Just., Antitrust Guidelines for
    Collaborations Among Competitors (Apr. 2000),
    http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf ...................................10, 12, 14

## INTRODUCTION

The undisputed evidence in this case shows that Defendants—large, multinational companies with thousands of employees—entered into a legitimate collaboration for the purpose of servicing a U.S. government contract in Molesworth, England. Plaintiffs claim that the Challenged Conduct[1] (hiring practices ancillary to that collaboration) impacted employees in the small market they define as "intelligence analysts" and limit to one facility in Molesworth.

There are many reasons why Plaintiffs' market is not properly defined. Nonetheless, if the Court accepts Plaintiffs' definition, it must dismiss Plaintiffs' claims under the FTAIA. If the Court does not accept Plaintiffs' market definition, then Plaintiffs cannot survive summary judgment because they are unable to create a triable issue regarding the first element of the rule of reason analysis—a *prima facie* showing of anticompetitive effects.

Additionally, Plaintiffs' Opposition,[2] while lengthy, does not refute or even directly address many of Moving Defendants' arguments, including Plaintiffs' improper product market definition or Plaintiffs' insufficient evidence of antitrust injury and damages. The Court should grant Moving Defendants' Motion for Summary Judgment for the reasons set forth in their opening brief and below.

## ARGUMENT

## I.   THE FTAIA BARS PLAINTIFFS' CLAIMS.

Moving Defendants are entitled to summary judgment under the FTAIA because the Challenged Conduct undisputedly occurred entirely overseas, and had no substantial effect on American domestic commerce. The FTAIA prevents the application of U.S. antitrust laws to

---

[1] Unless otherwise noted, all capitalized terms have the meaning ascribed to them in Moving Defendants' Motion for Summary Judgment. *See generally* Moving Defs.' Mot. for Summ. J., ECF No. 175 ("Defs.' MSJ" or "Motion").

[2] *See generally* Pls.' Opp. to Defs.' MSJ, ECF No. 203 ("Pls.' Opp. to Defs.' MSJ" or "Opposition").

"commercial activities taking place abroad *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (emphasis in original). For the Sherman Act to apply, the conduct must "(1) sufficiently affect[] American commerce, *i.e.*, have a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) ha[ve] an effect of a kind that antitrust law considers harmful." *Id.* at 162 (emphasis added); *see also* 15 U.S.C § 6a.

Moving Defendants' opening brief details why the FTAIA bars Plaintiffs' claims.[3] In response, Plaintiffs incorrectly suggest, without citation to any authority, that the citizenship of the parties and the fact that Plaintiffs are paid in U.S. currency resolve the FTAIA question in their favor.[4] Plaintiffs' Opposition, however, overlooks precedent holding that it is not *who* the parties are but *how* their conduct affects commerce within the United States that matters. *See F. Hoffmann-La Roche Ltd.*, 542 U.S. at 159; *CSR Ltd. v. CIGNA Corp.*, 405 F.Supp.2d 526, 546 (D.N.J. 2005) (regardless of the involvement of U.S. companies, "this Court must examine the location of the *effects* of Defendants' alleged decisions and actions, rather than the location of the decisions and actions themselves") (emphasis in original).

Plaintiffs' attempt to evade the FTAIA on the basis of the citizenship of the parties is meritless.[5] Although there are some U.S. laws for which extraterritorial application can hinge on

---

[3] Defs.' MSJ at PageID 13633-41.

[4] Pls.' Opp. to Defs.' MSJ at PageID 21480.

[5] Plaintiffs base this argument on an overly narrow construction of the statute by suggesting that "[f]or the FTAIA to apply, there must be commercial transactions between the United States (or its citizens or entities) and foreign entities." However, this construction of the FTAIA ignores Supreme Court precedent that provides that all non-import activity—such as that of Defendants—"involving foreign commerce" is outside the scope of the Sherman Act, unless it "*both* (1) sufficiently affects American commerce . . . *and* (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 162 (emphasis in original) (citing the FTAIA, §§ 6a(1), (2)). Although "inelegantly phrased," the FTAIA's purpose is to

the citizenship of the individuals involved, that is not the relevant test under the FTAIA. The dispositive question in applying the FTAIA is whether the Challenged Conduct in England had a "direct, substantial, and reasonably foreseeable effect" on domestic U.S. commerce. *F. Hoffmann-La Roche Ltd.*, 542 U.S. at 162. Here, it did not. Plaintiffs are private citizens who were civilian employees of U.S. companies working outside the United States. These employees lived in England, worked in England, shopped in England, found private housing in England, sent their children to school in England, and were not subject to U.S. taxes while they were in England.[6] The Challenged Conduct allegedly occurred in England, and relates to work performed solely in England.[7] Thus, the Challenged Conduct did not directly, substantially, or foreseeably affect domestic commerce.

If Plaintiffs' argument was valid, a U.S. citizen living anywhere in the world could bring a viable antitrust claim against any company organized under U.S. law for entirely foreign anticompetitive conduct that had no domestic impact. This would eviscerate the purpose of the FTAIA and run counter to a wealth of precedent. *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig. v. Intel Corp.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006) (allegations of a

---

[6] *See* Defs.' MSJ at PageID 13639. Plaintiffs note in their brief that "Defendants' violations of the Sherman Act resulted in reduced payments by those United States entities to the United States Plaintiffs. Defendants make those payments in United States dollars to United States bank accounts, subject to United States tax laws, and antitrust laws as well." *See* Pls.' Opp. to Defs.' MSJ at PageID 21480. This is misleading. First, there is no dispute that the employees themselves did not pay U.S. income tax while working in England. *See* Defs.' MSJ at PageID 13639; *see also* 26 U.S.C. § 911(d) (2018) (providing that U.S. citizens living in a foreign country for at least 330 days in a twelve-month period may elect to exclude foreign earned income from their gross taxable income). Second, as noted, Defendants' employees at all times were located in and accessing their money in England (regardless of whether it was a U.S. bank), converting it to pounds, and spending it in England. Defs.' MSJ Ex. 6, Transcript of Deposition of Sarah Hunter, dated Feb. 5, 2021, ECF No. 175-3 ("Hunter Tr.") at PageID 13848 (185:2-18) (testifying that she would convert her money to pounds and "use that on the [British] economy," including to pay her rent).

[7] *See* Defs.' MSJ at PageID 13639.

corporation's American citizenship "do not create jurisdiction without substantial, direct effects on the domestic market"); *Liamuiga Tours, Div. of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd.*, 617 F. Supp. 920, 924 (E.D.N.Y. 1985) ("It matters not if there was anti-competitive conduct in the United States or by domestic corporations. The consequences suffered by plaintiff are limited to St. Kitts. Accordingly, these effects do not establish a jurisdictional nexus."). Moreover, the use of U.S. dollars has a negligible effect, if any, on American commerce, and the FTAIA requires more for U.S. antitrust laws to apply. *See McLafferty v. Deutsche Lufthansa A.G.*, 2009 WL 3365881, at *4 (E.D. Pa. Oct. 16, 2009) ("The fact that the supra-competitive prices were paid by persons in the United States does not establish, or even intimate, that the conspiracy directly affected United States commerce.").

Not only have Plaintiffs failed to proffer evidence supporting such a domestic effect, they have consistently argued the opposite—that the alleged anticompetitive effects are limited to a small relevant geographic market in Molesworth, England.[8]  Plaintiffs also concede that "Dr. Johnson concluded that the relevant market is intelligence analysts at Molesworth."[9]  Nowhere in their Opposition do Plaintiffs posit that the Challenged Conduct had *any* effects in the United States, let alone *direct*, *substantial*, and *reasonably foreseeable* effects in the United States.  *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 534 F.Supp.2d 1101, 1110 (N.D. Cal. 2007) ("A domestic effect may be 'substantial' if it involves a sufficient volume of U.S. commerce and is not a mere 'spillover effect.'"); *see generally* Pls.' Opp. to Defs.' MSJ at PageID 21479-84.

---

[8] *See* Pls.' Opp. to Defs.' MSJ at PageID 21461 ("The relevant market here is the labor input market for intelligence analysts at Molesworth.  Plaintiffs and the class members are all intelligence analysts who work or worked at Molesworth.").

[9] *See id.* at PageID 21464.

Plaintiffs' own expert—who provides Plaintiffs' only evidence of impact—admits that his "opinions regarding undercompensation and damages are about Molesworth."[10] Dr. Johnson further admits that he is "not offering any opinions in this case about impact or damages related to the defendants' challenged conduct for any employees other than those that were employed at Molesworth."[11] If an individual left Defendants' employ in England and moved elsewhere, Dr. Johnson excluded that employee from his analysis.[12]

Plaintiffs have failed to establish that the Challenged Conduct had any direct, substantial, and reasonably foreseeable effects in the United States. Accordingly, Moving Defendants are entitled to summary judgment because Plaintiffs' claims are barred in their entirety under the FTAIA.

## II. THE RULE OF REASON, NOT THE *PER SE* STANDARD, SHOULD APPLY BASED ON THE UNDISPUTED FACTS.

Determining which standard of review should apply to the Challenged Conduct is a question of law for the Court to decide. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014); Mem. Op. at 21, *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP (S.D. Ala. Apr. 5, 2018) (ECF No. 2063) ("The appropriate standard for evaluating the conduct challenged under the Sherman Act—rule of reason or *per se*—is a question of law for the court to decide."). As the Challenged Conduct is indisputably ancillary to a legitimate collaboration, this Court should apply the rule of reason.

---

[10] Defs.' MSJ Ex. 79, Transcript of Deposition of Dr. Phillip Johnson, dated Aug. 27, 2021, ECF No. 175-9 ("Johnson (Aug. 2021) Tr.") at PageID 15096 (378:14-22).

[11] *Id.* at PageID 15097 (379:8-15).

[12] *See id.* at PageID 15108-09 (442:22-443:13).

**A. The Undisputed Record Shows that the Challenged Conduct is Ancillary to a Legitimate Collaboration and the Rule of Reason Therefore Applies.**

The record is unrefuted that Defendants were working independently, without any hiring-related agreements, prior to collaborating to support the IPAS task order. Defendants engaged in the Challenged Conduct only when they were teaming—first to provide a strong bid for, and then to staff, the IPAS task order. There is no evidence that Defendants entered into any "naked" agreements related to recruiting or hiring. Faced with that uncontroverted fact, Plaintiffs resort to red herrings and mischaracterizations of the record.

*Uncontroverted Evidence Shows That the Challenged Conduct Was Ancillary to Defendants' Collaboration.* It is beyond any reasonable dispute that the Challenged Conduct was implemented as a part of the IPAS teaming arrangement.[13] In fact, Plaintiffs admit that Defendants hired from each other freely *before* they started to team, and Plaintiffs themselves allege that the Challenged Conduct began *contemporaneously* with ME and CACI each beginning to team with Booz Allen for the IPAS task order. Not only is the Challenged Conduct linked to the teaming arrangements in time, but the only reasonable inference from the record evidence is that the Challenged Conduct was intended to contribute to the success of those teaming arrangements.[14] Plaintiffs' conclusory assertions to the contrary are incorrect: Moving Defendants have proffered evidence that the Challenged Conduct "relate[s] to Defendants' ability to provide or carry out intelligence analysis or provide support services"[15] and have explained "how the risk of competition would undermine their teaming arrangement."[16] Moving Defendants have detailed

---

[13] *See* Defs.' MSJ at PageID 13624.

[14] *See id.* at PageID 13624-25.

[15] *See* Pls.' Opp. to Defs.' MSJ at PageID 21448.

[16] *See id.* at PageID 21449-50.

how the Challenged Conduct was implemented to ensure more effective service to the government client.[17] Defendants entered into the IPAS teaming arrangement precisely because no one Defendant could service the task order alone,[18] and believed that the Challenged Conduct was a reasonable means for ensuring that the teaming arrangement would succeed.[19] Testimony from Booz Allen, ME, and CACI managers all confirm that Defendants' intent in entering into the Challenged Conduct was to support the IPAS teaming arrangement.[20] As just one of several examples, ME's Director of Program Management, Anna Hunt, testified that "aggressive" cross-team solicitation would cause "a lot [of] contract turmoil, lower fill rates, and [lead to the] disruption of deliverables to the government."[21]

Further, Moving Defendants' government contracting expert, Professor Christopher Yukins, explains at length how the Challenged Conduct helped support the IPAS teaming arrangement—namely, by ensuring a smooth IPAS transition, effective client communication,

---

[17] *See* Defs.' MSJ at PageID 13624-26; *see also* Defs.' Opp. to Pls.' MSJ, ECF No. 198 ("Defs.' Opp. to Pls.' MSJ") at PageID 20407-08.

[18] Defs.' MSJ at PageID 13622; Defs.' Opp. to Pls.' MSJ at PageID 20406-07; *see* Defs.' MSJ Ex. 83, ECF No. 175-10 at PageID 15276; *see also* Defs.' MSJ Ex. 28, ECF No. 175-6 at PageID 14454-55 ("ME was unable to bid as the prime contractor for IPAS because the OASIS contract required any prime contractor on the IPAS task order to already be a prime contractor performing under OASIS and ME did not meet that requirement."). Plaintiffs argue that the Challenged Conduct was not "necessary" to fulfill the government's requirements on the IPAS contract because Booz Allen could have entered into the contract on its own. *See* Pls.' Opp. to Defs.' MSJ at PageID 21473-74. Not only is this the wrong standard, *see infra* Section II.B, but Plaintiffs only provide tenuous support for this claim. *See id.* The fact that Booz Allen is a large organization does not prove that it could have won the bid or serviced the task order alone. Further, Plaintiffs suggest that "[i]f BAH could not staff the contract internally, BAH could have simply posted the job on public job boards and selected the best person from the pool of applicants." *See id.* This ignores the fact that each IPAS team member brought its own unique strengths and capabilities to the teaming arrangement and bidding process. *See* Defs.' MSJ at 13622. If Booz Allen had instead posted on public job boards, the government client would not have benefited from this combined expertise. Plaintiffs' sheer speculation about what could have been should be ignored.

[19] Defs.' MSJ at PageID 13623.

[20] *See id.* at PageID 13624-25; *see also* Defs.' Opp. to Pls.' MSJ at PageID 20407-08.

[21] Defs.' MSJ Ex. 30, Transcript of Deposition of Anna Hunt, dated Jan. 13, 2021, ECF No. 175-6 ("Hunt Tr.") at PageID 14477 (131:17-132:3).

strong technical performance, and financial management and cost control.[22]  Dr. McCrary also details how this arrangement benefitted the government by combining resources from each team and expanding the pool of potential bids,[23] and benefitted putative class members by ensuring continued employment and increasing compensation.[24]

Plaintiffs point to an email in 2020 describing a conversation with Booz Allen's Deputy Program Manager, Tom Morlan, to show Defendants' "true motivation" for the Challenged Conduct.[25]  However, contrary to Plaintiffs' interpretation, the email shows that Defendants were concerned about the "bigger picture with the client,"[26] and explains why a "chair shuffle" would unnecessarily slow down the hiring process and, in turn, negatively impact the government client.

Plaintiffs also falsely claim that the Challenged Conduct allowed Defendants to "keep a greater share of revenues."[27]  There is simply no evidence in the record that Defendants' profits increased as a result of the Challenged Conduct.  Furthermore, Plaintiffs have failed to explain

---

[22] Defs.' MSJ Ex. 86, Transcript of Deposition of Christopher Yukins, dated Aug. 13, 2021, ECF No. 175-10 at PageID 15373-74 (359:13-360:21); *see* Defs.' MSJ at PageID 13625; *see also* Defs.' Opp. to Pls.' MSJ at PageID 20408.

[23] Defs.' MSJ Ex. 1, Expert Report of Justin McCrary, dated June 3, 2021, ECF No. 175-2 ("McCrary Merits Rpt.") at PageID 13683, 13685-87 (¶¶ 33, 39-44); Defs.' MSJ Ex. 9, Expert Reply Report of Justin McCrary, dated July 15, 2021, ECF No. 175-3 ("McCrary Merits Reply Rpt.") at PageID 13980-81, 13982-84 (¶¶ 82-83, 87-89); *see also* Defs.' Opp. to Pls.' MSJ at PageID 20410-11.

[24] McCrary Merits Rpt. at PageID 13686 (¶ 41); Defs.' MSJ Ex. 76, Expert Report of Justin McCrary, dated March 12, 2021, ECF No. 175-9 ("McCrary Class Cert. Rpt.") at PageID 14886-87 (¶¶ 74-75); *see also* Defs.' Opp. to Pls.' MSJ at PageID 20411.

[25] *See* Pls.' Opp. to Defs.' MSJ at PageID 21450-51.

[26] Contrary to Plaintiffs' assertions, the exchange plainly shows that Defendants thought hiring one another's employees at Molesworth was not a "client beneficial solution" because of the "impact at the client site – that is, were [CACI] to hire [an ME employee working under IPAS to perform the same job for CACI], the client still remains with a hole in its cyber team."  Moreover, the email further clarifies that the concern was specific to the IPAS teaming arrangement.  *See* Pls.' Opp. to Defs.' MSJ Ex. 58, ECF No. 203-65 at PageID 22093 ("He has no issues if this candidate applied for a CACI job and is selected for something other than here."); *see also* Defs.' Opp. to Pls.' MSJ at PageID 20408.

[27] *See* Pls.' Opp. to Defs.' MSJ at PageID 21451.

how this would even be possible given the cost-plus fee structure of the IPAS task order.[28]  On the basis of the uncontroverted record, the only reasonable conclusion is that the Challenged Conduct was reasonably related to a legitimate collaboration.[29]

***Plaintiffs Argue Facts That Are Not Material.***  Plaintiffs speculate as to alternative paths that Defendants supposedly might have taken *before* the Challenged Conduct, but such matters are not material and, therefore, should play no role in the Court's ruling on summary judgment.  For example, there is no need, as Plaintiffs contend, to present evidence that inter-defendant hiring *prior to the Challenged Conduct* "disrupted the provision of intelligence services to the government."[30]  Seeking such evidence is nonsensical and would not be informative in this case because, prior to the Challenged Conduct, Defendants worked independently of one another on different government tasks orders at Molesworth.[31]  Similarly, Plaintiffs' argument that ME and CACI should have avoided teaming with Booz Allen or tried to "win the IPAS task order on their own" is a speculative, counter-factual argument that is simply not relevant to the question of whether the Challenged Conduct was ancillary to Defendants' actual collaboration on the IPAS task order.[32]  In fact, the record is clear that ME was not eligible to win the work on its own.[33]

---

[28] *See* Defs.' MSJ at PageID 13649 n.174; *see also* Defs.' MSJ Ex. 2, Expert Report of Christopher Yukins, dated March 12, 2021, ECF No. 175-2 ("Yukins Class Cert. Rpt.") at PageID 13743 (¶ 11(d)(7)).

[29] *See* Defs.' MSJ at PageID 13620-26; *see also* Defs.' Opp. to Pls.' MSJ at PageID 20405-13.

[30] Pls.' Opp. to Defs.' MSJ at PageID 21449.

[31] *See* Defs.' MSJ at PageID 13607.

[32] *See* Pls.' Opp. to Defs.' MSJ at PageID 21449.

[33] Defs.' MSJ Ex. 28, ECF No. 175-6 at PageID 14454-55; Defs.' MSJ Ex. 29, ECF No. 175-6 at PageID 14470.

### B. Plaintiffs Confuse the Standard.

#### 1. The *Per Se* Standard Applies in Very Specific and Limited Circumstances.

In light of the foregoing undisputed factual record, Plaintiffs cannot establish that the Challenged Conduct falls within the narrow category of activity so obviously anticompetitive that this Court should find it subject to *per se* treatment. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718-19 (6th Cir. 2003) (cautioning that the Supreme Court has described the *per se* rule as a "demanding" rule that should be applied "only in clear cut cases") (citations omitted). The rule of reason is the default standard for antitrust cases, except in situations where "courts have had considerable experience with the type of restraint at issue" and "can predict with confidence that the restraint would be invalidated in all or almost all instances." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 877-78 (2007); *In re Se. Milk Antitrust Litig.*, 739 F.3d at 271-273.

As Moving Defendants recognize, there is some authority suggesting that, under certain circumstances, "no-poach" agreements may be subject to the *per se* rule.[34] However, Plaintiffs' assertion that the DOJ "views no-poach agreements between or among horizontal competitors as *per se* illegal" is misleading and overstates the DOJ's position.[35] The agencies have expressed concern with "**naked**" horizontal agreements.[36] But they also recognize that non-solicitation agreements ancillary to legitimate procompetitive joint collaborations are not *per se* unlawful.[37]

---

[34] *See id.* at PageID 21441-43.

[35] *Id.* at PageID 21442.

[36] DEP'T OF JUST. & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR HUMAN RESOURCE PROFESSIONALS 3 (Oct. 2016), https://www.justice.gov/atr/file/903511/download; *see also* FED. TRADE COMM'N & U.S. DEP'T OF JUST., ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS 8 (Apr. 2000), http://www.ftc.gov/os/2000/04/ftcdojguidelines.pdf.

[37] *See* Defs.' Opp. to Pls.' MSJ at PageID 20406 n.7.

For example, in a Statement of Interest ("SOI") quoted by Plaintiffs, the DOJ states that "no-poach agreements between competing employers are *per se* unlawful **unless** they are **reasonably related to a separate legitimate business transaction or collaboration between the employers**, in which case the rule of reason applies."[38]

Plaintiffs request that the Court take judicial notice of the DOJ's SOI in a different case, *In re Outpatient Medical Center Employee Antitrust Litigation* ("*In re Outpatient*"), No. 1:21-cv-00305 (N.D. Ill. Dec. 9, 2021) (ECF No. 91), which similarly does not establish that *per se* treatment is appropriate in this case.[39]  Even if Plaintiffs' request were procedurally proper,[40] the DOJ's position in the *In re Outpatient* SOI is not helpful to Plaintiffs.  Instead, like the SOI in *Seaman*, the DOJ makes clear that the *rule of reason applies to ancillary agreements*.[41]  The DOJ has similarly commented in other cases that the rule of reason applies when an agreement is

---

[38] *See* Pls.' Opp. to Defs.' MSJ at PageID 21442 (quoting Statement of Interest of the United States of America at 19, *Seaman v. Duke University*, No. 1:15-cv-00462 (M.D.N.C. Mar. 7, 2019), ECF No. 325 (emphasis added)).

[39] *See* Request for Judicial Notice in Support of Pls.' Mot. for Summary Judgment and Opp. to Defs.' Mot. for Summary Judgment ("Pls.' Request for Judicial Notice"), ECF No. 207; *see also* Pls.' Request for Judicial Notice Ex. 1, ECF No. 207-1.

[40] Plaintiffs' request is not proper under Federal Rule of Evidence 201.  Rule 201 allows for judicial notice of *indisputable facts*.  FED. R. EVID. 201(b).  The DOJ's statements are not indisputable facts.  They are legal arguments about a dispute between the parties in another case that the court in the relevant case must ultimately determine.  *See, e.g.*, *In re Outpatient* SOI at 5, 8.  Accordingly, judicial notice of the DOJ's arguments in the *In re Outpatient* SOI would not be appropriate here, and—at most—judicial notice as to the existence of the SOI, not its contents, would be appropriate.  *See In re Papa John's Emp. & Franchisee Emp. Antitrust Litig.*, 2019 WL 5386484, at *5 (W.D. Ky. Oct. 21, 2019) (declining to "abdicate [the court's] duty to apply the law to the facts of this case by blindly deferring to the DOJ's analysis of distinct factual scenarios," and instead taking note of the *existence* of a DOJ SOI and only "any information contained therein that is not subject to reasonable dispute"); *see also Cal. Pharmacists Assoc. v. Maxwell-Jolly*, 2010 WL 11523634, at *1 n.1 (C.D. Cal. July 6, 2010) (declining to take judicial notice of the "truth of the matters asserted therein" a DOJ SOI, and instead granting judicial notice of the fact that the document was filed with the court).

[41] The alleged agreement in *In re Outpatient* was a standalone agreement, not one ancillary to a legitimate collaboration like the Challenged Conduct in this case.  *See* Mem. in Support of Def.' Mot. to Dismiss at 10, *In re Outpatient*, No. 1:21-cv-00305 (N.D Ill. Dec. 9, 2021) (ECF No. 76); *see also* Defs.' MSJ at PageID 13623-26.  But, as the DOJ explains in the SOI, "*ancillary* no-hire or nonsolicitation agreements are subject to the rule of reason," *In re Outpatient* SOI at 11, further supporting that the rule of reason should apply here.

ancillary to a legitimate joint venture.[42]  Finally, while agency guidance is not binding on the

courts,[43] the DOJ and FTC Guidance for Human Resource Professionals cited by Plaintiffs also

supports the proposition that agreements ancillary to "[l]egitimate joint ventures . . . are not

considered per se illegal under the antitrust laws."[44]  Thus, even according to the DOJ's view, the

*per se* rule is not applicable to hiring conditions ancillary to a legitimate collaboration such as the

one among Defendants here.

Case law precedent is in accord.  Courts uniformly have considered non-solicitation

agreements that are ancillary to legitimate collaborations under the rule of reason.[45]  Plaintiffs cite

several cases for the proposition that non-solicitation agreements are *per se* violations of antitrust

laws,[46] yet these cases address "naked" agreements or are otherwise distinguishable.[47]  There is no

---

[42] For instance, the DOJ has explained: "[u]nder the 'ancillary restraints doctrine,' an agreement ordinarily condemned as *per se* unlawful is 'exempt from the *per se* rule' *if it is ancillary to a separate, legitimate venture between the competitors*."  Statement of Interest of the United States at 10, *In Re Ry Indus. Emp. No-Poach Antitrust Litig.*, No. 2:18-mc-00798-JFC (W.D. Pa. Feb. 8, 2019) (ECF No. 158) (citing *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986)) (emphasis added); *see also* Corrected Statement of Interest of the United States at 3, 13, *Stigar v. Dough*, Inc., No. 2:18-cv-00244-SAB (E.D. Wash. Mar. 8, 2019) (ECF No. 34) (stating that "[a]ncillary restraints are subject to the rule of reason" and a no-poach agreement would be *per se* unlawful "*if not ancillary to any legitimate and procompetitive joint venture*") (emphasis added).

[43] *See* CONG. RSCH. SERV., LSB10591, AGENCY USE OF GUIDANCE DOCUMENTS (2021), https://crsreports.congress.gov/product/pdf/LSB/LSB10591.

[44] *See* Pls.' Opp. to Defs.' MSJ at PageID 21443, 21472 n.108; DEP'T OF JUST. & FED. TRADE COMM'N, *supra* note **Error! Bookmark not defined.**, at 3; *see also* FED. TRADE COMM'N & U.S. DEP'T OF JUST., *supra* note 36, at 8 ("If . . . participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal.").

[45] *See* Defs.' MSJ at PageID 13619; *see also, e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc*., 2020 WL 2553181, at *13 (S.D. Cal. May 20, 2020); *Helmerich & Payne Int'l Drilling Co. v. Schlumberger Tech. Corp.*, 2017 WL 6597512, at *4 (N.D. Ok. Dec. 26, 2017); *Kelsey K. v. NFL Enters. LLC*, 2017 WL 3115169, at *2 (N.D. Cal. July 21, 2017), aff'd, 757 F. App'x 524 (9th Cir. 2018); *Deslandes v. McDonald's USA, LLC*, 2021 WL 3187668, at *10 (N.D. Ill. July 28, 2021).

[46] *See* Pls.' Opp. to Defs.' MSJ at PageID 21441-42 (citing *In re Animation Workers Antitrust Litig*., 123 F. Supp. 3d 1175, 1181 (N.D. Cal. 2015), *United States v. eBay*, 968 F. Supp. 2d 1030,  1040 (N.D. Cal. 2013), *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012), *Radovich v. Nat'l Football League*, 352 U.S. 445, 453 (1957), and *Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc*., 540 F.2d 824, 829 (5th Cir. 1976)).

[47] As Plaintiffs themselves note, *eBay* dealt with a "naked agreement between eBay and Intuit not to solicit or hire each other's employees." Pls.' Opp. to Defs.' MSJ at PageID 21442 n.41; *see also eBay*, 968 F. Supp. 2d at 1039-40. The court in *Quinonez* did not examine a non-solicitation agreement, but instead considered a "no-switching"

evidence to support any contention that the Challenged Conduct was a "naked" agreement.  The overwhelming evidence shows that it was ancillary to Defendants' collaboration on the IPAS task order.[48]  Indeed, the whole case centers around Defendants' decision to form a legitimate collaboration—a team to bid for and then service the IPAS task order.  Thus, regardless of whether Plaintiffs agree with the details of the purpose of the Challenged Conduct or its propriety, on this record, it is simply not credible to say that Defendants entered into a standalone, naked agreement.  Therefore, as a matter of law, the *per se* standard does not apply, and Moving Defendants are entitled to summary judgment that the rule of reason is the proper standard for adjudicating the Challenged Conduct.

## 2. Plaintiffs Misstate the Standard for Ancillary Restraints.

The Sixth Circuit has held that "a challenged restraint need not be essential, but rather only reasonably ancillary to the legitimate cooperative aspects of the venture." *See Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys*., 922 F.3d 713, 726 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 380, 205 L. Ed. 2d 219 (2019) (internal citations omitted).  The Sixth Circuit further explained that a restraint is ancillary where there is a "reasonable relationship to the joint venture's success" and that *per se* categorization is inappropriate where the "restraint may contribute to the success of a cooperative venture."  *See id.* at 725-727 (internal citations omitted).  Put differently, the relevant question is whether "the alleged restraint is reasonably related to [the joint venture's] operation."  *See SCFC ILC, Inc. v. Visa USA, Inc*., 36 F.3d 958, 970 (10th Cir. 1994).

---

agreement not ancillary to any legitimate collaboration.  *Quinonez v. Nat'l Ass'n of Sec. Dealers, Inc.*, 540 F.2d 824, 829 (5th Cir. 1976).  Additionally, Moving Defendants have already distinguished the *Animation Workers*, *High Tech*, and *Radovich* opinions.  *See* Defs.' Opp. To Pls.' MSJ at PageID 20403-04 n.5.

[48] *See supra* Section II.A; *see also* Defs.' MSJ at PageID 20405-13.

Plaintiffs' assertion that "the 'risks' that Defendants cite are not the type of injury the antitrust laws are intended to prevent" is incorrect.[49] Courts designed the ancillary restraints doctrine to protect "beneficial arrangements," recognizing that "[a] legal rule that enforces covenants not to compete . . . makes it easier for people to cooperate productively in the first place." *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment."). Here, the Challenged Conduct promoted cooperation through the IPAS teaming arrangement—the type of arrangement that the ancillary restraints doctrine permits so long as it is reasonable.

> **Defendants Need Not Form a Formal Corporate "Joint Venture" for the Ancillary Restraints Doctrine to Apply.** Defendants entered into teaming agreements and combined resources to successfully bid for IPAS. As noted in Moving Defendants' opening brief, Booz Allen, ME, and CACI managers described a variety of procompetitive purposes for the teaming agreements, including fulfilling government requirements, preventing contract turmoil, managing fill rates, and improving the quality of deliverables to the government customer.[50]

Plaintiffs imply that because Defendants did not form a formal corporate "joint venture," they did not form a legitimate joint collaboration for antitrust purposes.[51] That is not the law. Instead, the leading antitrust treatise notes that a "'joint venture' does not have a single, well-defined meaning under the antitrust laws . . . and embraces any collaborative activity, short of a full merger, by which separate firms pool resources to produce or sell a common product or service,

---

[49] *See* Pls.' Opp. to Defs.' MSJ at PageID 21452.

[50] *See* Defs.' MSJ at PageID 13624-25.

[51] *See* Pls.' Opp. to Defs.' MSJ at PageID 21428.

to obtain needed inputs, or to pursue some other common objective." *See* AMERICAN BAR ASS'N, ANTITRUST LAW DEVELOPMENTS, ch. 4, at 453 (8th ed. 2016). Rather than supporting Plaintiffs' unsubstantiated view, the treatise specifically emphasizes that "the pooling of resources and associated risk sharing may be accomplished by agreement without a new entity being created." *See id*. This position has been supported by the FTC and DOJ and reaffirmed by numerous courts. *See e.g.* FED. TRADE COMM'N & U.S. DEP'T OF JUST., *supra* note 36, at 6 ("The potential efficiencies from competitor collaborations may be achieved through a variety of contractual arrangements including joint ventures, trade or professional associations, licensing arrangements, or strategic alliances."); *SCFC ILC, Inc.*, 36 F.3d at 963 (explaining that "virtually any collaborative activity among business firms may be called a joint venture"); *Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc*., 596 F. Supp. 1231, 1253–54 (S.D. Fla. 1984), *aff'd*, 779 F.2d 592 (11th Cir. 1986) (finding that "[u]nwarranted emphasis upon formalistic aspects of the relationship" was not helpful in making a determination that VISA was a joint venture).

The record establishes that each company brought unique value to the team and no individual company could have successfully competed for the IPAS contract on its own.[52] For example, ME began performing intelligence work in Molesworth as early as 2013 and had the deepest institutional knowledge at the base.[53] Moreover, ME was not eligible to bid for the IPAS task order on its own because it was not an eligible "OASIS" contractor as required for the IPAS bid.[54] In addition, CACI and ME each brought unique technical capabilities to the team.[55] Accordingly, regardless of the corporate form, because Defendants pooled their resources and

---

[52] Defs.' MSJ at PageID 13609 & n.33, 13622 & n.95.

[53] *See* Defs.' MSJ at PageID 13604 n.2; *see also* McCrary Merits Rpt. at PageID 13674 (Ex. 1).

[54] Defs.' MSJ at PageID 13609.

[55] *Id.* at PageID 13622 & n.95.

efforts to fulfill the IPAS task order, their conduct in seeking to promote the success of that collaboration should be evaluated under the rule of reason.

**The Challenged Conduct Need Not Be "Necessary" to be Ancillary.** Plaintiffs also assert the wrong standard when they claim that the "[n]o-Hire Agreements were not—and are not— necessary to teaming arrangements" as a rationale for why the rule of reason should not apply.[56] Necessity is not the standard in the Sixth Circuit. As Plaintiffs elsewhere acknowledge, "[a]ncillary restraints are restraints by a joint venture that are **not integral to the running** of the joint venture, but **may contribute to the success** of a cooperative venture." Pls.' Opp. to Defs.' MSJ at PageID 21444 (internal quotations omitted) (quoting *Med. Ctr. at Elizabeth Place*, 922 F.3d at 725).[57] Therefore, Plaintiffs' various arguments that the Challenged Conduct was not necessary are contrary to controlling precedent. Regardless, Plaintiffs' assertion that the Challenged Conduct was not necessary is counter to the facts.[58]

Moreover, as the Supreme Court has recognized, "[c]ourts should not second guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgment of

---

[56] *See, e.g.*, Pls.' Opp. to Defs.' MSJ at PageID 21451, 21472-73.

[57] Plaintiffs' Opposition does not cite the overturned district court decision in *Med. Ctr. at Elizabeth Place* that they cite in their own summary judgment motion, *see* Pls.' Mot. for Summ. J., ECF No. 177 at PageID 17100, but they still cling to the same incorrect standard that the Challenged Conduct must be "necessary." As Moving Defendants have already pointed out, the Sixth Circuit specifically rejected the standard set forth in *Med. Ctr. Elizabeth Place, LLC v. Premier Health Partners*, 2017 WL 3433131, at *14 (S.D. Ohio Aug. 9, 2017), that a restraint must be "plausibly necessary." *See Med. Ctr. at Elizabeth Place*, 922 F.3d at 725-27; *see also* Defs.' Opp. to Pls.' MSJ at PageID 20409 n.17.

[58] As noted above, each company brought unique value to the team. *See supra* at 15. Further, Plaintiffs falsely contend that ME was not a vital part of the team because "the government rejected the majority of the ME employees as unqualified." *See* Pls.' Opp. to Defs.' MSJ at PageID 21475. However, this view ignores the fact that it was not just the individual employees but the expertise, institutional knowledge, and capabilities of the companies that brought value to the team. Furthermore, the ME employees the government did not reject were qualified and considered to be high performers. Thus, once this highly-skilled team was secured and proffered to the government, Defendants were reasonable in attempting to promote the success of the team and prohibit conduct that was viewed as detrimental to interests of their government client. *See, e.g.*, Hunt Tr. at PageID 14477 (131:17-132:3).

degrees of efficiency.'"[59]  It is not appropriate for Plaintiffs to demand that Defendants' managers could only rely on what *Plaintiffs' lawyers* retroactively deem to be important when making a business determination that hiring amongst teammates would disrupt the provision of intelligence services.  Rather, for the Challenged Conduct to be ancillary, it is enough that the agreement "when, viewed **at the time it was adopted** . . . 'may contribute to the success of a cooperative venture.'"  *See Med. Ctr. at Elizabeth Place*, 922 F.3d at 727 (following "the majority of Circuits" and quoting from *Polk Bros., Inc. v. Forest City Enters., Inc.* 776 F.2d at 189).  The record here shows that the Challenged Conduct was reasonably related to the success of Defendants' collaboration.[60]  Specifically, the scope of the teaming agreements was geographically limited and only impacted the relatively small number of analysts employed on IPAS, despite the fact that the Defendants employ tens of thousands of employees, and compete on contracts, across the globe.

*Moving Defendants Need Not Prove Procompetitive Benefits of the Challenged Conduct for it to be Categorized as Ancillary.*  Plaintiffs seem to argue that Moving Defendants must actually prove that the Challenged Conduct has procompetitive benefits before it can be categorized as ancillary.[61]  There is no authority for such a stringent requirement; the determination of ancillarity *precedes* application of the rule of reason analysis.  Plaintiffs' argument would invert the rule of reason's burden shifting framework, which does not require a defendant to offer procompetitive benefits until *after* a plaintiff has shown anticompetitive impact in a properly

---

[59] *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2161-62 (2021); *see also* Defs.' MSJ at PageID 13623; Defs.' Opp. to Pls.' MSJ at PageID 20411.

[60] *See* Defs.' MSJ Ex. 25, Expert Report of Christopher Yukins, dated June 3, 2021, ECF No. 175-5 ("Yukins Merits Rpt.") at PageID 14327-30 (¶¶ 19-24).

[61] *See. e.g.*, Pls.' Opp. to Defs.' MSJ at PageID 21444-45, 21448-49.

defined market.[62]  To require Moving Defendants to make a full blown procompetitive benefits showing before even applying the rule of reason would upend the analysis.

Plaintiffs cite to *Med. Ctr. at Elizabeth Place* to argue that the Challenged Conduct is not ancillary because it supposedly does not "contribute to legitimate procompetitive efficiencies of the agreements."[63]  But Plaintiffs selectively cite from the court's opinion in that case.  The full sentence reads: "[i]f the record in this case reveals a ***plausible*** way in which the challenged restraints contribute to the procompetitive efficiencies of the joint venture, then 'the ***possibility*** of countervailing procompetitive effects' is not remote and per se treatment is improper."  *Med. Ctr. at Elizabeth Place*, 922 F.3d at 728 (emphasis added).  Thus, procompetitive benefits need only be plausible, and  Moving Defendants easily meet that test here.[64]

Plaintiffs also cite to the concurrence of the Second Circuit opinion in *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008), for the proposition that "the ancillary restraint 'must have a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the joint venture.'"[65]  However, the crux of the concurrence's opinion is not that a defendant must *prove* procompetitive benefits, as they might do later under the rule of reason's burden shifting framework, but rather that a defendant must "distinguish between those restraints that are intended to promote the efficiencies of a joint venture and those

---

[62] *Nat'l Hockey League*, 325 F.3d at 718 (stating that the rule of reason analysis "employs a burden-shifting framework" in which the burden does not shift to a defendant to show evidence of procompetitive benefits until the plaintiff has established anticompetitive effects); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (same); *see also In re Currency Conversion Fee Antitrust Litig.*, 2012 WL 401113, at *9 (S.D.N.Y. Feb. 8, 2012) (denying plaintiffs' motion for partial summary judgment on procompetitive benefits as premature, in case where it was disputed whether the rule of reason should apply, because "Defendants bear the burden of justifying their conduct only if Plaintiffs first prove the existence of an anticompetitive conspiracy" and plaintiffs "ha[d] not proven their case by a preponderance of the evidence, and may not be able to do so").

[63] *See* Pls.' Opp. to Defs.' MSJ at PageID 21448.

[64] *See* Defs.' MSJ at PageID 13620-26; *see also* Defs.' Opp. to Pls.' MSJ at PageID 20405-13.

[65] *See* Pls.' Opp. to Defs.' MSJ at PageID 21448.  The majority opinion does not address the ancillary restraints doctrine at all.  *See generally Major League Baseball*, 542 F.3d at 293-335.

that are simply unrelated." *See id.* As discussed, *see supra* Section II.A, the Challenged Conduct was not "simply unrelated," but instead implemented as part of and to support the IPAS teaming arrangement. Accordingly, the Challenged Conduct is ancillary, and this Court should apply the rule of reason.

### 3. The Quick Look Standard Does Not Apply.

As an alternative to the *per se* standard, Plaintiffs argue that the quick look standard—which is a "truncated analysis" that is "applied where the 'likelihood of anticompetitive effects' [is] 'comparably obvious' to one possessing a mere 'rudimentary understanding of economics'"—should apply here.[66]

A quick look analysis is not appropriate here for the same reasons the Plaintiffs have failed to establish that *per se* treatment is appropriate. Quick look is not the default standard[67] and is only applicable where "the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look."[68] This is not a "clear" case where the Court can "simply assume the existence of anticompetitive effect where the conduct at issue amounts to a 'naked' and effective restraint . . . that carries 'obvious' anticompetitive consequences."[69] Rather, as described above and in

---

[66] *See* Pls.' Opp. to Defs.' MSJ at PageID 21427, 21477 (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)).

[67] *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 387 (8th Cir. 2007) (describing quick look standards as "exceptional," "reserved for the most patently anticompetitive restraints," and finding significant "danger of applying those truncated modes of analysis too freely").

[68] *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 960 (6th Cir. 2004) (quoting *Cal. Dental Ass'n*, 526 U.S. at 780-81).

[69] *Id.*; *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1311 (10th Cir. 2017). Nor is this a case where "identical conclusions" have been reached in "case after case" and therefore courts have "sufficient experience with this type of conduct to permit the abbreviated analysis." *Cal. Dental Ass'n*, 526 U.S. at 781; *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 116-17 (2d Cir. 2021) ("When, as here, not only are there cognizable procompetitive justifications but also the type of restraint has not been widely condemned in our 'judicial experience,' more is required." (internal citations omitted)); Defs.' MSJ at PageID 13619.

Moving Defendants' opening brief, the Challenged Conduct is ancillary to a legitimate collaboration.[70] Further, the anticompetitive effects here are far from "obvious"—in fact, it is Moving Defendants' position that the undisputed record shows that there are none at all and Plaintiffs are forced to rely on complicated (and dubious) expert analysis as their only support.[71] These are not circumstances in which the quick look standard applies.[72]

Moreover, it must be apparent that the Challenged Conduct "would have an anticompetitive effect on customers and *markets*."[73]  The Sixth Circuit has held that quick look analysis is not the proper standard where the relevant market is "neither obvious nor undisputed."[74]  Plaintiffs' proposed relevant market is neither.[75]  Because there are serious questions as to Plaintiffs' market definition, a quick look analysis does not apply here.

---

[70] The DOJ has explained in a SOI that "where a court concludes that the no-poach agreement is ancillary, then, by definition, quick look analysis is not appropriate."  Corrected Statement of Interest of the United States at 17, *Stigar v. Dough, Inc.*,  No. 2:18-cv-00247-SAB (E.D. Wash. Mar. 8, 2019) (ECF No. 34).

[71] Defs.' MSJ at PageID 13647-50; *see infra* Section IV.

[72] *See Buccaneer Energy*, 846 F.3d at 1311 (finding quick look inappropriate where "Defendants' conduct here 'might plausibly be thought to have . . . no effect at all on competition'"); *1-800 Contacts*, 1 F.4th at 117 n.7 (noting that "the fact that it required the testimony of expert witnesses who provided empirical analyses in order to determine the net competitive effect of the Challenged Agreements underscores the point: these restraints are not obviously anticompetitive to someone with only a rudimentary understanding of economics").

[73] *Cal. Dental Ass'n*, 526 U.S. at 770 (emphasis added).

[74] *Worldwide Basketball*, 388 F.3d at 961 (stating that a quick look can only be done "where the contours of the market and, where relevant, submarket, are sufficiently well-known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition").

[75] *See* Defs.' MSJ at PageID 13628-43; *see infra* Section III.  There is nothing obvious about Plaintiffs' assertion that intelligence analysts—who travel globally to work on short-term, limited duration contracts—are limited in their employment options to a single military base in rural England.  There is also nothing obvious about Plaintiffs' attempt to lump all intelligence analysts—who have varying skillsets that would affect their employment options within and outside of Molesworth—into a single market.

III. **WITHOUT A PROPERLY DEFINED, RELEVANT ANTITRUST MARKET, DEFENDANTS DID NOT HAVE THE REQUISITE MARKET POWER TO SUPPRESS COMPENSATION.**

Knowing that their market definition is deficient, Plaintiffs argue that they can abandon their market definition and instead rely on "direct" or "indirect" proof.

A. **Plaintiffs Ignore Undisputed Facts that Establish that Plaintiffs Do Not Properly Define the Product or Geographic Components of Their Proposed Relevant Market.**

Plaintiffs' alleged market consisting of intelligence analysts working in Molesworth makes no sense on its face. Moreover, it is refuted by the undisputed facts that: (1) the vast majority of those employees came to Molesworth from elsewhere and left from Molesworth to go elsewhere, and (2) the sources of labor for Defendants were never primarily from, or limited to, those personnel in Molesworth. Moving Defendants' opening brief detailed the evidence of these commercial realities and others refuting Plaintiffs' market definition.[76] Plaintiffs' Opposition has no rejoinder.

***Lack of Interchangeability.*** First, Plaintiffs barely address Moving Defendants' argument that the "product" component of their alleged market is ill-defined.[77] As explained in Moving Defendants' opening brief, Defendants' employees at Molesworth, although all intelligence analysts, have a highly diverse set of skills and subspecialties for which they are hired, pursuant to particular contractual requirements set by the government.[78] Because of this, intelligence analysts are *not* interchangeable as Plaintiffs surmise.[79] *Nat'l Hockey League Players Ass'n, v.*

---

[76] Defs.' MSJ at PageID 13629-33.

[77] *See* Pls.' Opp. to Defs.' MSJ at PageID 21467-69.

[78] Defs.' MSJ at PageID 13629-30.

[79] *See, e.g.*, Hunter Tr. at PageID 13852 (410:15-17) ("Q. . . . [H]ow many people were working on your problem set? A. Only me.").

*Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005) (interchangeability gauged by whether employees "can perform the same function"). While Plaintiffs claim that "Defendants never explain how any such differences would affect movement into or out of the market for intelligence analysts at Molesworth,"[80] Moving Defendants have previously explained that demand for intelligence analysts with different skill sets would vary—for example based on the uniqueness of the skill, *see, e.g.*, Defs.' MSJ at PageID 13630 (describing different competitive conditions for Russian speakers), or based on the contractual conditions, *see, e.g.*, Defs.' MSJ at PageID 13630 (stating that demand for intelligence analysts without a Bachelor's degree significantly changed when the IPAS task order came into effect given its very different requirements compared to JAC Omnibus).[81] There is no genuine dispute that intelligence analysts with varying skill sets are not substitutes for each other, and the Plaintiffs' inability to support their product market definition alone is enough to warrant granting Moving Defendants' Motion.

**Global Opportunities.** Plaintiffs also ignore overwhelming evidence that the geographic component of the relevant market must be much broader than Molesworth because Plaintiffs and putative class members readily had global job opportunities throughout the relevant period.[82] *See*

---

[80] Pls.' Opp. to Defs.' MSJ at PageID 21467.

[81] Plaintiffs' argument that the variation in skills between intelligence analysts do not matter because the Challenged Conduct applies to them all equally and they all may face the same hypothetical switching costs is inapposite. Pls.' Opp. to Defs.' MSJ at PageID 21467. This argument fails to address the critical question for market definition purposes—whether the employees are interchangeable, *i.e.*, "can perform the same function." *See Nat'l Hockey League*, 419 F.3d at 472.

[82] As with many of their statements, Plaintiffs fail to provide any support in the record or otherwise for their argument that "[t]here are few, if any, intelligence analysis jobs near Molesworth that could serve as acceptable substitutes for Defendants' positions. And other jobs that are available in the area would not provide acceptable substitutes." *See* Pls.' Opp. to Defs.' MSJ at PageID 21465. Plaintiffs have not presented evidence to support this, and there is in fact evidence in the record that belies Plaintiffs' position. *See* Def.' MSJ at PageID 13615 (Youtz found a job with GDIT in Menwith Hill, England); Defs.' Opp. to Pls.' Mot. For Class Cert., ECF No. 112 at PageID 2608 n.181 (Youtz's position at GDIT was contingent upon him having "Top Secret CI Poly level Security Clearance"). Regardless, as Moving Defendants have explained, Defendants' employees were not limited to jobs near Molesworth. *See* Def.' MSJ at PageID 13614-16; *see also id.* at PageID 13630-33.

*Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1017 (6th Cir. 1999). Defendants hired almost all of their employees (approximately 97%) from outside Molesworth,[83] and approximately 12-33% of Defendants' employees left Molesworth each year (both before and after the Challenged Conduct).[84] Further, as of February 26, 2021, there were 722 job postings for "Intelligence Analyst" or "All Source Analyst" on a reputable public online job board, *only 5 of which* were at Molesworth.[85] As these numbers show, Defendants' employees were not "trapped" in one location—far from it, they comprise a highly mobile workforce that easily came and went from Molesworth, and had many job opportunities both before and after coming to Molesworth.

The Named Plaintiffs' personal experiences highlight this inconvenient truth for Plaintiffs. Sarah Hunter expressed interest in, applied for, and received offers for multiple positions outside of Molesworth *before* the Challenged Conduct,[86] and both Sarah Hunter and David Youtz were able to quickly find employment with higher compensation outside of Molesworth after being terminated by ME.[87]

***Speculative Costs.*** Plaintiffs cannot support their alleged market where all the employees within it have markedly different skill sets and often move internationally for work. So, instead

---

[83] Def.' MSJ at PageID 1362; McCrary Merits Reply Rpt. at PageID 13952 (¶ 28, Ex. 1).

[84] McCrary Merits Reply Rpt. at PageID 13954 (¶ 32). Plaintiffs state that "Dr. McCrary does not provide any evidence as to the reasons for departure [of the 12 to 33 percent of employees that left Molesworth yearly] or any evidence regarding subsequent employment. The fact that some employees left Molesworth doesn't say anything about those circumstances." Pls.' Opp. to Defs.' MSJ at PageID 21468. This argument is without merit, and attempts to divert attention to irrelevant issues rather than addressing actual movement patterns. It is not relevant *why* the employees left, particularly for those who left prior to the alleged start of the Challenged Conduct. And *who* the employees subsequently worked for is also not relevant since the movement itself means that their subsequent employers were adequate substitutes.

[85] McCrary Merits Reply Rpt. at PageID 13958, 13959(¶¶ 40-41, Ex. 3).

[86] Defs.' MSJ Ex. 18, ECF No. 175-4 at PageID 14195-97 (Pls.' Supp. Answer to Interrog. No. 3). Plaintiffs attempt to argue that Plaintiffs only looked for these jobs after they were told they would not be considered for jobs at Molesworth due to the Challenged Conduct, but Hunter applied for and was offered jobs in Washington, D.C. and Afghanistan on February 2, 2017. *Id.*; Pls.' Opp. to Defs.' MSJ at PageID 21467.

[87] Defs.' MSJ at PageID 13631-32.

of analyzing the actual behaviors and circumstances of employees within their alleged market, Plaintiffs play a diversion game, and try to use "switching costs" as support for the geographic component of their market.[88]  Plaintiffs posit that these costs made jobs outside of Molesworth "not practical substitutes," but they fail to proffer any *evidence* regarding: (1) how frequently these costs were actually incurred, and (2) whether such costs actually impacted putative class members' decisions to stay in or leave Molesworth.  For example, Plaintiffs state that a worker "who leaves Molesworth before his or her commitment is finished," will have to pay their own moving expenses, which "can" exceed $30,000.[89]  But Plaintiffs offer no evidence or analysis to show how much of the Molesworth workforce already had completed their durational "commitment" such that they would not have incurred these moving expenses. Plaintiffs also cite to potential tax penalties for "early departure."[90]  This suffers from the same flaw as Plaintiffs' argument about moving expenses—Plaintiffs did not consider that employees overseas for longer than one year would not have incurred any penalties or that such penalties would not apply to class members who remained overseas after leaving their positions at Molesworth.[91]  Additionally, Molesworth

---

[88] Pls.' Opp. to Defs.' MSJ at PageID 21464-65.

[89] *Id.* at PageID 21464.  Plaintiffs do not adequately support their argument that the high switching costs identified by Dr. Johnson are "actual costs" and that they are "documented by Defendants' own business records."  *See id.* at PageID 21468.  The documents cited by Plaintiffs are provisions of Named Plaintiffs' employment offer letters and an employment agreement.  *See* Pls.' Opp. to Defs.' MSJ Ex. 52, ECF No. 203-59 at PageID 22064; Pls.' Opp. to Def.' MSJ Ex. 62, ECF No. 203-69 at PageID 22167; Pls.' Opp. to Defs.' MSJ Ex. 63, ECF No. 203-70 at PageID 22171.  Instead of proving Plaintiffs' argument, these documents further support Moving Defendants' point that Dr. Johnson only identifies potential costs—they are merely alerting new employees to costs they *could* incur in the future under specific circumstances.  Plaintiffs also do not account for the fact that *other companies* may cover the relocation expenses of Molesworth employees leaving Molesworth in the same way that Defendants did when bringing employees to Molesworth.  *See* Johnson (Aug. 2021) Tr. at PageID 15117 (539:15-24) (admitting that he was not sure whether firms outside of Molesworth offered to pay relocation costs for departing employees).

[90] Pls.' Opp. to Defs.' MSJ at PageID 21464-65.

[91] Plaintiffs further claim that "Defendants disseminated information" regarding switching costs "in part to increase their bargaining power with respect to compensation and compensation negotiation."  *Id.* at PageID 21468.  Tellingly, Plaintiffs fail to offer any citation for this claim, in particular that it was a ploy to increase Defendants' bargaining power.

employees' actual movements show that any moving costs that they may have incurred did not foreclose them from freely moving to jobs in other locations.[92]

In sum, Plaintiffs and Dr. Johnson cite to a few documents that indicate there *might* be costs to relocation for *certain* employees at *certain* times, but turn a blind eye to all other evidence. At summary judgment, they must come forward with *evidence* to support their claim, not just surmise. Because they do not assess whether their purported switching costs are incurred, or whether any such costs actually had an impact on class members' decisions, their "analysis" does not provide any evidentiary support for their theory that putative class members were "trapped" at Molesworth—a theory that is belied by a documented history of vast numbers of employees coming and going without difficulty.[93]

### B. Plaintiffs Cannot Show that Defendants Had Market Power Through "Direct" or "Indirect" Proof.

***Direct Proof.*** Plaintiffs argue that they can avoid defining a market and instead rely on "direct proof" of Defendants' market power.[94] But the undisputed fact that salaries at Molesworth

---

[92] Moving Defs.' Reply to Pls.' Opp'n. to Defs.' Mot. to Exclude the Ops. and Test. Of Phillip Johnson, ECF No. 212 at 4 ("[T]he fact that the average departing tenure was so short and that 97% of employees came from outside of Molesworth (incurring moving costs), means that these costs did not foreclose jobs in other locations from being substitutes to Molesworth jobs.").

[93] Plaintiffs' attempts to distinguish certain cases cited in Moving Defendants' opening brief regarding their market arguments ignore the general antitrust principles for which they stand. *See* Pls.' Opp. to Defs.' MSJ at PageID 21469-70. For example, Moving Defendants cite *Kentucky Speedway* for the proposition that the results of a SSNIP test inform market definition, and cite *Berlyn* for the basic antitrust principle that failure to properly define a relevant geographic market is fatal to Plaintiffs' claims. *See Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CIV.A.05-138(WOB), 2008 WL 113987, at *4 (E.D. Ky. Jan. 7, 2008), *aff'd*, 588 F.3d 908 (6th Cir. 2009); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 726, 728-29 (D. Md. 2002), *aff'd sub nom. Berlyn Inc. v. The Gazette Newspapers, Inc.*, 73 F. App'x 576 (4th Cir. 2003). Plaintiffs' attempt to undermine these core principles by nitpicking the differences in the facts of these cases, which unsurprisingly are not identical to the facts here, fails. Moving Defendants also cite *Queen City Pizza* for the proposition that "switching costs" do not limit employment mobility. *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439-40 (3d Cir. 1997). Plaintiffs try to distinguish this case by saying that employees were not aware of the Challenged Conduct when they accepted their positions at Molesworth. *See* Pls.' Opp. to Defs.' MSJ at PageID 21469-70. But they *were* aware of the potential switching costs, which as *Queen City* says means they "could assess the potential costs and economic risks" of leaving when they accepted the positions. *See Queen City Pizza*, 124 F.3d at 440.

[94] *See* Pls.' Opp. to Defs.' MSJ at PageID 21463.

did not go down during the class period (and in fact were higher), along with the inherent flaws in Dr. Johnson's model, make this argument worthless. As Plaintiffs admit,[95] direct proof is exactly what it sounds like—evidence of Defendants' "actual control over prices" and "an actual adverse effect on competition." *See In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 725 (E.D. Tenn. 2011); *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001).[96] Here, Plaintiffs claim that Defendants' conduct lowered employee compensation. So, presumably, direct evidence that Defendants had such market power would be evidence that employees' compensation *went down* market-wide after the Challenged Conduct began.[97] But there is no such "direct" evidence here. Instead, the undisputed data is clear—employees' compensation went *up*, not down, after the Challenged Conduct began.[98]

Plaintiffs' expert's analysis also cannot provide such direct proof, as it is flawed and unreliable in multiple respects and therefore should be excluded.[99] Dr. Johnson opines that wages were suppressed even though it is undisputed that wages at Molesworth actually *increased* over the class period. In effect, he purports to show by statistical analyses that wages at Molesworth would have gone up *more* than they already did.[100] But this modeling, even if not excluded in its entirety, is incapable of providing "direct" evidence of wage suppression, as it "bakes in" his Molesworth-centric market definition by myopically focusing on only Defendants as their

---

[95] *Id.* at PageID 21462.

[96] *See also Am. Express Co.*, 138 S. Ct. at 2285 n.7 (rejecting evidence of adverse effects on competition in lieu of defining a relevant market); *1-800 Contacts, Inc.*, 1 F.4th at 118 & nn.10-11 (rejecting evidence and finding it to be "theoretical and anecdotal; it is not 'direct'").

[97] Direct proof must show *market-wide* effects. *See 1-800 Contacts, Inc.*, 1 F.4th at 118 n.11.

[98] *See* Johnson *Daubert* Mot. at PageID 15681; McCrary Class Cert. Rpt. at PageID 14918-19 (¶ 148).

[99] *See generally* Johnson *Daubert* Mot.

[100] McCrary Class Cert. Rpt. at PageID 14886-87 (¶¶ 74-75); *see also* MSJ Ex. 97, Expert Report of Phillip Johnson, dated May 4, 2021, ECF No. 175-12 ("Johnson Class Cert. Reply Rpt.") at PageID 15546 (¶ 58).

prospective employers. That approach is contrary to commercial realities, as explained previously. Plaintiffs' claim that these models can provide direct "proof" of wage suppression is built on a house of cards that collapses under the weight of the undisputed market facts.

**Indirect Proof.** Alternatively, Plaintiffs claim that they provide "indirect proof" that Defendants had market power.[101] But because Plaintiffs' contrived Molesworth market is unsustainable and they do not attempt to show market power in a broader market, Plaintiffs' argument of "indirect proof" of market power also fails.[102] If gerrymandering an overly narrow market as Dr. Johnson does were all that is required, then no Plaintiff would ever struggle to establish market dominance—a Plaintiff could narrowly define a market as "the market for gasoline sold on the corner of Main and Elm," show that there is just one gas station there, and— *voila!*—the station's owner has "market power" over the Main and Elm gasoline market.

The gas station analogy seems patently unrealistic, but that is precisely what Plaintiffs try to do here. Essentially, Plaintiffs argue that Defendants had market power because they had control over the hiring and salaries for employees working at Molesworth, which predominantly consisted of employees working on IPAS.[103] While it is not surprising that the IPAS prime contractor (Booz Allen) and two of its principal subcontractors (ME and CACI) would employ a substantial majority of the intelligence analysts working at Molesworth, that does not equate to a high market share within a properly defined relevant market, as required to show market power.[104] Plaintiffs do not even attempt to allege or proffer evidence of Defendants' market share in a

---

[101] Pls.' Opp. to Defs.' MSJ at PageID 21462, 21464-66.

[102] *See id.* at PageID 21464.

[103] *See* Defs.' MSJ at PageID 13628.

[104] Pls.' Opp. to Defs.' MSJ at PageID 21429 (citing *In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 725 (E.D. Tenn. 2011)).

broader geographic market for intelligence workers.  In reality, positions at Molesworth are only a miniscule fraction of the jobs available to class members.[105]  On this record, Plaintiffs cannot meet their burden to establish the required element that Defendants had market power.  *Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 530–31 (6th Cir. 2001).

## IV.   MOVING DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT UNDER THE RULE OF REASON BECAUSE PLAINTIFFS FAILED TO SHOW COMPETITIVE HARM.

Plaintiffs argue that "Defendants fail to show—as they must—the absence of evidence of the [Challenged Conduct's] anticompetitive effects."[106]  Not so.  Moving Defendants need not prove an absence of evidence—*Plaintiffs* bear the initial burden under the rule of reason to provide *sufficient* evidence of competitive harm to create a triable issue.[107]  As detailed in Moving Defendants' opening brief and their Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 198), the evidentiary record does not support a finding of any competitive harm.

### A.  Plaintiffs Do Not Dispute Moving Defendants' Evidence that Hunter and Youtz Did Not Suffer Any Antitrust Injury.

To survive summary judgment, Plaintiffs must present sufficient evidence that (among other things) they suffered an "antitrust injury" from the Challenged Conduct such that a jury

---

[105] McCrary Merits Reply Rpt. at PageID 13958, 13959 (¶¶ 40-41, Ex. 3).

[106] Pls.' Opp. to Defs.' MSJ at PageID 21456.

[107] Defs.' MSJ at PageID 13617, 13643-44.  Additionally, Moving Defendants need not prove that the Challenged Conduct had procompetitive benefits to prevail on summary judgment.  First, Moving Defendants did not move on the issue of procompetitive benefits.  Second, Plaintiffs cite *In re Se. Milk* for the proposition that "[d]efendants have the burden of showing that the No-Hire Agreements had legitimate procompetitive benefits." Pls.' Opp. to Defs.' MSJ at PageID 21471.  This is misleading.  Under the rule of reason, procompetitive benefits are the second stage of the analysis.  *See supra* Section II.B.2.  While Moving Defendants do carry the burden on the element of procompetitive benefits, Plaintiffs must first carry their burden on the element of anticompetitive effects.  Only if they can make that threshold showing do procompetitive benefits come into play.  As described below, Plaintiffs have not proffered sufficient evidence of anticompetitive effects to shift the burden to Moving Defendants.

potentially could find in their favor on that issue.[108] This is a requirement under both the rule of reason and the *per se* standard.[109] Plaintiffs cannot meet this requirement.

The only Named Plaintiffs are Sarah Hunter and David Youtz; for this case to survive summary judgment, there must be evidence that Named Plaintiffs suffered an injury flowing from Defendants' anticompetitive conduct. Thus, it is somewhat surprising that Plaintiffs do not address Defendants' points relating to the issue of antitrust injury for Hunter and Youtz.[110] In particular, Plaintiffs ignore that Hunter and Youtz were not hired by Booz Allen or CACI when they applied in approximately September 2018 because the government did not want them to work on IPAS,[111] and that not being considered for IPAS is *not* an antitrust injury.[112]

Plaintiffs cannot create a "genuine dispute" as to a required element of their claim by ignoring the record. As set forth in Moving Defendants' opening brief, what the undisputed record ***does*** establish is that if the Named Plaintiffs suffered any "injury" after being terminated by ME, it was not an antitrust injury. In other words, their termination did not flow from the Challenged

---

[108] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating that there is no "genuine" issue of material fact unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

[109] *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) ("Antitrust injury does not arise for purposes of § 4 of the Clayton Act, until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct." (internal citations omitted)); *id.* at 341-42 ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Clayton Act. Per se and rule-of-reason analysis are but two methods of determining whether a restraint is 'unreasonable,' i.e., whether its anticompetitive effects outweigh its procompetitive effects.").

[110] *See* Defs.' MSJ at PageID 13644-45 (describing how alternative causes, unrelated to the Challenged Conduct, prevented Hunter and Youtz from switching from ME to another Defendant), 13646-47 (explaining that not being considered for IPAS is not an antitrust injury).

[111] *Id.* at PageID 13644-45. Hunter (as well as several other ME employees) also did not qualify for IPAS because the task order required at least a bachelor's degree, which it is undisputed she did not have. *Id.* at PageID 13645. Although Plaintiffs state that "[o]verwhelming evidence shows individuals—including Named Plaintiffs—being denied employment at Molesworth because of the No-Hire Agreements," Pls.' Opp. to Defs.' MSJ at PageID 21458, they cite no evidence to support this claim.

[112] Defs.' MSJ at PageID 13646-47.

Conduct, but from the government's downsizing of the IPAS project and their failure to qualify or otherwise be chosen by the Government for transition to IPAS.[113]  Plaintiffs' only retort is to repeatedly make the conclusory statement that the Challenged Conduct was the "direct and proximate" cause of injury to Plaintiffs based on Dr. Johnson's opinions.[114]  But Dr. Johnson did not do any individual analysis of harm to any individual employees, including the only two people who matter right now—Hunter and Youtz.[115]  Further, Dr. Johnson admits that not all of Defendants' employees would necessarily be affected equally by the Challenged Conduct.[116]  In other words, there is no evidence to support the contention that the Named Plaintiffs suffered an antitrust injury.[117]

---

[113] *Id.* at PageID 13644-47.

[114] Pls.' Opp. to Defs.' MSJ at PageID 21453-54, 21470-71.  In apparent support of their use of Dr. Johnson to show antitrust injury, Plaintiffs refer to this Court's ruling on Defendants' motion to dismiss for the proposition that "Plaintiffs' **allegations** that Defendants' No-Hire Agreements suppressed Plaintiffs' compensation sufficiently **pleaded** 'an injury of the type the antitrust laws were intended to prevent and that such injury flowed from Defendants' unlawful acts.'"  *Id.* at PageID 21454 (emphasis added).  This case is now well past the point of mere allegations sufficing.  Plaintiffs must be able to put forth **evidence** of each element of their claim to proceed to trial, and, as to antitrust injury, they do not do so.

[115] Showing harm using representative evidence for a class can be permissible, but only if each member of the class could rely upon that evidence to establish liability in an individual action.  *See In re Pre-filled Propane Tank Antitrust Litig.*, 2021 WL 5632089, at *6 (W.D. Mo. Nov. 9, 2021) (citing *Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016)).

[116] Johnson *Daubert* Mot. at PageID 15679 n.32 (not every putative class member would be undercompensated "precisely the same"); *see also* Transcript of October 22, 2021 Hearing, ECF No. 187 at PageID 19719 (101:11-14) (Dr. Johnson admitting that employees hired during the Class Period, unlike existing Molesworth employees, were free to negotiate their initial offers with more than one Defendant).

[117] Even if Dr. Johnson's opinions provided a viable method to measure undercompensation and, thus, injury to Named Plaintiffs, his opinions could not show that any such undercompensation was a "direct" or "proximate" result of the Challenged Conduct.  For example, 2018 was the first year that Booz Allen, CACI, and ME all teamed together, and Booz Allen manager Annette Redman testified that it was her practice to refrain from hiring teammates' employees, regardless of any agreement.  Defs.' Opp. To Pls.' Mot. for Class. Cert. Ex. 5, Transcript of Deposition of Annette Redman, ECF No. 113-3 at PageID 2901 (116:12-19).  In addition, in 2018 the government requested a downsizing of the overall workforce at Molesworth which resulted in the reduction of approximately 80 ME employees, including Named Plaintiffs.  *See* Defs.' MSJ at PageID 13611-12.  These are circumstances separate and apart from the Challenged Conduct that had unique impacts on mobility and compensation in 2018 that Plaintiffs and Dr. Johnson do not account for, and therefore prevent them from showing causation.  *Cf.* Defs.' MSJ at PageID 13644-45.

### B. Plaintiffs' Only Evidence of Harm to Competition is Dr. Johnson's Flawed Analysis.

Plaintiffs attempt to avoid having to show evidence of harm to competition by arguing that it can be assumed from the mere existence of the Challenged Conduct.[118]  In essence, Plaintiffs argue, "we think Defendants did something bad, therefore it must have had an anticompetitive impact."  But anticompetitive effects cannot be assumed at Plaintiffs' say-so, especially in a case like this where the Challenged Conduct was ancillary to Defendants' legitimate and procompetitive IPAS teaming arrangement.[119]

Plaintiffs try to side-step the issue because the only "evidence" they have is Dr. Johnson's regression analysis, and this analysis is flawed and unreliable for the reasons described in Moving Defendants' pending *Daubert* motion to exclude the opinions and testimony of Dr. Johnson:

- Dr. Johnson's methods for measuring the effect of the Challenged Conduct and class-wide impact are incapable of doing so because they only measure average alleged firm-wide undercompensation and posit that on average an employee's salary is correlated to firm-wide salary changes;[120]

- Dr. Johnson's statistical models have not been reliably applied.  They are driven by a benchmark to salaries from Washington, D.C. that did not trend in a similar direction to salaries at *Molesworth* during the "clean" period, and he excludes known allowances (an admittedly material component of compensation) from his analysis;[121] and

---

[118] *See, e.g.*, Pls.' Opp. to Defs.' MSJ at PageID 21456-59 (claiming "[t]here is little doubt that the agreements at issue here caused anticompetitive effects," but citing to economic theory rather than the facts of this case in support), 21478-79.

[119] *See supra* Section II.  Further, the cases and guidance Plaintiffs cite to support their argument deal with "naked" non-solicitation agreements which have been found to be anticompetitive and subject to *per se*, not rule of reason, treatment.  *See* Pls.' Opp. to Defs.' MSJ at PageID 21456-57.  Aside from being decided under the inapplicable *per se* standard, each of the cases that Plaintiffs cite are also readily distinguishable.  *See* Defs.' Opp. To Pls.' MSJ at PageID 20403-04 n.5 (distinguishing the *High Tech.*, *Animation Workers*, *Blanton*, and *Radovich* opinions).  These cases simply cannot be used as support for Plaintiffs' makeshift argument that the Challenged Conduct is "inherently anticompetitive."

[120] *See* Johnson *Daubert* Mot. at PageID 15677-88; *see also Pre-filled Propane*, 2021 WL 5632089, at *8-9.

[121] *See* Johnson *Daubert* Mot. at PageID 15688-98.

- Dr. Johnson's undercompensation and damages conclusions are based only on salary data from a small subset of employees, and damages for 2019, 2020, and 2021 are unreliably extrapolated based on alleged undercompensation from only 2018.[122]

Accordingly, neither Dr. Johnson, nor any other evidence in the record, provides sufficient evidence to create a triable issue as to harm to competition.

### C. Plaintiffs' Economic Theories Do Not Align with the Record.

Finally, Plaintiffs and Dr. Johnson rely heavily on economic theory to support their argument that the Challenged Conduct reduced putative class members' ability to switch firms and obtain higher pay.[123] Plaintiffs also claim that economic theory teaches that the Challenged Conduct was inefficient because it prevented Defendants from staffing employees in the jobs that best fit their skills.[124] But these theoretical arguments are at direct odds with the undisputed record in this case, which unequivocally establishes that: (1) the geographic scope of any market was much larger than Molesworth, (2) hiring among Defendants and the way compensation was set largely remained unchanged after the Challenged Conduct, and (3) the Challenged Conduct was intended to improve quality, not reduce it. In fact, the only inference that reasonably can be drawn from these facts is that the conditions necessary for Plaintiffs' theory of harm to manifest itself did *not* exist and, thus, there can be *no* finding of any harm to competition.

*Plaintiffs' Theoretical Antitrust Harm is Based on An Improperly Defined Market of U.S. Intelligence Analysts at Molesworth.* Plaintiffs have not properly defined a relevant market for the reasons explained above and in Moving Defendants' opening brief.[125] The same problems that undercut Plaintiffs' market definition are also fatal to their theory of competitive harm.

---

[122] *See id.* at PageID 15698-03; *see also Pre-filled Propane*, 2021 WL 5632089, at *6, *11-13.

[123] *See e.g.*, Pls.' Opp. to Defs.' MSJ at PageID 21457-59; Defs.' MSJ at PageID 13648.

[124] Pls.' Opp. to Defs.' MSJ at PageID 21459-60.

[125] *See supra* Section III; Defs.' MSJ at PageID 13628-43.

For example, a necessary condition to Plaintiffs' theory of reduced mobility is that "[t]here were no other important market participants or other companies that were relevant competitors as buyers of labor that would have provided workers with attractive outside opportunities."[126] But the undisputed facts show that putative class members were part of a highly-mobile workforce (with specialized and diverse skills) that was never constrained to the job opportunities available at Molesworth.[127] Likewise, Plaintiffs claim that "poaching is an important source of information about the market value of workers' labor" because "workers learn . . . important information about what employers are willing to pay for their services within the market."[128] This is entirely theoretical. Plaintiffs have not pointed to any evidence showing that employees at Molesworth actually were gathering information about their market value prior to the Challenged Conduct, which then was suddenly foreclosed during the Class Period (especially when only 3% of Molesworth employees switched between Defendants).[129] The undisputed record also shows that Named Plaintiffs continued to apply for jobs during the Class Period despite the Challenged Conduct,[130] making them privy to robust information about their market value.

**Plaintiffs' Theory is at Odds with Actual Employee Movements and How Compensation is Set.** Plaintiffs also claim that the Challenged Conduct caused anticompetitive harm because it prevented putative class members from being able to switch to higher paying jobs or to receive

---

[126] Pls.' Opp. to Defs.' MSJ at PageID 21456.

[127] *See* Defs.' MSJ at PageID 13630-32 (noting that between 12 and 33% of Defendants' employees at Molesworth left Molesworth *every year* from 2014-2018).

[128] Pls.' Opp. to Defs.' MSJ at PageID 21458.

[129] McCrary Merits Reply Rpt. at PageID 13952 (¶ 28). This is not surprising, as Plaintiffs time and again try to fill the gaps in their evidentiary record with facts from *other antitrust cases* that are inapposite. *See, e.g.*, Pls.' Opp. to Defs.' MSJ at PageID 21459 (citing to Google raising employees' salaries due to industry poaching).

[130] *See* Defs.' MSJ at PageID 13614-15.

raises from their employers to keep them from leaving.[131] Again, the record evidence is flatly to the contrary. As an initial matter, employee switches between Defendants in the period *after* the Challenged Conduct allegedly began were consistent with switches *before* the Challenged Conduct.[132] Therefore, no matter how many out-of-context emails Plaintiffs cite, the record does not support a conclusion that the Challenged Conduct led to any material change in actual hiring decisions. Not only did the number of switches remain largely consistent, but in many cases, there are reasons completely separate from the Challenged Conduct for putative class member's inability to switch firms.[133] Therefore, at most the Challenged Conduct may have prevented less than a handful of people from switching jobs—this is woefully short of the evidence needed to establish the type of market-wide harm to the competitive process that Plaintiffs must have to survive summary judgment.

Further, Plaintiffs theorize that the Challenged Conduct "eliminate[d] upward pressure on compensation because employers do not have to raise compensation to ward off poaching," whereas "[i]n a normally-functioning competitive market, employers will frequently raise compensation for their workers across the board in order to prevent competitors from luring their employees away."[134] However, the undisputed record shows that Defendants did *not* implement any across-the-board retention raises before the Challenged Conduct began, even though at the

---

[131] *See* Pls.' Opp. to Defs.' MSJ at PageID 21457-59.

[132] Dr. Johnson examined Defendants' data from a six-year period leading up to and during the class period. Between 2013 and 2016 there were eight instances of employees switching between Defendants (an average of two switches per year). In the second half of 2017, *after* Dr. Johnson claims the Challenged Conduct began, there were three switches, and in 2018 there was one known switch. *See* Defs.' MSJ Ex. 17, Expert Report of Phillip Johnson, dated Dec. 18, 2020, ECF No. 175-4 ("Johnson Class Cert. Rpt.") at PageID 14120 (¶ 36) ("in May 2017, BAH began discussions with other companies related to becoming teammates for . . . IPAS . . . following those discussions the Defendants immediately altered their approach to hiring."), 14120 (Fig. 4).

[133] *See* Defs.' MSJ at PageID 13646 (addressing Plaintiffs' FRE 1006 summary purportedly showing the impact of the Challenged Conduct).

[134] Pls.' Opp. to Defs.' MSJ at PageID 21459.

time Defendants allegedly "poached" each other's employees on a regular basis.[135]  With evidence to the contrary from the "clean" period and no other evidence that Defendants would have considered across-the-board raises, Plaintiffs' purely theoretical argument about what might have happened falls flat.  Additionally, while Plaintiffs tout the importance of being able to negotiate salaries, they ignore *yet another* material, undisputed fact: most new hires came from outside Molesworth, and therefore, more than 100 putative class members were able to negotiate their starting salaries with any or all of the Defendants during the Class Period.[136]

***Plaintiffs' Theory that Defendants Intended to Foreclose Competition is Belied by the Undisputed Record.***  Plaintiffs claim that "Defendants entered into the No-Hire Agreements to prevent competition with respect to the government contracts," and they cite to a handful of documents that they claim show that Booz Allen teamed with CACI only to avoid competing with them for the IPAS task order.[137]  Moving Defendants certainly deny that this was the case but, regardless, it is a red herring.  Plaintiffs' argument is essentially that the IPAS *teaming agreements* removed a potential competitor for the IPAS bid.  This contention, on its face, says nothing about the Challenged Conduct, alleged harm to employees, or any other aspect of Plaintiffs' claims in this action.  The record also conclusively shows that the purpose of the Challenged Conduct was

---

[135] *See* Pls.' Opp. to Defs.' MSJ at PageID 21460-61 (describing ME's "exasperation and fear regarding BAH's poaching" prior to the Challenged Conduct); Defs.' MSJ Ex. 79, Transcript of Deposition of Dr. Phillip Johnson, dated Feb. 18, 2021, ECF No. 175-9 at PageID 15083-84 (118:15-119:19) (Dr. Johnson admitting that he had not seen evidence of preemptory raises in this case during the "clean" period); Johnson (Aug. 2021) Tr. at PageID 15112-13 (480:9-481:8) (testifying "I haven't seen that kind of pay raise to have to deter competition or deal with the – the greater level of competitiveness – competitiveness in this – in this case").

[136] *See* Johnson Class Cert. Rpt. at PageID 14119 (Fig. 3) (showing 104 employees hired in 2018 and 2019); Johnson (Aug. 2021) Tr. at PageID 15103 (417:4-21) (Plaintiffs' expert testifying that the Defendants had the ability to simultaneously pursue a new hire).

[137] Pls.' Opp. to Defs.' MSJ at PageID 21460.

to promote the procompetitive teaming structure, and not, as Plaintiffs claim, to foreclose competition. *See* Defs.' MSJ at PageID 13625.

**The Challenged Conduct Improved Quality by Supporting the Efficient Allocation of Resources.** Plaintiffs assume that the Challenged Conduct led to "a lower quality product" for the government client because Defendants' employees could not "seek the best opportunities for their talents and skill sets," thus causing competitive harm.[138] This argument is at odds with the undisputed record, which shows that the Challenged Conduct was intended to facilitate the efficient allocation of Defendants' workforce under the IPAS teaming arrangement. *See supra* Section II.A. By efficiently staffing positions on a teamwide basis, rather than simply doing a "chair shuffle" for the short-term benefit of one Defendant, Defendants were able to ensure more consistent and effective service to the government.[139] Moreover, Defendants still hired each other's employees during the Class Period when it made sense to do so from a teaming perspective, as evidenced by Dr. Johnson's own analysis.[140] Finally, not all employees who sought to switch companies would be changing to positions that required different skill sets, and thus they would not be underutilized. For example, in the oft-cited email in which Tom Morlan discusses whether ██████████ could be hired by CACI, he specifically says that "her and Rob do the same

---

[138] *Id.* at PageID 21459-60.

[139] *See* Yukins Class Cert. Rpt. at PageID 13752, 13755, 13757-58, 13759-60 (¶¶ 14(b), 16, 18(b), 18(f)); *see also* Yukins Merits Rpt. at PageID 14325, 14327, 14328, 14330, 14331 (¶¶ 18, 21, 23, 24(e), 25). Although Plaintiffs try to paint Tom Morlan and Garrick Thomas's reasoning about why it did not make sense for Defendants to hire from each other as a reason that "poaching did not imperil their mission to the government," they miss the point. *See* Pls.' Opp. to Defs.' MSJ at PageID 21450. The fact that Defendants hiring from each other has "no net effect" means that the position will simply be open longer before it is filled, and there will be an unnecessary administrative burden in transitioning the employee from one company within the team to the other.

[140] *See* Johnson Class Cert. Rpt. at PageID 14120 (¶36, Fig. 4) (showing four employees switching between ME and Booz Allen in 2017 and 2018 after Dr. Johnson claims that the Challenged Conduct went into effect).

job."[141]  Thus, ███ was not prevented from "finding the best fit for [her] skills and talents," and the government received the same quality work product it would have otherwise.

The record therefore conclusively rebuts, rather than supports, Plaintiffs' argument that the Challenged Conduct led to lower quality output.

## V.        PLAINTIFFS FAIL TO ESTABLISH A TRIABLE ISSUE AS TO DAMAGES.

Plaintiffs do not meaningfully address Moving Defendants' argument that even if Plaintiffs could show harm they have no factual basis to support their damages.[142]  All they can muster is a conclusory footnote that "there are disputed questions of fact" making summary judgment improper and "the damages are more than sufficient to satisfy the requirements for proving damages in an antitrust case."[143]

But it is undisputed that Dr. Johnson purports to calculate damages: (1) for almost four years based on data from one highly disruptive, unique year (2018); (2) based on data for only a fraction of the putative class; (3) based on an unsupported assumption that those employees working in 2019 continued working through 2021; and (4) based on another unsupported assumption that the same employees continued working through 2021 with their salary from 2019.[144]  As previously described, damages calculated in this way are completely speculative.[145]  Plaintiffs' citation to *Bigelow* does not help them—Plaintiffs in an antitrust case may not be able

---

[141] Pls.' Opp. to Defs.' MSJ at PageID 21450.

[142] *See* Defs.' MSJ at PageID 13651-52 (Section IV).

[143] *See* Pls.' Opp. to Defs.' MSJ at PageID 21439 n.37 (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 579-580 (1946)).

[144] Defs.' MSJ Ex. 8, Expert Report of Phillip Johnson, dated June 3, 2021, ECF No. 175-3 at PageID 13924-25 (¶¶ 108-109); *see also* Johnson *Daubert* Mot. at PageID 15698-703.

[145] *See* Defs.' MSJ at PageID 13651-52; *cf. Pre-filled Propane*, 2021 WL 5632089, at *12-13 (finding it to be an "inferential leap" to find that "all of AmeriGas's and Ferrellgas's thousands of retailers similarly passed on an overcharge, and at the same rate" based on "a study of sales to only three retailers that ends three years before the end of the class period").

to calculate *exactly* what would have happened in the "but-for" world because the but-for world did not happen, but that does not mean that damages properly may be calculated "based on speculation or guesswork." *Bigelow*, 327 U.S. at 264. Dr. Johnson's calculations are just that. Accordingly, there is no genuine dispute that Plaintiffs cannot present sufficient evidence of damages, and summary judgment should be granted in Moving Defendants' favor on this basis alone.

## VI. PLAINTIFFS' ADMISSIBILITY OBJECTIONS ARE PREMATURE AND LACK SUFFICIENT SPECIFICITY TO REQUIRE A RESPONSE.

Plaintiffs attach to their Opposition a chart that purports to raise admissibility objections to 97 unique exhibits attached to Moving Defendants' Motion for Summary Judgment and *Daubert* motions.[146] These include all of Moving Defendants' expert reports attached to the motions; deposition transcripts (including the testimony of Named Plaintiffs' themselves); portions of Defendants' 30(b)(6) responses that explain Defendants' contracts; Defendants' teaming agreements with each other and other contractors; emails, letters, and other documents about Ms. Hunter and Mr. Youtz; as well as many emails, presentations, and other business documents of Defendants produced in discovery.

Moving Defendants appreciate that, as the proponents of this evidence, it is their burden to, in the face of a proper objection, "show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56 advisory committee's notes (2010 amendment). Further, Moving Defendants understand that they "will have the ability to address the opponent's objections, and the Rule allows the court to give the proponent 'an opportunity to properly support or address the fact' *if the court finds the objection meritorious*." *ForeWord*

---

[146] Pls.' Opp. to Defs.' MSJ Ex. 110, ECF No. 203-120 at PageID 23332-49.

*Mag., Inc. v. OverDrive, Inc*., 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (quoting FED. R. CIV. P. 56(e)(1) (emphasis added)).

Here, Plaintiffs have thrown evidentiary objections at the proverbial wall but have failed to raise *meritorious objections* in several respects. First, the question is not whether the evidence is admissible, as provided for purposes of the Motion, but "whether [the evidence] can be presented in a form that is admissible at trial." *Myers v. Am. Educ. Servs*., 2021 WL 859538, at *3 (S.D. Ohio Mar. 8, 2021). Plaintiffs do not explain why the information in the documents would be inadmissible at trial. For example, Plaintiffs object to the admission of Dr. McCrary's expert reports, but make no claim that he will be unable to testify to the underlying opinions. In the same vein, Plaintiffs object to the transcripts of Youtz and Hunter. While Moving Defendants agree that their deposition transcripts need not be admitted at trial, Moving Defendants have no doubt that one way or another—either live or by deposition designations—there will be trial testimony by the Named Plaintiffs. Similarly, Moving Defendants have no reason to believe that the substance of the evidence to which Plaintiffs object will not be submitted in an admissible form at trial, which is the standard the Court must apply in analyzing such objections.

Second, it would be unnecessarily burdensome, and frankly, premature, for Moving Defendants to go point-by-point on each piece of evidence cited to explain how it would be proffered at trial. Even if this Court were to find that exercise necessary at this point, the nature of Plaintiffs' generic and vague objections do not allow for a point-by-point analysis. Plaintiffs have failed to articulate the substance of their objections and the portions of each exhibit to which their objections apply. Moving Defendants, therefore, have no way of meaningfully responding to each objection without speculating as to what Plaintiffs' issues are with each citation.

Finally, and perhaps most importantly, Plaintiffs have not identified any evidence that, if excluded pursuant to Plaintiffs' objections, would create a disputed, material issue of fact where one would otherwise not exist or that would alter the summary judgment decision in this case. If Plaintiffs were to identify any such evidence, Moving Defendants would ask for an opportunity to respond to a meritorious objection. However, Defendants do not believe it serves the Court or the spirit of the rules to respond to Plaintiffs' objections on what amounts to 97 premature motions *in limine*.

## **CONCLUSION**

For the foregoing reasons, Moving Defendants respectfully request that their Motion for Summary Judgment be granted.

Respectfully submitted,

/s/ William G. Porter                          /s/ Robert F. Ware
William G. Porter (0017296), Trial Attorney    Robert F. Ware (0055515), Trial Attorney
Kimberly Weber Herlihy (0068668)               Rob.Ware@ThompsonHine.com
Kara M. Mundy (0091146)                        Mark R. Butscha, Jr. (0088854)
VORYS, SATER, SEYMOUR AND                      Mark.Butscha@ThompsonHine.com
PEASE LLP                                      Caitlin R. Thomas (0093857)
52 East Gay Street, P.O. Box 1008              Caitlin.Thomas@ThompsonHine.com
Columbus, Ohio 43216-1008                      THOMPSON HINE LLP
Tel:    (614) 464-6400                         3900 Key Center
Fax:    (614) 464-6350                         127 Public Square
Email: wgporter@vorys.com                      Cleveland, Ohio 44114
        kwherlihy@vorys.com                    Telephone: (216) 566-5500
        kmmundy@vorys.com                      Fax: (216) 566-5800

David A. Higbee *(Pro Hac Vice)*               Anthony C. White (0062146)
Todd M. Stenerson *(Pro Hac Vice)*             Anthony.White@ThompsonHine.com
Adam B. Schwartz *(Pro Hac Vice)*              THOMPSON HINE LLP
SHEARMAN & STERLING LLP                        41 South High Street, Suite 1700
401 9th Street, NW, Suite 800                  Columbus, Ohio 43215-6101
Washington, DC 20004-2128                      Telephone: (614) 469-3235
Tel:    (202) 508-8000                         Fax: (614) 469-3361
Fax:    (202) 508-8100
Email: david.higbee@shearman.com               ***Attorneys for Defendant***
        todd.stenerson@shearman.com            ***Mission Essential Personnel, LLC***
        adam.schwartz@shearman.com

Rachel E. Mossman *(Pro Hac Vice)*
SHEARMAN & STERLING LLP
2828 North Harwood Street, 18th Floor
Dallas, TX 75201
Tel:    (214) 271-5777
Email: rachel.mossman@shearman.com

***Attorneys for Defendant***
***Booz Allen Hamilton Inc.***

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was filed electronically with the Court this 21st day of January.

Service will be made by the Court's electronic notification system, and all parties may access

this filing through the Court's system.

*/s/ Kimberly Weber Herlihy*
Kimberly Weber Herlihy (0068668)